# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

GENEVA HENDERSON, HELEN
DULOCK, RENA GUZMAN,
JACQUELINE GOLDBERG, CONNIE
CORPENING, JOANNE RACKSTRAW,
JOANN D. WRIGHT, DEON M.
MOORE, CYNTHIA T. JAMES,
HUBERTA W. WALLER,
JACQUELINE BLACKWELL, AND
KATHRYN T. PRESLEY, individually
and as representatives of a class of
participants and beneficiaries on behalf
of the Emory University Retirement
Plan and the Emory Healthcare, Inc.
Retirement Savings and Matching Plan,

　　　　　　　　*Plaintiffs*,

　v.

EMORY UNIVERSITY, EMORY
HEALTHCARE, INC., EMORY
PENSION BOARD, EMORY
INVESTMENT MANAGEMENT, AND
MARY L. CAHILL,

　　　　　　　　*Defendants*.

Civil Action No.

COMPLAINT—CLASS ACTION

JURY TRIAL DEMANDED

　　1.　　Plaintiffs Geneva Henderson, Helen Dulock, Rena Guzman,

Jacqueline Goldberg, Connie Corpening, Joanne Rackstraw, Joann D.

Wright, Deon M. Moore, Cynthia T. James, Huberta W. Waller, Jacqueline

Blackwell, and Kathryn T. Presley, individually and as representatives of a class of participants and beneficiaries in the Emory University Retirement Plan and the Emory Healthcare, Inc. Retirement Savings and Matching Plan ("Plans") bring this action under 29 U.S.C. §1132(a)(2) and (3) on behalf of the Plans[1] against Defendants Emory University, Emory Healthcare, Inc., Emory Pension Board, Emory Investment Management, and Mary L. Cahill for breach of fiduciary duties under ERISA.[2]

2.     The duties of loyalty and prudence are the "highest known to the law" and require fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth,* 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982).  As fiduciaries to the Plans, Defendants are obligated to act for the exclusive benefit of participants and beneficiaries and to ensure that Plan expenses are reasonable and the Plans' investments are prudent. The marketplace for retirement plan services is established and competitive. Billion dollar defined contribution plans, like the Plans, have significant bargaining power to demand low-cost administrative and investment management services. Instead of using the Plans' bargaining power to benefit

---

[1] When applicable, the Emory University Retirement Plan is referred to as the "Retirement Plan" and the Emory Healthcare, Inc. Retirement Savings and Matching Plan is referred to as the "Healthcare Plan".

[2] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.

participants and beneficiaries, Defendants allowed unreasonable expenses to be charged to participants for administration of the Plans, and retained high-cost and poor-performing investments compared to available alternatives.

3.     To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plans, bring this action on behalf of the Plans under 29 U.S.C. §1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plans all losses resulting from each breach of fiduciary duty. In addition, Plaintiffs seek such other equitable or remedial relief for the Plans as the Court may deem appropriate.

## JURISDICTION AND VENUE

4.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

5.     This District and Division are the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district and division in which the subject Plans are administered, where at least one of the alleged breaches took place, and where all defendants reside.

## PARTIES

### The Emory University Retirement Plan and the Emory Healthcare, Inc. Retirement Savings and Matching Plan

6.     The Plans are defined contribution, individual account, employee pension benefit plans under 29 U.S.C. §1002(2)(A) and §1002(34).

7.     The Plans are established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1).

8.     The Plans provide for retirement income for employees of Emory University, Emory Healthcare, Inc., Emory-Children's Center, Inc. (fka Emory Children's Center, Inc.), Wesley Woods Center of Emory University, Inc., and Emory Specialty Associations, LLC, each of which have adopted the Plans with the consent of Emory University or Emory Healthcare, Inc. That retirement income depends upon contributions made on behalf of each employee by his or her employer, deferrals of employee compensation and employer matching contributions, and from the performance of investment options net of fees and expenses.

9.     As of December 31, 2014, the Retirement Plan had $2.6 billion in net assets and had 20,261 participants with account balances. As of December 31, 2014, the Healthcare Plan had $1.06 billion in net assets and had 21,536 participants with account balances. As such, these plans are

among the largest defined contribution plans in the United States, ranking in the top 1% of all defined contribution plans based on total plan assets that filed a Form 5500 with the Department of Labor. Plans of such great size are commonly referred to as "jumbo plans".

## Plaintiffs

10.    Geneva Henderson resides in Atlanta, Georgia, and is a "participant" in both the Retirement Plan and Healthcare Plan under 29 U.S.C. §1002(7) and Retirement Plan §3.27 because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

11.    Helen Dulock resides in Atlanta, Georgia, and is a participant in the Retirement Plan under 29 U.S.C. §1002(7) and Retirement Plan §3.27 because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

12.    Rena Guzman resides in Atlanta, Georgia, and is a participant in the Retirement Plan under 29 U.S.C. §1002(7) and Retirement Plan §3.27 because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

13.    Jacqueline Goldberg resides in Atlanta, Georgia, and is a participant in the Retirement Plan under 29 U.S.C. §1002(7) and Retirement

Plan §3.27 because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

14.     Connie Corpening resides in Woodstock, Georgia, and is a participant in the Retirement Plan under 29 U.S.C. §1002(7) and Retirement Plan §3.27 because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

15.     Joanne Rackstraw resides in Stonebridge, Georgia, and is a participant in the Retirement Plan under 29 U.S.C. §1002(7) and Retirement Plan §3.27 because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

16.     Joann D. Wright resides in Decatur, Georgia, and is a participant in the Healthcare Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

17.     Deon M. Moore resides in Stone Mountain, Georgia, and is a participant in the Healthcare Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

18.     Cynthia T. James resides in Lithonia, Georgia, and is a participant in the Healthcare Plan under 29 U.S.C. §1002(7) because she and

her beneficiaries are or may become eligible to receive benefits under the Plan.

19.    Huberta W. Waller resides in Stockbridge, Georgia, and is a participant in the Healthcare Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

20.    Jacqueline Blackwell resides in Stone Mountain, Georgia, and is a participant in the Healthcare Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

21.    Kathryn T. Presley resides in Cumming, Georgia, and is a participant in the Healthcare Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

## Defendants

22.    Emory University is a non-profit corporation organized under Georgia law with its principal place of business in Atlanta, Georgia. Section 12.1 of the Retirement Plan names Emory University as the fiduciary responsible for the control, management and administration of the Retirement Plan, in accordance with 29 U.S.C. §1102(a). Emory University is

the Plan Administrator of the Retirement Plan under Retirement Plan §12.2
and 29 U.S.C. §1002(16)(A)(i) with exclusive responsibility and complete
discretionary authority to control the operation, management and
administration of the Retirement Plan, with all powers necessary to enable it
to properly carry out such responsibilities, including the selection and
compensation of the providers of administrative services to the Retirement
Plan and the selection, monitoring, and removal of the investment options
made available to participants for the investment of their contributions and
provision of their retirement income.

     23.    Emory Healthcare, Inc. (hereinafter Emory Healthcare) is a non-
profit corporation organized under Georgia law with its principal place of
business in Atlanta, Georgia. Upon information and belief, the Healthcare
Plan names Emory Healthcare as the fiduciary responsible for the control,
management and administration of the Healthcare Plan, in accordance with
29 U.S.C. §1102(a). Emory Healthcare is the Plan Administrator of the
Healthcare Plan under 29 U.S.C. §1002(16)(A)(i) with exclusive responsibility
and complete discretionary authority to control the operation, management
and administration of the Healthcare Plan, with all powers necessary to
enable it to properly carry out such responsibilities, including the selection
and compensation of the providers of administrative services to the

Healthcare Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

24.    Emory University acts through its Board of Trustees, which is authorized to designate a person or a committee to act on behalf of Emory University with respect to the Retirement Plan, who serve at the pleasure of the Board of Trustees. Emory University also acts through its officers.

25.    Emory Healthcare acts through its Board of Directors, which is authorized to designate a person or committee to act on behalf of Emory Healthcare with respect to the Healthcare Plan, who serve at the pleasure of the Board of Directors. Emory Healthcare also acts through its officers.

26.    The Emory University Board of Trustees has created and controls the membership of the Emory Pension Board, which provides fiduciary oversight and administration of the Plans and Emory University's other defined contribution and deferred compensation plans. The Emory Pension Board provides recommendations on Plan design and changes, reviews and approves the investment strategy and manager selection for the Plans, and monitors the performance of Plan investment options. The Finance Committee of the Board of Trustees of Emory University approves those

members that serve on the Emory Pension Board after providing notice and receiving input from the Emory Healthcare Board.

27.    Upon information and belief, the Emory Pension Board has delegated development of Plan investment strategy and investment policies, as well as the appointment of Plan investment managers, to the Emory University Investment Office, aka Emory Investment Management. Emory Investment Management supervises the management of the assets of the Plans, as well as other defined contribution, defined benefit, deferred compensation, and healthcare trust plans of Emory University and its affiliates. In addition, Emory Investment Management manages Emory University's endowment of more than $7 billion.

28.    Emory Investment Management is responsible for the investment of the assets of the Plans and Emory's other plans to the extent such investment management is not performed by external investment managers. As its investment philosophy, Emory Investment Management pursues value investments, because, as it says, "*price matters*."[3] As Emory Investment Management acknowledges, "Investments into Emory's long-term investment portfolio gain the benefit of professional investment management through a

---

[3] See Philosophy, EMORY INVESTMENT MANAGEMENT, available at http://www.investment.emory.edu/About_EIM/About_EIM_Philosophy.html (emphasis added).

cost effective, risk controlled, and highly diversified portfolio."[4] Emory Investment Management is required to monitor the Plans' investments' compliance with portfolio management guidelines on a monthly basis.

29.     Emory Investment Management is responsible for selecting, retaining, and terminating the external investment managers and investment vehicles for the Plans, monitoring those investments, and implementing and ensuring compliance with the investment policies established by the Investment Committee. Emory Investment Management has responsibility for establishing internal controls, policies, and procedures to govern due diligence, execution, administration and compliance relative to the overall investment of Plan investment options and to undertake ongoing monitoring of such investments.

30.     The Emory University Board of Trustees oversees Emory Investment Management. Through its Investment Committee, the Board of Trustees sets the investment policies for the Plans and sets the overall target asset allocation for Emory's endowment fund. The Investment Committee sets the Statement of Investment Objectives, Policies, and Guidelines (also known as an investment policy statement, or IPS) for the Plans and Emory

---

[4] See
http://www.investment.emory.edu/investment_management/index.html.

University's other plans, and is responsible for reviewing the IPS annually to assess its continued appropriateness, developing investment objectives, establishing investment performance and measurement standards and benchmarks, reviewing and evaluating investment results, and reviewing the reasonableness of Plan fees at least annually. The Investment Committee is responsible for reviewing Emory Investment Management's policies for investment selection, ongoing due diligence of Plan investments, and approving the retention and termination of service providers to the Plan.

31.     The investment objective for the Plans is to provide participants a selection of investment vehicles that will assist participants in achieving long-term retirement goals. To accomplish that objective, investment options provided in the Plans are supposed to be diversified by asset class and investment style to provide participants a reasonable opportunity to create a diversified portfolio. The IPS requires measurement of the performance of Plan investment options against benchmarks over rolling one-, three-, and five-year periods. It also requires that passive index funds be considered for efficient markets such as large capitalization equities, where the IPS recognizes the difficulty in obtaining performance above benchmarks. The IPS also requires consideration of fees and expense ratios when selecting Plan investment options.

32.   The members of the Emory Pension Board include the following officers of Emory University or Emory Healthcare, or their affiliates: Vice President for Investments and Chief Investment Officer, Emory University; Senior Director of Human Resources, Emory Healthcare; Director, the Emory Clinic; Chief Financial Officer, the Emory Clinic; Chief Financial Officer, Emory Healthcare; representative from the Office of the General Counsel, Emory University; Vice President for Human Resources, Emory University; and Vice President of Finance, Emory University.

33.   The Investment Committee of the Board of Trustees of Emory University provides general oversight of the investments of the Plans and establishes and maintains the IPS. The Investment Committee delegates to Emory Investment Management its responsibility for investment selection and implementation of investment policies for the Plans.

34.   Mary L. Cahill, the current Vice President of Investments and Chief Investment Officer of Emory University, is responsible for approving investment selections for the Plans as recommended by Emory Investment Management.

35.   Despite the apparent delegations to various departments within Emory University described above, Emory University informs participants in summary plan descriptions that it is the Plan Administrator and has

exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Retirement Plan with all powers necessary to enable it to properly carry out such responsibility and exercise such authority.

36.    Similarly, Emory Healthcare informs participants in summary plan descriptions that it is the Plan Administrator and has exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Healthcare Plan with all powers necessary to enable it to properly carry out such responsibility and exercise such authority.

37.    Because all of the Emory University or Emory Healthcare entities or committee members, including Ms. Cahill, described above have acted as alleged herein as the agents of Emory University or Emory Healthcare, all defendants are collectively referred to hereafter as Defendants.

## FACTS APPLICABLE TO ALL COUNTS

38.    In the Plans, Emory University or Emory Healthcare makes a non-elective contribution to individual participant accounts and provides eligible employees a cash or deferred arrangement in which employees can elect to have their employer contribute a portion of their compensation to

14

their individual accounts in the Plans and the employer will provide a matching contribution.

39.   All contributions to individual participant accounts are held in group custodial accounts that are selected and maintained by Emory University or Emory Healthcare. The Plans allow participants to designate investment options into which their individual accounts are invested. Emory University has and exercises exclusive and discretionary authority and control over the investment options that are included in the Retirement Plan, and Emory Healthcare has and exercises exclusive and discretionary authority and control over the investment options that are included in the Healthcare Plan.

40.   Defendants have included as Plan investment options over 100 different mutual funds or insurance company variable annuity products from Teachers Insurance and Annuity Association of America and College Retirement Equities Fund, the Vanguard Group, Inc., and Fidelity Investments.[5]

---

[5] Fidelity Management Trust Company and Fidelity Investments Institutional Operations Company are referred to collectively as "Fidelity", Teachers Insurance and Annuity Association of America and College Retirement Equities Fund are referred to collectively as "TIAA-CREF", and Vanguard Fiduciary Trust Company and the Vanguard Group, Inc. are referred to collectively as "Vanguard".

41.    The Plans' investment options were and are offered by three separate recordkeepers who provide custodial and recordkeeping services to the Plans. These recordkeepers are Fidelity, TIAA-CREF, and Vanguard.

42.    Defendants select investment options into which participants' investments are directed, including those investment options that have been removed from the Plans.

### I.    Plan investments

43.    The Retirement Plan and the Healthcare Plan offer the same investment options to participants based on Defendants' centralized management of Plan assets. As of December 31, 2014, Defendants included *111* investment options in the Plans, including 43 Fidelity options, 23 TIAA-CREF options, and 44 Vanguard options. These investments included mutual funds, an insurance separate account, variable annuity options, and a fixed annuity option. The mutual fund options included *retail* share class mutual funds, despite the jumbo size of the Plans. These retail share class mutual funds are designed for small individual investors and are identical in every respect to institutional share class funds, except for much higher fees.

44.    These investments are designated by Emory University or Emory Healthcare as available investment alternatives offered under the Plans.

16

45.     The TIAA Traditional Annuity offered in the Plans is a guaranteed fixed annuity contract that guarantees principal and a contractually specified minimum interest rate. Assets invested in the TIAA Traditional Annuity are held in the general account of Teachers Insurance and Annuity Association of America and are backed by the claims-paying ability of Teachers Insurance and Annuity Association of America.

46.     The TIAA Traditional Annuity has severe restrictions and penalties for withdrawal if participants wish to change their investments in the Plan. For example, some participants who invest in the TIAA Traditional Annuity may withdraw or change their investment in a single lump sum within 120 days of termination of employment, but, to do so, such participants must pay a 2.5% surrender charge. Rather than participants being able to withdraw or change their TIAA Traditional Annuity investments earlier, the only way participants can withdraw or change their investment is to spread withdrawal over a *ten-year period,* unless a substantial penalty is paid. Thus, participants who wish to withdraw their investment without penalty can only do so over ten years.

47.     The Plans also include the CREF Stock Account, CREF Global Equities Account, CREF Equity Index Account, CREF Growth Account, CREF Social Choice Account, CREF Money Market Account, and CREF Bond

Market Account, which are variable annuities that invest in underlying securities for a given mandate. The value of each participant's investment in the variable annuity will change over time based on the investment experience and expenses of the account.

48.    The expense ratio of the CREF variable annuity accounts is made up of multiple layers of fees called:

   a.  "administrative expense" charge (24 bps);[6]

   b.  "distribution expense" charge (9.5 bps);

   c.  "mortality and expense risk" charge (0.5 bps); and

   d.  "investment advisory expense" charge (ranging from 4 bps to 12.5 bps).

49.    The TIAA Real Estate Account is an insurance separate account maintained by TIAA-CREF. An insurance separate account is an investment vehicle that aggregates assets from more than one retirement plan for a given investment strategy, but those assets are segregated from the insurance company's general account assets. Similar to the CREF variable annuity accounts, the expense ratio of the TIAA Real Estate Account is

_____

   [6] One basis point is equal to 1/100th of one percent (0.01%). Expenses stated as of May 1, 2014.

separated into multiple layers of fees. As of May 1, 2013, these charges were called:

      a.  "administrative expense" charge (26.5 bps);

      b.  "distribution expense" charge (8 bps);

      c.  "mortality and expense risk" charge (0.5 bps);

      d.  "liquidity guarantee" (18 bps); and

      e.  "investment management expense" charge (36.5 bps).

50.    The remaining TIAA-CREF funds are registered investment companies under the Investment Company Act of 1940, known as mutual funds. The TIAA-CREF mutual funds charge varying amounts for investment management, distribution, marketing and other expenses, depending on the investment at issue and share class.

51.    The Fidelity and Vanguard investment options offered to Plan participants are exclusively mutual funds that charge varying amounts for investment management, distribution, marketing and other expenses, depending on the investment at issue and share class.

52.    Mutual funds have shareholders who are not participants in the Plans, or any retirement plan, and who purchase shares as a result of marketing the fund. However, all shareholders in mutual funds, including

participants in the Plans, pay all the mutual fund expenses set forth in ¶¶50–51.

53.    As of December 31, 2014, of the Retirement Plan's $2.6 billion in net assets, TIAA-CREF investments accounted for approximately $1.4 billion, Vanguard $687 million, and Fidelity $549 million. As of the same date, of the Healthcare Plan's $1.05 billion in net assets, TIAA-CREF investments accounted for approximately $470 million, Vanguard $296 million, and Fidelity $284 million.

## II.    Defendants' actions caused Plan participants to pay excessive administrative and recordkeeping fees in violation of ERISA's requirement that fees be reasonable.

54.    Recordkeeping is a service necessary for every defined contribution plan. The market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to large defined contribution plans like the Plans. These recordkeepers primarily differentiate themselves based on price and vigorously compete for business by offering the best price.

55.    To ensure that plan administrative and recordkeeping expenses are and remain reasonable for the services provided, prudent fiduciaries of large defined contribution plans put the plan's recordkeeping and

20

administrative services out for competitive bidding at regular intervals of approximately three years.

56.     The cost of recordkeeping services depends on the number of participants, not on the amount of assets in the participant's account. Thus, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account. For this reason, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees on the basis of a fixed dollar amount for each participant in the plan rather than as a percentage of plan assets. Otherwise, as plan assets increase through participant contributions or investment gains, the recordkeeping compensation increases without any change in the recordkeeping and administrative services.

57.     Jumbo defined contribution plans, like the Plans, possess massive economies of scale for recordkeeping and administrative services. As the number of participants in the plan increases, the per-participant fee charged for recordkeeping and administrative services declines. These lower administrative expenses are readily available for plans with a greater number of participants, such as the Plans.

58.     The fee schedule attached to the Fidelity recordkeeping agreement for the Retirement Plan amended October 31, 1995 further

21

illustrates how these economies of scale reduce recordkeeping and
administrative fees as plan assets increase.

| Plan Asset Range | Fee Per Participant |
|---|---|
| $0 to $10 million | $12.00 |
| $10 million to $25 million | $8.00 |
| $25 million to $50 million | $4.00 |
| in excess of $50 million | None |

59.    Some investments engage in a practice known as revenue
sharing. In a revenue sharing arrangement, a mutual fund or other
investment vehicle directs a portion of the asset-based expense ratio it
charges to investors to the plan's recordkeeper putatively for providing
recordkeeping and administrative services for the investment. Because
revenue sharing arrangements provide asset-based fees, prudent fiduciaries,
if they use asset-based fees to pay for recordkeeping services, monitor the
total amount of revenue sharing a recordkeeper receives to ensure that the
recordkeeper is not receiving unreasonable compensation. A prudent
fiduciary must ensure that the recordkeeper rebates to the plan all revenue
sharing payments that exceed a reasonable, negotiated recordkeeping fee.
Because revenue sharing payments are asset-based, they often bear no
relation to a reasonable recordkeeping fee and can provide excessive

compensation, or may be used as kickbacks to induce recordkeepers to have their high priced mutual funds included as plan investment options.

60.     Prudent fiduciaries of similarly sized defined contribution plans use a single recordkeeper rather than hiring multiple recordkeepers and custodians or trustees. This leverages plan assets to ensure that plan participants pay only reasonable recordkeeping fees, while also simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when one or more recordkeepers are used.

61.     According to a 2013 survey of 403(b) plans, over 90% of plans use a single recordkeeper to provide administrative and recordkeeping services to participants. See LIMRA Retirement Research, *403(b) Plan Sponsor Research* (2013).[7]

62.     It is well known in the defined contribution industry that plans with dozens of choices and multiple recordkeepers "fail"  based on two primary flaws:

**1. The choices are overwhelming**. Numerous studies have demonstrated that when people are given too many choices of anything, they lose confidence or make no decision.

---

[7] Available at http://www.limra.com/uploadedFiles/limracom/LIMRA_Root/Secure_Retirement_Institute/News_Center/Reports/130329-01exec.pdf.

> **2. The multi-recordkeeper platform is inefficient**. It does not allow sponsors to leverage total plan assets and receive appropriate pricing based on aggregate assets.

The Standard Retirement Services, Inc., *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 (Nov. 2009)(emphasis in original).[8]

63.     The benefits of a single recordkeeper are clear.

> By selecting a single recordkeeper, plan sponsors can enhance their purchasing power and negotiate lower, transparent investment fees for participants. Participants will benefit from a more manageable number of institutional-quality investment options to choose from. Participants will also benefit from customized and consistent enrollment, education and ongoing communication materials.[9]

64.     In a study titled "How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It", AonHewitt, an independent investment consultant, similarly recognized:

> 403(b) plan sponsors can dramatically reduce participant-borne costs while improving employees' retirement readiness by:
>
> > – Reducing the number of investment options, utilizing an "open architecture" investment menu, and packaging the options within a "tiered" structure.
> >
> > – Consolidating recordkeepers to improve efficiencies and reduce compliance-related risks.

---

[8] Available at https://www.standard.com/pensions/publications/14883_1109.pdf.

[9] *Id.*

– Leveraging aggregate plan size and scale to negotiate competitive pricing.[10]

65.     Another independent investment consultant, Towers Watson, also recognized that using multiple recordkeepers has caused:

> high investment and administrative costs, and complex choices for plan participants in terms of the number of vendors and the array of investment options. Additionally, this complexity has made it difficult for employers to monitor available choices and provide ongoing oversight…Such designs typically are expensive and fail to leverage plan size. They can also be confusing to the average plan participant, who is likely to fall short of achieving retirement readiness and would benefit from more guidance.

Peter Grant and Gary Kilpatrick, *Higher Education's Response to a New Defined Contribution Environment*, TOWERS WATSON VIEWPOINTS, at 2 (2012).[11]

66.     Other industry literature makes the same points. See, e.g., Kristen Heinzinger, *Paring Down Providers: A 403(b) Sponsor's Experience,* PLANSPONSOR (Dec. 6, 2012)("One advantage of consolidating to a single provider was an overall drop in administrative fees and expenses.

---

[10] AonHewitt, *How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It* (Jan. 2016), available at https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-4bc0-aac1-1685d2a64078/How_403(b)_Plans_are_Wasting_Nearly_$10_Billion_Annually_Whitepaper_FINAL.pdf.aspx.

[11] Available at https://www.towerswatson.com/DownloadMedia.aspx?media=%7B08A2F366-14E3-4C52-BB78-8930F598FD26%7D.

Recordkeeping basis points returned to the plan sponsors rather than to the vendor. All plan money aggregated into a single platform, and participants were able to save on fee structure. This also eliminated the complications and confusion of having three different recordkeepers.");[12] Paul B. Lasiter, *Single Provider, Multiple Choices*, BUSINESS OFFICER (Mar. 2010)(identifying, among other things, the key disadvantages of maintaining a multi-provider platform including the fact that it is "cumbersome and costly to continue overseeing multiple vendors.").[13]

67.    Use of a single recordkeeper is also less confusing to participants and avoids excessive recordkeeping fees charged to the Plan. *Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29, 2010)(recognizing the following benefits, among others: "The plan participant experience is better" because "employees are benefiting from less confusion as a result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because "[w]ith a reduced number of vendors in the equation, plan

---

[12] Available at http://www.plansponsor.com/paring-down-providers-a-403b-sponsors-experience/?fullstory=true.

[13] Available at http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_Provider_Multiple_Choices.html.

sponsors are better able to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per-participant ratio").[14]

68.     Despite the long-recognized benefits of a single recordkeeper for a defined contribution plan, Defendants have continued to contract with *three* separate recordkeepers for the Plans: TIAA-CREF, Fidelity, and Vanguard. This inefficient and costly structure has caused Plan participants to pay excessive and unreasonable fees for Plan recordkeeping and administrative services.

69.     Mary L. Cahill, Emory's Vice President of Investments and Chief Investment Officer, who is responsible for approving Plan investment selections, has personal knowledge of retirement plan services provided to multi-billion dollar retirement plans. Before joining Emory, Ms. Cahill was Deputy Chief Investment Officer at Xerox Corporation where she was responsible for developing, recommending and implementing investment alternatives for Xerox's $12 billion in defined benefit and defined contribution plan assets. While she was responsible for investment management of the Xerox defined contribution plan, named the Xerox Corporation Savings Plan,

---

[14] Available at http://www.plansponsor.com/vendor-consolidation-in-higher-education/?fullstory=true.

Xerox only used a single recordkeeper to provide recordkeeping and administrative services to the plan.

70.     Moreover, the Emory Clinic, Inc. Retirement Savings Plan is a 403(b) plan with $310.4 million in assets and 2,231 participants with an account balance as of December 31, 2014. In contrast to the administration of the Plans, the Emory Clinic's 403(b) plan has a *single* recordkeeper (Fidelity), even though both Vanguard and Fidelity mutual fund options are included in that plan. Notably, no TIAA-CREF investments are offered. Despite the Emory Clinic's 403(b) plan having significantly less assets than the Plans, *that plan invested in lower-cost share classes than the Plans* for many of the same mutual fund options offered to participants. See infra ¶94.

71.     The Plans' recordkeepers receive compensation for providing recordkeeping services through per-participant fees and/or revenue sharing payments from the Plans' investments.

72.     Under the recordkeeping services agreement between TIAA-CREF and Emory University dated April 1, 2008, TIAA-CREF is compensated based on revenue sharing payments from mutual funds or annuity contracts. The agreement does not specify the negotiated fee between Emory University and TIAA-CREF for administrative services. Administrative fees and revenue sharing payments are also not listed on the

agreement's Schedule B, despite the requirement in the agreement that such information be provided. Upon information and belief, TIAA-CREF is compensated based on the same or substantially similar terms under the recordkeeping services agreement between TIAA-CREF and Emory Healthcare.

73.     Upon information and belief and industry experts, the amount of revenue sharing kicked back to the TIAA-CREF recordkeeping entity for the Plans' TIAA-CREF investments from the expense ratio paid by participants is set forth below.

| TIAA-CREF Investment | Revenue Share |
|---|---|
| CREF variable annuity contracts | 24 bps |
| Premier share class of TIAA-CREF mutual funds | 15 bps |
| Retirement share class of TIAA-CREF mutual funds | 25 bps |
| TIAA Real Estate Account | 24–26.5 bps |
| TIAA Traditional Annuity | 15 bps |

74.     Under the recordkeeping services agreement between Vanguard and Emory University dated January 1, 2010, Vanguard charges a per-participant fee deducted from participant accounts for recordkeeping and administrative services. However, Vanguard receives much more by receiving asset-based compensation through internal revenue sharing from the

Vanguard Investor share mutual funds, a higher priced share class than institutional rates readily available to the Plans. Upon information and belief, Vanguard is compensated based on the same or substantially similar terms under the recordkeeping services agreement between Vanguard and Emory Healthcare.

75.    Upon information and belief, prior to 2013, Fidelity assessed a per-participant fee deducted from participant accounts for recordkeeping and administrative services for the Retirement Plan. During 2013, Fidelity eliminated this per-participant fee. Upon information and belief, Fidelity is compensated based on the same or substantially similar terms under the recordkeeping services agreement between Fidelity and Emory Healthcare.

76.    Apart from the per-participant fee, Fidelity is compensated through internal revenue sharing payments from the Fidelity mutual fund options. Upon information and belief and industry experts, the amount of revenue sharing kicked back to Fidelity's recordkeeping arm from the expense ratio paid by participants is set forth below.

| Fidelity Mutual Fund | Revenue Share |
|---|---|
| Actively managed equity mutual funds | 35 bps |
| Fidelity Freedom Funds | 35 bps |
| Actively managed K share equity mutual funds | 20 bps |

| Fidelity Mutual Fund | Revenue Share |
|---|---|
| Fidelity Freedom K share funds | 20 bps |
| Actively managed fixed income and money market mutual funds | 20 bps |

77.     In addition, the Plans' recordkeepers receive additional indirect compensation, including float, revenue derived from securities lending, distribution fees, mortality and expense charges, surrender charges, spread, and redemption fees.

78.     Based on the Plans' features, the nature of the administrative services provided by the Plans' recordkeepers, the Plans' combined participant level (roughly 40,000), and the recordkeeping market, the outside limit of a reasonable recordkeeping fee for the Plans would have approximated a fixed $1.25 million in the aggregate for both Plans combined (or $30 per participant with an account balance). Even if Defendants had negotiated a reasonable recordkeeping fee for the Retirement Plan and Healthcare Plan separately, the Plans would have paid dramatically less for recordkeeping services.

79.     The Retirement Plan's Form 5500 filed with the Department of Labor reported that TIAA-CREF *alone*—as one of three recordkeepers—received $5.69 million in recordkeeping compensation for 2011, which equals $372 per participant with an account balance. In 2012, TIAA-CREF received

$6.16 million, or $583 per participant. In 2011 and 2012 alone, the Plan's fiduciaries caused the Retirement Plan to pay well over 1140% and 1843% more than what was a reasonable fee for recordkeeping services. These reported expenses are understatements of the Retirement Plan's total recordkeeping fees because they do not take into account the compensation received by Vanguard and Fidelity for similar services. Therefore, the total per-participant fee is substantially higher when these additional sources of recordkeeping expenses from Vanguard and Fidelity are included.

80.     Overall, based on the direct and indirect compensation levels shown on the Plan's Form 5500s filed with the Department of Labor, and on the internal revenue share allocated to Vanguard, TIAA-CREF, and Fidelity for recordkeeping services, the Retirement Plan paid between $2 million and $6.6 million (up to approximately $594 per participant) per year from 2010 to 2014. The Healthcare Plan paid between $1.1 and $1.5 million (up to approximately $119 per participant) per year from 2010 to 2014. The Plans therefore paid millions of dollars in excessive recordkeeping fees.[15]

---

[15] The recordkeeping fees paid by the Plans are based on information presently known to Plaintiffs and reported by Emory University and Emory Healthcare. However, Emory University has failed to maintain sufficient account records. For instance, Emory University reported in the Retirement Plan's Form 5500 for 2010 that "*the Plan has not maintained sufficient accounting records and supporting documents relating to the Plan's beginning*

81.    The impact of excessive fees on employees' and retirees'
retirement assets is dramatic. The U.S. Department of Labor has noted that
a 1% higher level of fees over a 35-year period makes a 28% difference in
retirement assets at the end of a participant's career. U.S. Dep't of Labor, *A
Look at 401(k) Plan Fees,* at 1–2 (Aug. 2013).[16]

82.    Defendants failed to prudently monitor and control the
compensation paid for recordkeeping and administrative services,
particularly the asset-based revenue sharing received by TIAA-CREF,
Fidelity, and Vanguard and therefore caused the Plans to pay unreasonable
recordkeeping fees. This can be further seen by the tremendous growth in the
assets of the Plans. From the beginning of 2009 to the end of 2014, the Plans'
assets increased from $2.3 to $3.7 billion, an increase of *61 percent*.
Defendants allowed participants to be charged asset-based fees for
recordkeeping, instead of flat per-participant rates. Because revenue sharing
payments are asset-based, the already excessive compensation paid to the
Plans' recordkeepers became even more excessive as the Plans' assets grew,
even though the administrative services provided to the Plans remained the

---

*balance at January 1, 2009 which in turn affects the Plan's beginning balance
at January 1, 2010.*" 2010 Emory University Retirement Plan Form 5500,
Notes to Fin. Stmts, at 1 (emphasis added).
    [16] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

same. Defendants could have capped the amount of revenue sharing to ensure that any excessive amounts were returned to the Plans, but failed to do so.

83. Further, upon information and belief, Defendants have failed to put the Plans recordkeeping services out for competitive bidding. A competitive bidding process for the Plans' recordkeeping services would have determined a reasonable recordkeeping fee for the Plans. As the fiduciaries to the Plans, Defendants have a duty to determine the market rate for Plan recordkeeping services and the amount of excess compensation paid to the recordkeepers. Without a competitive bidding process, Defendants would not obtain a market rate bid for recordkeeping and administrative services. This competitive bidding process would have thus enabled Defendants to obtain a reasonable fee for recordkeeping services.

84. Had Defendants monitored the compensation paid to the Plans' recordkeepers and ensured that participants were only charged reasonable fees for administrative and recordkeeping services, Plan participants would not have lost in excess of $30 million of their retirement savings through unreasonable recordkeeping fees.[17]

---

[17] Plan losses have been brought forward to the present value using the investment returns of the S&P 500 index to compensate participants who

III.    **Defendants failed to prudently consider or offer dramatically lower-cost investments that were available to the Plans, including identical mutual funds in lower-cost share classes.**

85.    Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 FIN. ANALYSTS J. 7, 8 (Jan./Feb. 1991);[18] Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1915 (2010)("After costs…in terms of net returns to investors, active investment must be a negative sum game.").

86.    To the extent managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Fama & French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, at 1931–34; see also Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. FIN. 1655, 1690 (2000)("on a net-

have not been reimbursed for their losses. This is because the excessive fees participants paid would have remained in Plan investments growing with the market.

[18] Available at http://www.cfapubs.org/doi/pdf/10.2469/faj.v47.n1.7.

return level, the funds underperform broad market indexes by one percent

per year").

87.    If an individual high-cost mutual fund exhibits market-beating

performance over a short period of time, studies demonstrate that

outperformance during a particular period is not predictive of whether a

mutual fund will perform well in the future. Laurent Barras et al., *False

Discoveries in Mutual Fund Performance: Measuring Luck in Estimated

Alphas*, 65 J. FIN. 179, 181 (2010); Mark M. Carhart, *On Persistence in

Mutual Fund Performance*, 52 J. FIN. 57, 57, 59 (1997)(measuring thirty-one

years of mutual fund returns and concluding that "persistent differences in

mutual fund expenses and transaction costs explain almost all of the

predictability in mutual fund returns"). However, the *worst-performing*

mutual funds show a strong, persistent tendency to continue their poor

performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

88.    Accordingly, investment costs are of paramount importance to

prudent investment selection, and a prudent fiduciary will not select higher-

cost actively managed funds without a documented process to realistically

conclude that the fund is likely to be that extremely rare exception, if one

even exists, that will outperform its benchmark index over time, net of

investment expenses.

89.    Moreover, jumbo retirement plans have massive bargaining power to negotiate low fees for investment management services.

> The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the 'prevailing circumstances'—such as the size of the plan—are a part of a prudent decisionmaking process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach.

Fred Reish, *Class–ifying Mutual Funds*, PLANSPONSOR (Jan. 2011).[19]

90.    Apart from the fact that a prudent fiduciary will carefully weigh whether an actively managed fund is likely to outperform an index over time, net of fees, academic and financial industry literature demonstrates that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2009); see also Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010)(summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

---

[19] Available at http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively mutual managed funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

91.     Lower-cost institutional share classes of mutual funds compared to retail shares are available to institutional investors, and far lower-cost share classes are available to jumbo investors like the Plan. In addition, insurance company pooled separate accounts are available that can significantly reduce investment fees charged on mutual fund investments to defined contribution plans.

92.     Despite these far lower-cost options, Defendants selected and continued to provide Plan investment options with far higher cost than were and are available for the Plans based on their size. For the *exact same mutual fund option*, Defendants provided higher-cost share classes of identical mutual funds than were available to the Plans.

93.     Minimum investment thresholds for institutional share classes are routinely waived by the investment provider if not reached by a single fund based on the retirement plan's total investment in the provider's platform. Therefore, it is commonly understood by investment managers of

large pools of assets that, for retirement plans of the Plans' size, if requested, the investment provider would make available lower-cost share classes for the Plans, if there were any fund that did not individually reach the threshold.

94.    Lower-cost share class *identical* alternatives to the Plans' mutual funds are set forth below:

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Fidelity Balanced (FBALX) | 61 bps | Fidelity Balanced K (FBAKX) | 47 bps | 29.79% |
| Fidelity Blue Chip Growth (FBGRX) | 93 bps | Fidelity Blue Chip Growth K (FBGKX) | 74 bps | 25.68% |
| Fidelity Capital Appreciation (FDCAX) | 86 bps | Fidelity Capital Appreciation K (FCAKX) | 68 bps | 26.47% |
| Fidelity Contrafund (FCNTX) | 91 bps | Fidelity Contrafund K (FCNKX) | 78 bps | 16.67% |
| Fidelity Disciplined Equity (FDEQX) | 68 bps | Fidelity Disciplined Equity K (FDEKX) | 51 bps | 33.33% |
| Fidelity Equity Income II (FEQTX) | 69 bps | Fidelity Equity Income II K (FETKX) | 54 bps | 27.78% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Fidelity Equity-Income (FEQIX) | 74 bps | Fidelity Equity-Income K (FEIKX) | 54 bps | 37.04% |
| Fidelity Freedom 2000 (FFFBX) | 51 bps | Fidelity Freedom 2000 K (FFKBX) | 43 bps | 18.60% |
| Fidelity Freedom 2005 (FFFVX) | 64 bps | Fidelity Freedom 2005 K (FFKVX) | 52 bps | 23.08% |
| Fidelity Freedom 2010 (FFFCX) | 67 bps | Fidelity Freedom 2010 K (FFKCX) | 53 bps | 26.42% |
| Fidelity Freedom 2015 (FFVFX) | 68 bps | Fidelity Freedom 2015 K (FKVFX) | 54 bps | 25.93% |
| Fidelity Freedom 2020 (FFFDX) | 74 bps | Fidelity Freedom 2020 K (FFKDX) | 57 bps | 29.82% |
| Fidelity Freedom 2025 (FFTWX) | 76 bps | Fidelity Freedom 2025 K (FKTWX) | 59 bps | 28.81% |
| Fidelity Freedom 2030 (FFFEX) | 79 bps | Fidelity Freedom 2030 K (FFKEX) | 61 bps | 29.51% |
| Fidelity Freedom 2035 (FFTHX) | 81 bps | Fidelity Freedom 2035 K (FKTHX) | 61 bps | 32.79% |
| Fidelity Freedom 2040 (FFFFX) | 81 bps | Fidelity Freedom 2040 K (FFKFX) | 62 bps | 30.65% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Fidelity Freedom 2045 (FFFGX) | 82 bps | Fidelity Freedom 2045 K (FFKGX) | 62 bps | 32.26% |
| Fidelity Freedom 2050 (FFFHX) | 84 bps | Fidelity Freedom 2050 K (FFKHX) | 63 bps | 33.33% |
| Fidelity Freedom Income (FFFAX) | 50 bps | Fidelity Freedom Income K (FFKAX) | 42 bps | 19.05% |
| Fidelity Fund (FFIDX) | 60 bps | Fidelity Fund K (FFDKX) | 43 bps | 39.53% |
| Fidelity Growth Company (FDGRX) | 89 bps | Fidelity Growth Company K (FGCKX) | 72 bps | 23.61% |
| Fidelity International Discovery (FIGRX) | 100 bps | Fidelity International Discovery K (FIDKX) | 79 bps | 26.58% |
| Fidelity Large Cap Growth (FSLGX) | 86 bps | Fidelity Large Cap Growth (Instl) (FLNOX) | 74 bps | 16.22% |
| Fidelity Low-Priced Stock (FLPSX) | 99 bps | Fidelity Low-Priced Stock K (FLPKX) | 85 bps | 16.47% |
| Fidelity Magellan (FMAGX) | 74 bps | Fidelity Magellan K (FMGKX) | 58 bps | 27.59% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Fidelity Mid-Cap Stock (FMCSX) | 64 bps | Fidelity Mid-Cap Stock K (FKMCX) | 41 bps | 56.10% |
| Fidelity Overseas (FOSFX) | 85 bps | Fidelity Overseas K (FOSKX) | 66 bps | 28.79% |
| Fidelity Puritan (FPURX) | 61 bps | Fidelity Puritan K (FPUKX) | 47 bps | 29.79% |
| Fidelity Spartan 500 Index (Adv) (FUSVX) | 7 bps | Fidelity Spartan 500 Index (Adv Instl) (FXAIX) | 3 bps | 133.33% |
| Fidelity Spartan 500 Index (Inv) (FUSEX) | 10 bps | Fidelity Spartan 500 Index (Adv) (FUSVX) | 7 bps | 43% |
| Fidelity Spartan 500 Index (Inv) (FUSEX) | 10 bps | Fidelity Spartan 500 Index (Adv Instl) (FXAIX) | 3 bps | 233% |
| Fidelity Spartan Extended Market Index (Adv) (FSEVX) | 7 bps | Fidelity Spartan Extended Market Index (Adv Instl) (FSMAX) | 6 bps | 16.67% |
| Fidelity Spartan Extended Market Index (Inv) (FSEMX) | 10 bps | Fidelity Spartan Extended Market Index (Adv) (FSEVX) | 6 bps | 66.67% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Fidelity Spartan International Index (Adv) (FSIVX) | 7 bps | Fidelity Spartan International Index (Adv Instl) (FSPSX) | 6 bps | 16.67% |
| Fidelity Spartan International Index (inv) (FSIIX) | 10 bps | Fidelity Spartan International Index (Adv) (FSIVX) | 7 bps | 42.86% |
| Fidelity Spartan Total Market Index (Instl) (FSKTX) | 6 bps | Fidelity Spartan Total Market Index (Adv Instl) (FSKAX) | 5 bps | 20.00% |
| Fidelity Spartan U.S. Bond Index (Adv) (FSITX) | 12 bps | Fidelity Spartan U.S. Bond Index (Adv Instl) (FXNAX) | 5 bps | 140.00% |
| Fidelity Spartan U.S. Bond Index (Inv) (FBIDX ) | 27 bps | Fidelity Spartan U.S. Bond Index (F) (FUBFX ) | 12 bps | 125.00% |
| Fidelity Stock Selector (FDSSX) | 86 bps | Fidelity Stock Selector K (FSSKX) | 66 bps | 30.30% |
| Fidelity Value (FDVLX) | 63 bps | Fidelity Value K (FVLKX) | 46 bps | 36.96% |
| Fidelity Value Discovery (FVDFX) | 95 bps | Fidelity Value Discovery K (FVDKX) | 74 bps | 28.38% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| TIAA-CREF International Equity Index (Prem) (TRIPX) | 24 bps | TIAA-CREF International Equity Index (Instl) (TCIEX) | 9 bps | 166.67% |
| TIAA-CREF International Equity Index (Retire) (TRIEX) | 35 bps | TIAA-CREF International Equity Index (Instl) (TCIEX) | 10 bps | 250.00% |
| TIAA-CREF International Equity (Prem) (TREPX) | 68 bps | TIAA-CREF International Equity (Instl) (TIIEX) | 53 bps | 28.30% |
| TIAA-CREF International Equity (Retire) (TRERX) | 78 bps | TIAA-CREF International Equity (Instl) (TIIEX) | 57 bps | 36.84% |
| TIAA-CREF Lifecycle 2010 (Prem) (TCTPX) | 55 bps | TIAA-CREF Lifecycle 2010 (Instl) (TCTIX) | 40 bps | 37.50% |
| TIAA-CREF Lifecycle 2010 (Retire) (TCLEX) | 65 bps | TIAA-CREF Lifecycle 2010 (Instl) (TCTIX) | 40 bps | 62.50% |
| TIAA-CREF Lifecycle 2015 (Prem) (TCFPX) | 56 bps | TIAA-CREF Lifecycle 2015 (Instl) (TCNIX) | 41 bps | 36.59% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| TIAA-CREF Lifecycle 2015 (Retire) (TCLIX) | 67 bps | TIAA-CREF Lifecycle 2015 (Instl) (TCNIX) | 42 bps | 59.52% |
| TIAA-CREF Lifecycle 2020 (Prem) (TCWPX) | 57 bps | TIAA-CREF Lifecycle 2020 (Instl) (TCWIX) | 42 bps | 35.71% |
| TIAA-CREF Lifecycle 2020 (Retire) (TCLTX) | 67 bps | TIAA-CREF Lifecycle 2020 (Instl) (TCWIX) | 42 bps | 59.52% |
| TIAA-CREF Lifecycle 2025 (Prem) (TCQPX) | 58 bps | TIAA-CREF Lifecycle 2025 (Instl) (TCYIX) | 43 bps | 34.88% |
| TIAA-CREF Lifecycle 2025 (Retire) (TCLFX) | 69 bps | TIAA-CREF Lifecycle 2025 (Instl) (TCYIX) | 44 bps | 56.82% |
| TIAA-CREF Lifecycle 2030 (Prem) (TCHPX) | 59 bps | TIAA-CREF Lifecycle 2030 (Instl) (TCRIX) | 44 bps | 34.09% |
| TIAA-CREF Lifecycle 2030 (Retire) (TCLNX) | 71 bps | TIAA-CREF Lifecycle 2030 (Instl) (TCRIX) | 46 bps | 54.35% |
| TIAA-CREF Lifecycle 2035 (Prem) (TCYPX) | 60 bps | TIAA-CREF Lifecycle 2035 (Instl) (TCIIX) | 45 bps | 33.33% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| TIAA-CREF Lifecycle 2035 (Retire) (TCLRX) | 72 bps | TIAA-CREF Lifecycle 2035 (Instl) (TCIIX) | 47 bps | 53.19% |
| TIAA-CREF Lifecycle 2040 (Prem) (TCZPX) | 60 bps | TIAA-CREF Lifecycle 2040 (Instl) (TCOIX) | 45 bps | 33.33% |
| TIAA-CREF Lifecycle 2040 (Retire) (TCLOX) | 72 bps | TIAA-CREF Lifecycle 2040 (Instl) (TCOIX) | 47 bps | 53.19% |
| TIAA-CREF Lifecycle 2045 (Prem) (TTFPX) | 60 bps | TIAA-CREF Lifecycle 2045 (Instl) (TTFIX) | 45 bps | 33.33% |
| TIAA-CREF Lifecycle 2045 (Retire) (TTFRX) | 72 bps | TIAA-CREF Lifecycle 2045 (Instl) (TTFIX) | 47 bps | 53.19% |
| TIAA-CREF Lifecycle 2050 (Prem) (TCLPX) | 60 bps | TIAA-CREF Lifecycle 2050 (Instl) (TFTIX) | 45 bps | 33.33% |
| TIAA-CREF Lifecycle 2050 (Retire) (TLFRX) | 71 bps | TIAA-CREF Lifecycle 2050 (Instl) (TFTIX) | 46 bps | 54.35% |
| TIAA-CREF Lifecycle 2055 (Prem) (TTRPX) | 62 bps | TIAA-CREF Lifecycle 2055 (Instl) (TTRIX) | 49 bps | 30.61% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| TIAA-CREF Lifecycle Retirement Income (Prem) (TPILX) | 55 bps | TIAA-CREF Lifecycle Retirement Income (Instl) (TLRIX) | 38 bps | 39.47% |
| TIAA-CREF Lifecycle Retirement Income (Retire) (TLIRX) | 65 bps | TIAA-CREF Lifecycle Retirement Income (Instl) (TLRIX) | 40 bps | 62.50% |
| Vanguard 500 Index (Inv) (VFINX) | 17 bps | Vanguard 500 Index (Instl Plus) (VIIIX) | 2 bps | 750.00% |
| Vanguard Capital Opportunity (Inv) (VHCOX) | 48 bps | Vanguard Capital Opportunity (Adm) (VHCAX) | 41 bps | 17.07% |
| Vanguard Developed Markets Index (Inv) (VDMIX) | 20 bps | Vanguard Developed Markets Index (Instl Plus) (VDMPX) | 6 bps | 233.33% |
| Vanguard Emerging Markets Stock Index (Inv) (VEIEX) | 35 bps | Vanguard Emerging Markets Stock Index (Instl) (VEMIX) | 15 bps | 133.33% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Vanguard Emerging Markets Stock Index (Inv) (VEIEX) | 33 bps | Vanguard Emerging Markets Stock Index (Instl Plus) (VEMRX) | 10 bps | 230.00% |
| Vanguard Equity-Income (Inv) (VEIPX) | 31 bps | Vanguard Equity-Income (Adm) (VEIRX) | 22 bps | 40.91% |
| Vanguard Explorer (Inv) (VEXPX) | 49 bps | Vanguard Explorer (Adm) (VEXRX) | 32 bps | 53.13% |
| Vanguard Extended Market Index (Inv) (VEXMX) | 26 bps | Vanguard Extended Market Index (Instl Plus) (VIEIX) | 8 bps | 225.00% |
| Vanguard Extended Market Index (Inv) (VEXMX) | 24 bps | Vanguard Extended Market Index (Instl Plus) (VEMPX) | 6 bps | 300.00% |
| Vanguard Growth & Income (Inv) (VQNPX) | 32 bps | Vanguard Growth & Income (Adm) (VGIAX) | 21 bps | 52.38% |
| Vanguard Growth Index (Inv) (VIGRX) | 26 bps | Vanguard Growth Index (Instl) (VIGIX) | 8 bps | 225.00% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Vanguard International Growth (Inv) (VWIGX) | 49 bps | Vanguard International Growth (Adm) (VWILX) | 33 bps | 48.48% |
| Vanguard Mid Cap Index (Inv) (VIMSX) | 26 bps | Vanguard Mid Cap Index (Instl) (VMCIX) | 8 bps | 225.00% |
| Vanguard Mid Cap Index (Inv) (VIMSX) | 24 bps | Vanguard Mid Cap Index (Instl Plus) (VMCPX) | 6 bps | 300.00% |
| Vanguard Morgan Growth (Inv) (VMRGX) | 43 bps | Vanguard Morgan Growth (Adm) (VMRAX) | 29 bps | 48.28% |
| Vanguard Prime Money Market (Inv) (VMMXX) | 23 bps | Vanguard Prime Money Market (Adm) (VMRXX) | 9 bps | 155.56% |
| Vanguard PRIMECAP (Inv) (VPMCX) | 45 bps | Vanguard PRIMECAP (Adm) (VPMAX) | 36 bps | 25.00% |
| Vanguard Small Cap Growth Index (Inv) (VISGX) | 26 bps | Vanguard Small Cap Growth Index (Instl) (VSGIX) | 8 bps | 225.00% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Vanguard Small Cap Index (Inv) (NAESX) | 26 bps | Vanguard Small Cap Index (Instl) (VSCIX) | 8 bps | 225.00% |
| Vanguard Small Cap Index (Inv) (NAESX) | 24 bps | Vanguard Small Cap Index (Instl Plus) (VSCPX) | 6 bps | 300.00% |
| Vanguard Small Cap Value Index (Inv) (VISVX) | 26 bps | Vanguard Small Cap Value Index (Instl) (VSIIX) | 8 bps | 225.00% |
| Vanguard Tax-Managed International (Inv) (VDVIX) | 20 bps | Vanguard Tax-Managed International (Instl) (VTMNX) | 7 bps | 185.71% |
| Vanguard Total Bond Market Index (Inv) (VBMFX) | 22 bps | Vanguard Total Bond Market Index (Instl) (VBTIX) | 7 bps | 214.29% |
| Vanguard Total Bond Market Index (Inv) (VBMFX) | 22 bps | Vanguard Total Bond Market Index (Instl Plus) (VBMPX) | 5 bps | 340.00% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Vanguard Total International Stock Index (Inv) (VGTSX) | 22 bps | Vanguard Total International Stock Index (Instl Plus) (VTPSX) | 10 bps | 120.00% |
| Vanguard Total Stock Market Index (Inv) (VTSMX) | 17 bps | Vanguard Total Stock Market Index (Instl Plus) (VITPX) | 2 bps | 750.00% |
| Vanguard U.S. Growth (Inv) (VWUSX) | 44 bps | Vanguard U.S. Growth (Adm) (VWUAX) | 30 bps | 46.67% |
| Vanguard Value Index (Inv) (VIVAX) | 26 bps | Vanguard Value Index (Instl) (VIVIX) | 8 bps | 225.00% |
| Vanguard Wellington (Inv) (VWELX) | 30 bps | Vanguard Wellington (Adm) (VWENX) | 22 bps | 36.36% |
| Vanguard Windsor II (Inv) (VWNFX) | 35 bps | Vanguard Windsor II (Adm) (VWNAX) | 27 bps | 29.63% |

95. These lower-cost share classes of the identical mutual funds for the Plans have been available for years, some dating back to the early 2000s or before.

96.    The failure to select lower-cost share classes for the Plans'

mutual fund options *identical in all respects* (portfolio manager, underlying

investments, and asset allocation) *except for cost* demonstrates that Emory

failed to consider the size and purchasing power of their plans when selecting

share classes and engaged in no prudent process in the selection, monitoring,

and retention of those mutual funds.

97.    Had the amounts invested in the higher-cost share class mutual

fund options instead been invested in the readily available lower-cost share

class mutual fund options, Plan participants would not have lost millions of

dollars of their retirement savings.

**IV.    Defendants selected and retained a large number of
         duplicative investment options, diluting the Plans' ability to
         pay lower fees and confusing participants.**

98.    Defendants provided a litany of duplicative funds in the same

investment style thereby depriving the Plans of their bargaining power

associated with offering a single option in each investment style, which

significantly reduces investment fees, and leading to decision paralysis for

participants. Over 100 investment options were included and continue to be

included in the Plans in every major asset class. The number of options

provided in each of these asset classes included: target date funds (3 fund

families), asset allocation funds (6 options), large cap domestic equities (24 to

31 options), mid cap domestic equities (9 to 10 options), small cap domestic equities (7 options), international equities (12 to 13 options), fixed income (9 options), money market (6 options), real estate (2 options), and fixed guaranteed annuity (1 option).

99.    In comparison, according to Callan Investments Institute's 2015 Defined Contribution Trends survey, defined contribution plans in 2014 had on average 15 investment options, excluding target date funds. Callan Investments Institute, *2015 Defined Contribution Trends,* at 28 (2015).[20] This provides choice of investment style to participants while maintaining a larger pool of assets in each investment style and avoiding confusion.

100.   A larger pool of assets in each investment style also significantly reduces fees paid by participants. By consolidating duplicative investments of the same investment style into a single investment option, the Plans would then have the ability to command lower-cost investments, such as a low-cost institutional share class of the selected mutual fund option.

101.   Prudent fiduciaries of large defined contribution plans engage in a detailed due diligence process to select and retain investments for a plan based on the risk, investment return, and expenses of available investment alternatives. Overall, the investment lineup should provide participants with

---

[20] Available at https://www.callan.com/research/files/990.pdf.

the ability to diversify their portfolio appropriately while benefiting from the size of the pooled assets of other employees and retirees.

102.   Within each asset class and investment style deemed appropriate for the participant-directed retirement plan, prudent fiduciaries make a reasoned determination and select a prudent investment option. Unlike Defendants here, prudent fiduciaries do not select and retain numerous investment options for a single asset class and investment style. When a large number of investment options in a single investment style are plan options, fiduciaries lose the bargaining power to get lower investment management expenses for that style.

103.   In addition, providing multiple options in a single investment style adds unnecessary complexity to the investment lineup, leads to participant confusion, and causes the Plans to effectively have an index investment at an unreasonably high cost and consequently underperform. See, e.g., The Standard, *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 ("Numerous studies have demonstrated that when people are given too many choices of anything, they lose confidence or make no decision."); Michael Liersch, *Choice in Retirement Plans: How Participant Behavior Differs in Plans Offering Advice, Managed Accounts, and Target-Date Investments,* T. ROWE PRICE RETIREMENT RESEARCH, at 2 (Apr.

54

2009)("Offering too many choices to consumers can lead to decision paralysis, preventing consumers from making decisions.").[21]

104.    For example, in the large cap blend investment style for the Retirement Plan, Defendants offered *nine* actively managed or passively managed investment options for a combined asset amount of $602 million. If those investments were consolidated into a single investment for the large cap domestic blend asset category, the Plans would have saved millions of dollars in investment management expenses.

105.    For illustration purposes, the Plans' large cap domestic blend investments are summarized below and compared to a lower-cost alternative, the Vanguard Institutional Index Fund-Instl Plus (VIIIX) with an expense ratio of 2 bps. The expenses and assets of the Retirement Plan are noted in this example as of December 31, 2013.

| Investment | Assets | Plan Fee | Lower-Cost Fund Fee | Plan's Excess |
|---|---|---|---|---|
| CREF Stock Account | $422,863,993 | 49 bps | 2 bps | 2350% |
| CREF Equity Index | $50,553,487 | 43 bps | 2 bps | 2050% |

---

[21] Available at http://www.behavioralresearch.com/Publications/Choice_in_Retirement_Plans_April_2009.pdf.

| Investment | Assets | Plan Fee | Lower-Cost Fund Fee | Plan's Excess |
|---|---|---|---|---|
| Vanguard 500 Index Fund-Inv. (VFINX) | $55,676,352 | 17 bps | 2 bps | 750% |
| Vanguard Growth and Income Fund-Inv. (VQNPX) | $838,525 | 34 bps | 2 bps | 1600% |
| Vanguard Total Stock Market Index Fund-Inv. (VTSMX) | $41,466,550 | 18 bps | 2 bps | 89% |
| Spartan 500 Index-Adv. (FUSVX) | $8,089,166 | 7 bps | 2 bps | 250% |
| Spartan Total Market Index-Instl (FSKTX) | $13,351,098 | 7 bps | 2 bps | 250% |
| Fidelity Disciplined Equity-K (FDEKX) | $3,388,342 | 39 bps | 2 bps | 1850% |
| **Total** | **$596,227,514** | | | |

106.   With over *$500 million* held in the CREF Stock Account and the

CREF Equity Index Account as of December 31, 2014, these large cap blend

options were *23 and 18 times* more expensive than the far lower-cost

Vanguard index option with an expense ratio of 2 bps.

56



107.   Many other large cap index funds are also available at far lower costs than the Plans' large cap funds. Had the amounts invested in the Plans' large cap blend options been consolidated into the Vanguard Institutional Index Fund-Instl Plus, Plan participants would have saved in excess of $2 million in fees for 2014 alone, and many more millions since 2010.

108.   In addition, Defendants have selected and retained multiple passively managed index options in the same investment style. Rather than a fund whose investment manager actively selects stocks or bonds the fund will hold to generate investment returns in excess of its benchmark, passively managed index funds hold all or a representative sample of securities in a

57

specific index, such as the S&P 500 index. The sole investment strategy of an index fund is to track the performance of a specific market index. No stock selection or research is needed, unlike investing in actively managed funds. Thus, index fund fees are substantially lower.

109.   In the large cap blend investment style, Defendants provided five index funds that have similar investment strategies designed to generate investment results that correspond to the return of the U.S. equity market. For fixed income or the intermediate-term bond investment style, as another example, Defendants have retained two separate index funds.

110.   Since index funds merely hold the same securities in the same proportions as the index,[22] having multiple index funds in the Plans provides no benefit to participants. Instead, it hurts participants by diluting the Plans' ability to obtain lower rates for a single index fund of that style because the amount of assets in any one such fund is smaller than the aggregate would be in that investment style. Moreover, multiple managers holding stocks which mimic the S&P 500 or a similar index would pick the same stocks in the same proportions as the index.

111.   Thus, there is no value in offering separate index funds in the same investment style. Had Defendants combined hundreds of millions of

---

[22] Another example of an index is the Dow Jones Industrial Average.

dollars in Plan assets from duplicative index funds into a single index fund, the Plans would have generated higher investment returns, net of fees, and participants would not have lost significant retirement assets.

112.   Overall, Defendants failed to pool the assets invested in duplicative investment options for the same investment style into a single investment option, which caused Plan participants to pay millions of dollars in unreasonable investment expenses, thereby depleting their retirement assets.

## V.   Defendants imprudently retained historically underperforming Plan investments.

113.   Given the overlap in investment options in asset classes and investment styles based on Defendants' failure to conduct appropriate due diligence in selecting and retaining the Plan investments, numerous investment options underperformed lower-cost alternatives that were available to the Plans.

### A.   Large cap domestic equity investments

#### 1. *Actively managed investments offered in an efficient large capitalization market*

114.   According to the IPS and as is generally understood in the investment community, passively managed investment options should be used in efficient markets such as large capitalization U.S. stocks,  because it

59

is difficult and extremely unlikely to find actively managed mutual funds that outperform a passive index, net of fees, particularly on a persistent basis. This unlikelihood is even greater in the large cap market because such big companies are the subject of many analysts' coverage, unlike smaller stocks which are not covered by many analysts leading to potential inefficiencies in pricing.

115.   The efficiencies of the large cap market hinder an active manager's ability to achieve excess returns for investors.

> In conclusion, this study of mutual funds does not provide any reason to abandon a belief that securities markets are remarkably efficient. Most investors would be considerably better off by purchasing a low expense index fund, than by trying to select an active fund manager who appears to possess a "hot hand." Since active management generally fails to provide excess returns and tends to generate greater tax burdens for investors, the advantage of passive management holds, a fortiori.

Burton G. Malkiel, *Returns from Investing in Equity Mutual Funds 1971 to 1991*, 50 J. FIN. 549, 571 (1995).[23]

116.   Academic literature overwhelmingly concludes that active managers consistently underperform the S&P 500 index.

> Active managers themselves provide perhaps the most persuasive case for passive investing. Dozens of studies have examined the performance of mutual funds and other professional-managed assets, and virtually all of them have concluded that, on average,

---

[23] Available at http://indeksirahastot.fi/resource/malkiel.pdf.

active managers underperform passive benchmarks…The median
active fund underperformed the passive index in 12 out of 18
years [for the large-cap fund universe]…The bottom line is that,
over most periods, the majority of mutual fund investors would
have been better off investing in an S&P 500 Index fund.

\*\*\*

Most of the dismal comparisons for active managers are for large-
cap domestic managers versus the S&P 500 Index.

Robert C. Jones, *The Active Versus Passive Debate: Perspectives of an Active*

*Quant*, ACTIVE EQUITY PORTFOLIO MANAGEMENT, at 37, 40, 53 (Frank J.

Fabozzi ed., 1998).

117.   Prudent fiduciaries of large defined contribution plans conduct an

analysis to determine whether actively managed funds, particularly large

cap, will outperform their benchmark net of fees. Prudent fiduciaries then

make a reasoned decision as to whether it would be in the participants' best

interest to offer an actively managed large cap option, with its much higher

fees, for that particular investment style and asset class.

118.   Defendants failed to undertake such analysis when they selected

and retained actively managed large cap investments in the Plans.

Defendants also provided these actively managed investments despite the

IPS's requirement and the acceptance within the investment industry that

the large cap domestic equity market is the most efficient market and that

active managers do not outperform passive managers net of fees in this investment style. Had such an analysis been conducted by Defendants, they would have determined that the actively-managed large cap blend investments would not be expected to outperform passively managed large cap blend funds. That is in fact what occurred.

119.   With the exception of the Vanguard Growth and Income Fund, all of the Plans' other actively managed large cap blend investments (CREF Stock Account, Fidelity Disciplined Equity Fund-K, and Vanguard Dividend Growth Fund) underperformed passively managed index funds over one- and five-year periods ending December 31, 2014. These index funds include the Vanguard Total Stock Market Index Fund-Instl Plus (VITPX) and the Vanguard Institutional Index-Instl Plus (VIIIX). The CREF Stock Account, the Vanguard Growth and Income Fund, and the Fidelity Disciplined Equity Fund-K also underperformed passively managed index funds over the ten-year period ending December 31, 2014.[24]

120.   Had Defendants removed the large cap domestic equity blend funds and the amounts been invested in a lower-cost passively managed

---

[24] The passively managed index funds used for comparison purposes are the Vanguard Total Stock Market Index Fund-Instl Plus (VITPX) and the Vanguard Institutional Index-Instl Plus (VIIIX). Like the Plans' actively managed large cap blend options listed in ¶119, these options are large cap blend investments.

index fund, such as the Vanguard Total Stock Market Index Fund-Instl Plus, Plan participants would not have lost in excess of $117 million from these funds being retained in the Plans.[25]

### 2. CREF Stock Account

121.   The CREF Stock Account is one of the largest, by asset size, investment options in the Plans with over $500 million in combined assets, and has been included in the Plans from 2010 to date. In its fund fact sheets and participant disclosures, TIAA-CREF classifies the CREF Stock Account as a domestic equity investment in the large cap blend Morningstar category. This option has consistently underperformed over years and continues to underperform its benchmark and lower-cost actively and passively managed investments that were available to the Plans.

122.   TIAA-CREF imposed restrictive provisions on the specific annuities that *must* be provided in the Plans. Under these terms, TIAA-CREF required that the CREF Stock Account be offered to Plan participants, in addition to the TIAA Traditional and the CREF Money Market Account. Plan fiduciaries provided these mandatory offerings in the Plans without a prudent process to determine whether they were prudent alternatives and in

---

[25] Plan losses have been brought forward to the present value using the investment returns of the lower-cost alternatives to compensate participants who have not been reimbursed for their losses.

the exclusive best interest of Plan participants and beneficiaries. TIAA-CREF required the CREF Stock Account to be included in the Plans to drive very substantial amounts of revenue sharing payments to TIAA-CREF for recordkeeping services. The CREF Stock Account paid 24 bps for revenue sharing, which exceeded other TIAA-CREF investments by over 50% (15 bps).

123.   Rather than poor performance in a single year or two, historical performance of the CREF Stock Account has been persistently poor for many years compared to both available lower-cost index funds and the index benchmark. In participant communications, Defendants and TIAA-CREF identified the Russell 3000 index as the appropriate benchmark to evaluate the fund's investment results. The following performance chart compares the investment returns of the CREF Stock Account to its benchmark and two other passively managed index funds  for the one-, five-, and ten-year periods ending December 31, 2014.[26] For each comparison, the CREF Stock Account dramatically underperformed the benchmark and index alternatives. The passively managed index funds used for comparison purposes are the Vanguard Total Stock Market Index Fund-Instl Plus (VITPX) and the

---

[26] Performance data provided as of December 31, 2014 to correspond to the most recent filing of the Plans' Form 5500s with the Department of Labor.

Vanguard Institutional Index-Instl Plus (VIIIX). Like the CREF Stock

Account, these options are large cap blend investments.



124.   The CREF Stock Account, with an expense ratio of 46 bps as of

December 31, 2014, was and is dramatically more expensive than far better

performing index alternatives: the Vanguard Total Stock Market Index Fund-

Instl Plus (2 bps) and the Vanguard Institutional Index-Instl Plus (2 bps).

125.   Apart from underperforming passively managed index funds, the

fund also significantly underperformed comparable actively managed funds

over the one-, five- and ten-year periods ending December 31, 2014. These large cap alternatives with similar underlying asset allocations to the CREF Stock Account include the Vanguard Diversified Equity-Inv (VDEQX), the Vanguard PRIMECAP-Adm (VPMAX), and the Vanguard Capital Opp.-Adm (VHCAX).



126. The CREF Stock Account also had a long history of substantial underperformance compared to these actively managed alternatives over the one-, five-, and ten-year periods ending December 31, 2009.[27]



---

[27] For the Vanguard PRIMECAP-Adm and Vanguard Capital Opportunity Fund-Adm, the investment returns of the investor share class for ten-year performance were used because the admiral share class for each of these funds was not offered until November 12, 2001. The return since inception for the Vanguard PRIMECAP-Adm was 3.23%, and for the Vanguard Capital Opportunity Fund-Adm, 5.89%.





127. Despite the consistent underperformance, the CREF Stock Account, with an expense ratio of 46 bps as of December 31, 2014, was more expensive than better performing alternatives: the Vanguard Diversified Equity-Inv (40 bps), the Vanguard PRIMECAP-Adm (35 bps), and the Vanguard Capital Opp.-Adm (40 bps).

128. Apart from the abysmal long-term underperformance of the CREF Stock Account compared to both index funds and actively managed funds, the fund was recognized as imprudent in the industry. In March 2012, an independent investment consultant, AonHewitt, recognized the imprudence of the CREF Stock Account and recommended to its clients they remove this fund from their retirement plan. AonHewitt, *TIAA-CREF Asset Management*, INBRIEF, at 3 (July 2012).[28] This recommendation was made due to numerous factors, including the historical underperformance, high turnover of asset management executives and portfolio managers, and the fact that the fund had over 60 separate underlying investment strategies, greatly reducing the fund's ability to generate excess returns over any substantial length of time. *Id.* at 4–5.

---

[28] Available at http://system.nevada.edu/Nshe/?LinkServID=82B25D1E-9128-6E45-1094320FC2037740.

129.   The Supreme Court has recently and unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble v. Edison Int'l,* 135 S. Ct. 1823, 1829 (2015). In contrast to the conduct of prudent fiduciaries, Defendants failed to conduct a prudent process to monitor the CREF Stock Account and continue to retain the fund despite its continuing to underperform lower-cost investment alternatives that were readily available to the Plans, particularly due to TIAA-CREF's requirement that the CREF Stock Account be provided in the Plans in order to drive revenue to TIAA-CREF.

130.   Prudent fiduciaries of defined contribution plans continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better performing and reasonably priced options. Under the standards used by prudent independent fiduciaries, the CREF Stock Account would have been removed from the Plans.

131.   Had Defendants removed the CREF Stock Account and the amounts been invested in any of the actively managed lower-cost alternatives identified in ¶125, Plan participants would not have lost in excess of $136

million of their retirement savings from the fund being retained in the

Plans.[29]

**B.    TIAA Real Estate Account**

132.   Defendants selected and retained the TIAA Real Estate Account

as a real estate investment option in the Plans. The fund has far greater fees

than are reasonable, has historically underperformed, and continues to

consistently underperform comparable real estate investment alternatives,

including the Vanguard REIT Index I (VGSNX).

133.   With an expense ratio of 87 bps as of December 31, 2014, the

TIAA Real Estate Account is over *10 times more expensive* than the Vanguard

REIT Index I with an expense ratio of 8 bps.

---

[29] Plan losses have been brought forward to the present value using the
investment returns of the lower-cost alternatives to compensate participants
who have not been reimbursed for their losses.



134. The TIAA Real Estate Account had a long history of substantial underperformance relative to the Vanguard REIT Index over the one-, five-, and ten-year periods ending December 31, 2009.[30] Despite this, Defendants selected and retained it in the Plans.

---

[30] The return of the investor share class was used for ten-year performance because the institutional share class was not offered until December 2, 2003. The return since inception for the Vanguard REIT Index-I was 5.49%.







135.   This underperformance occurred for years and has continued after 2009. The TIAA Real Estate Account significantly underperformed the Vanguard REIT Index I over the one-, five-, and ten-year periods ending December 31, 2014.[31]

---

[31] Performance data provided as of December 31, 2014 to correspond to the most recent filing of the Plans' Form 5500s with the Department of Labor.



136.   As the Supreme Court unanimously ruled in *Tibble,* prudent

fiduciaries of defined contribution plans continuously monitor plan

investment options and replace imprudent investment options. *Tibble*, 135 S.

Ct. at 1829.  In contrast, Defendants failed to conduct such a process and

continue to retain the TIAA Real Estate Account as a Plan investment option

despite its continued underperformance and higher cost compared to

available investment alternatives.

137.   Had Defendants removed the TIAA Real Estate Account and the amounts been invested in the lower-cost and better-performing Vanguard REIT Index I, Plan participants would not have lost in excess of $11 million of their retirement savings from the fund being retained in the Plans.[32]

## ERISA'S FIDUCIARY STANDARDS

138.   ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a)(1), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)   for the exclusive purpose of
>
> (i) providing benefits to participants and their beneficiaries; and
> (ii) defraying reasonable expenses of administering the plan;
>
> [and]
>
> (B)   with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

---

[32] Plan losses have been brought forward to the present value using the investment returns of the Vanguard REIT Index I to compensate participants who have not been reimbursed for their losses.

139.   Under 29 U.S.C. §1103(c)(1), with certain exceptions not relevant here,

> the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

140.   Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in the plan.

141.   ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
>> (1)   if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]

> (2)   if, by his failure to comply with section
> 1104(a)(1) of this title in the administration of
> his specific responsibilities which give rise to
> his status as a fiduciary, he has enabled such
> other fiduciary to commit a breach; or
>
> (3)   if he has knowledge of a breach by such other
> fiduciary, unless he makes reasonable efforts
> under the circumstances to remedy the breach.

142.   29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a

civil action to enforce a breaching fiduciary's liability to the plan under 29

U.S.C. §1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who
> breaches any of the responsibilities, obligations, or duties
> imposed upon fiduciaries by this subchapter shall be personally
> liable to make good to such plan any losses to the plan resulting
> from each such breach, and to restore to such plan any profits of
> such fiduciary which have been made through use of assets of the
> plan by the fiduciary, and shall be subject to such other equitable
> or remedial relief as the court may deem appropriate, including
> removal of such fiduciary.

## CLASS ACTION ALLEGATIONS

143.   29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of

the Plans to bring an action individually on behalf of the Plans to enforce a

breaching fiduciary's liability to the plan under 29 U.S.C. §1109(a).

144.   In acting in this representative capacity and to enhance the due

process protections of unnamed participants and beneficiaries of the Plans, as

78

an alternative to direct individual actions on behalf of the Plans under 29

U.S.C. §1132(a)(2) and (3), Plaintiffs seek to certify this action as a class

action on behalf of all participants and beneficiaries of the Plans. Plaintiffs

seek to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of the Emory University
> Retirement Plan and the Emory Healthcare, Inc. Retirement
> Savings and Matching Plan from August 11, 2010 through the
> date of judgment, excluding the Defendants.

145.   This action meets the requirements of Rule 23 and is certifiable

as a class action for the following reasons:

a. The Class includes over 40,000 members and is so large that

joinder of all its members is impracticable.

b. There are questions of law and fact common to this Class because

the Defendants owed fiduciary duties to the Plans and to all

participants and beneficiaries and took the actions and omissions

alleged herein as to the Plans and not as to any individual

participant. Thus, common questions of law and fact include the

following, without limitation: who are the fiduciaries liable for

the remedies provided by 29 U.S.C. §1109(a); whether the

fiduciaries of the Plans breached their fiduciary duties to the

Plans; what are the losses to the Plans resulting from each

breach of fiduciary duty; and what Plan-wide equitable and other
relief the court should impose in light of Defendants' breach of
duty.

c.  Plaintiffs' claims are typical of the claims of the Class because
each Plaintiff was a participant during the time period at issue in
this action and all participants in the Plans were harmed by
Defendants' misconduct.

d.  Plaintiffs are adequate representatives of the Class because they
were participants in the Plans during the Class period, have no
interest that is in conflict with the Class, are committed to the
vigorous representation of the Class, and have engaged
experienced and competent attorneys to represent the Class.

e.  Prosecution of separate actions for these breaches of fiduciary
duties by individual participants and beneficiaries would create
the risk of (A) inconsistent or varying adjudications that would
establish incompatible standards of conduct for Defendants in
respect to the discharge of their fiduciary duties to the Plans and
personal liability to the Plans under 29 U.S.C. §1109(a), and (B)
adjudications by individual participants and beneficiaries
regarding these breaches of fiduciary duties and remedies for the

Plans would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

146.   A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

147.   Plaintiffs' counsel, Schlichter, Bogard & Denton LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

a. Schlichter, Bogard & Denton has been appointed as class counsel in 15 other ERISA class actions regarding excessive fees in large defined contribution plans. As a district court in one of those cases recently observed: "the firm of Schlichter, Bogard & Denton ha[s] demonstrated its well-earned reputation as a pioneer and the leader in the field". *Abbott v. Lockheed Martin Corp*., No. 06-701, 2015 U.S.Dist.LEXIS 93206 at 4 (S.D. Ill. July 17, 2015). Other courts have made similar findings: "It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc*., No. 08-3799, 2012 U.S.Dist.LEXIS 166816 at 8 (N.D. Ill. June 26, 2012). "As the preeminent firm in 401(k) fee litigation, Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients." *Nolte v. Cigna Corp*., No. 07-2046, 2013 U.S.Dist.LEXIS 184622 at 8 (C.D. Ill. Oct. 15, 2013). "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper Co*., No. 06-703, 2014 U.S.Dist.LEXIS 12037 at 8 (S.D. Ill. Jan. 31, 2014).

82

b.  The U.S. District Court Judge G. Patrick Murphy recognized the

work of Schlichter, Bogard & Denton as exceptional:

> Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing many thousands of hours for the benefit of employees and retirees. No case had previously been brought by either the Department of Labor or private attorneys against large employers for excessive fees in a 401(k) plan. Class Counsel performed substantial work…, investigating the facts, examining documents, and consulting and paying experts to determine whether it was viable. This case has been pending since September 11, 2006. Litigating the case required Class Counsel to be of the highest caliber and committed to the interests of the participants and beneficiaries of the General Dynamics 401(k) Plans.

*Will v. General Dynamics Corp.*, No. 06-698, 2010

U.S.Dist.LEXIS 123349 at 8–9 (S.D. Ill. Nov. 22, 2010).

c.  Schlichter, Bogard & Denton handled the only full trial of an

ERISA excessive fee case, resulting in a $36.9 million judgment

for the plaintiffs that was affirmed in part by the Eighth Circuit.

*Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding

attorney's fees after trial, the district court concluded that

"Plaintiffs' attorneys are clearly experts in ERISA litigation."

*Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S.Dist.LEXIS 157428 at

10 (W.D. Mo. Nov. 2, 2012). Following remand, the district court again awarded Plaintiffs' attorney's fees, emphasizing the significant contribution Plaintiffs' attorneys have made to ERISA litigation, including educating the Department of Labor and federal courts about the importance of monitoring fees in retirement plans.

> Of special importance is the significant, national contribution made by the Plaintiffs whose litigation clarified ERISA standards in the context of investment fees. The litigation educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees and separating a fiduciary's corporate interest from its fiduciary obligations.

*Tussey v. ABB, Inc.,* 2015 U.S.Dist.LEXIS 164818 at 7–8 (W.D. Mo. Dec. 9, 2015).

d. Schlichter, Bogard & Denton is also class counsel in and handled *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015), in which the Supreme Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" Schlichter, Bogard & Denton successfully petitioned for a writ of certiorari, and obtained amicus support from the United States Solicitor General and

84

AARP, among others. Given the Court's broad recognition of an ongoing fiduciary duty, the *Tibble* decision will affect all ERISA defined contribution plans.

e. Schlichter, Bogard & Denton has obtained class-wide settlements in a number of ERISA fiduciary breach cases, obtaining both significant monetary and non-monetary relief for the benefit of hundreds of thousands of defined contribution plan participants. *Abbott v. Lockheed Martin Corp.,* No. 06-701 (S.D. Ill.); *Spano v. Boeing Co.*, No. 06-743 (S.D. Ill.); *Krueger v. Ameriprise Financial, Inc.*, No. 11-2781 (D. Minn.); *Kanawi. v. Bechtel Corp.,* No. 06-5566 (N.D. Cal.); *Beesley v. Int'l Paper Co.*, No. 06-703 (S.D. Ill.); *Will* v. *General Dynamics Corp.*, No. 06-698 (S.D. Ill.); *Nolte v. Cigna Corp.,* No. 07-2046 (C.D. Ill) *George v. Kraft Foods Global, Inc.,* No. 07-1713 (N.D. Ill.); *George v. Kraft Foods Global, Inc.,* No. 08-3799 (N.D. Ill.); *Martin v. Caterpillar, Inc.,* No. 07-1009 (C.D. Ill.).

f. The firm's work in ERISA excessive fee class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. See, e.g., Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*,

WALL ST. J. (May 15, 2016);[33] Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014);[34] Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015);[35] Floyd Norris, *What a 401(k) Plan Really Owes Employees*,  N.Y. TIMES (Oct. 16, 2014);[36] Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, WALL ST. J. (Aug. 25, 2015);[37] Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015); [38] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014);[39] Mark Miller*, Are 401(k) Fees Too High? The High-Court May Have an Opinion*, REUTERS (May 1,

---

[33] Available at http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601.

[34] Available at http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[35] Available at http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

[36] Available at http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

[37] Available at http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/.

[38] Available at http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

[39] Available at http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

2014);[40] Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, Bloomberg (Oct. 2, 2014).[41]

## COUNT I

### Breach of Duties of Loyalty and Prudence—Unreasonable Administrative Fees

148.   Plaintiffs restate and incorporate the allegations in the preceding paragraphs 6–84.

149.   This Count alleges breach of fiduciary duties against all Defendants.

150.   The scope of the fiduciary duties and responsibilities of these Defendants includes discharging their duties with respect to the Plans solely in the interest of, and for the exclusive purpose of providing benefits to, Plan participants and beneficiaries, defraying reasonable expenses of administering the plan, and acting with the care, skill, prudence, and diligence required by ERISA.

151.   If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. See *George v. Kraft Foods*

---

[40] Available at http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501.

[41] Available at http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal.

*Global, Inc.*, 641 F.3d 786, 798–99 (7th Cir. 2011). Similarly, "us[ing] revenue sharing to benefit [the plan sponsor and recordkeeper] at the Plan's expense" while "failing to monitor and control recordkeeping fees" and "paying excessive revenue sharing" is a breach of fiduciary duties. *Tussey,* 746 F.3d at 336.

152.   Defendants failed to engage in a prudent and loyal process for selecting and retaining a recordkeeper. Rather than consolidating the Plans' administrative and recordkeeping services to a single service provider, Defendants retained three recordkeepers to provide recordkeeping services. This failure to consolidate the recordkeeping services eliminated the Plans' ability to obtain the same services at a lower cost with a single recordkeeper and caused the Plans to pay significantly excessive recordkeeping fees. This conduct was a breach of the duties of loyalty and prudence.

153.   Moreover, Defendants failed to solicit competitive bids from vendors on a flat per-participant fee. Defendants allowed the Plans' recordkeepers to receive asset-based revenue sharing and hard dollar fees, but failed to monitor those payments to ensure that only reasonable compensation was received for the recordkeeping services provided to the Plans. As the amount of assets grew, the revenue sharing payments to the Plans' recordkeepers grew, even though the services provided by the

recordkeepers remained the same. This caused the recordkeeping compensation paid to the recordkeepers to exceed a reasonable fee for the services provided. This conduct was a breach of the duties of loyalty and prudence.

154.   Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

155.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

156.   Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT II

### Breach of Duties of Loyalty and Prudence—Unreasonable Investment Management Fees and Performance Losses

157.   Plaintiffs restate and incorporate the allegations in the preceding paragraphs 6–53, 61–70, and 85–137.

158.   This Count alleges breach of fiduciary duties against all Defendants.

159.   The scope of the fiduciary duties and responsibilities of these Defendants includes managing the assets of the Plans for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with the care, skill, diligence, and prudence required by ERISA. These Defendants are directly responsible for ensuring that the Plans' fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plans' investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plans' assets are invested prudently.

160.   As the Supreme Court recently confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1829.

161.   For years, Defendants selected and retained as Plan investment options mutual funds and insurance company variable annuities with higher expenses and historically poor performance relative to other investment options that were readily available to the Plans at all relevant times.

162.   Rather than consolidating the Plans' over 100 investment options into a core investment lineup in which prudent investments were selected for a given asset class and investment style, as is the case with most defined contribution plans, Defendants retained multiple investment options in each asset class and investment style, thereby depriving the Plans of their ability to qualify for lower cost share classes of certain investments, while violating the well-known principle for fiduciaries that such a high number of investment options causes participant confusion and paralysis. In addition, Defendants, as fiduciaries charged with operating as prudent financial experts, *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984), knew or should have known that providing numerous actively managed duplicative funds in the same investment style would produce a "shadow index" return before accounting for much higher fees than index fund fees, thereby resulting in significant underperformance. The Plans' investment offerings included the use of mutual funds and variable annuities with expense ratios far in excess of other options available to the Plans. These lower-cost options included

91

lower-cost share class mutual funds with the identical investment manager
and investments, and lower-cost insurance company variable annuities and
insurance company pooled separate accounts. In so doing, Defendants failed
to make Plan investment decisions based solely on the merits of the
investment funds and what was in the interest of participants. Defendants
therefore failed to discharge their duties with respect to the Plans solely in
the interest of the participants and beneficiaries and for the exclusive
purpose of providing benefits to participants and their beneficiaries and
defraying reasonable expenses of administering the Plans. Therefore,
Defendants breached their fiduciary duty of loyalty under 29 U.S.C.
§1104(a)(1)(A).

163.   The same conduct by the Defendants shows a failure to discharge
their duties with respect to the Plans with the care, skill, prudence, and
diligence under the circumstances then prevailing that a prudent man acting
in a like capacity and familiar with such matters would use in the conduct of
an enterprise of like character and with like aims. Defendants therefore
breached their fiduciary duty of prudence under 29 U.S.C. §1104(a)(1)(B).

164.   Defendants failed to engage in a prudent process for the selection
and retention of Plan investment options. Rather, Defendants used more

expensive funds with inferior performance compared to investments that were available to the Plans.

165.  Large cap domestic equity investment options: The Plans' IPS as well as prudent investment management principles require Defendants to consider passively managed investments for large cap blend domestic equities. Despite the IPS's requirement and these principles, Defendants failed to analyze whether such investments would be likely to outperform the market after fees. Defendants have selected and continue to include actively managed investments for this asset class and investment style in the Plans, and failed to consider passive investments in place of these investment options. These Plan investments have underperformed and continue to underperform lower-cost passively managed index funds.

166.  CREF Stock Account: Apart from Defendants' failure to offer passively managed index funds in the large cap domestic equity investment style, Defendants selected and retained the CREF Stock Account despite its excessive cost and historical underperformance compared to actively managed investments and indices in a similar asset class.

167.  TIAA Real Estate Account: Defendants selected and retained the TIAA Real Estate Account for the real estate investment in the Plans despite

its excessive fees and historical underperformance compared to lower-cost real estate investments.

168.   Had a prudent and loyal fiduciary conducted a prudent process for the retention of investment options, it would have concluded that the Plans' investment options were selected and retained for reasons other than the best interest of the Plans and their participants and were causing the Plans to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plans.

169.   Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

170.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

171.   Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach.

94

Thus, each defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT III

## Failure to Monitor Fiduciaries

172.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs 6–137.

173.   This Count alleges breach of fiduciary duties against Emory University and Emory Healthcare.

174.   Emory University is the named fiduciary under Retirement Plan §12.1 with the overall responsibility for the control, management and administration of the Plan, in accordance with 29 U.S.C. §1102(a).  Emory University is the Plan Administrator of the Retirement Plan under Plan §12.2 and 29 U.S.C. §1002(16)(A)(i) with exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Retirement Plan, with all powers necessary to enable it to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Retirement Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

175.   Upon information and belief, Emory Healthcare is the named
fiduciary under the Healthcare Plan with the overall responsibility for the
control, management and administration of the Healthcare Plan, in
accordance with 29 U.S.C. §1102(a). Emory Healthcare is the Plan
Administrator of the Healthcare Plan under 29 U.S.C. §1002(16)(A)(i) with
exclusive responsibility and complete discretionary authority to control the
operation, management and administration of the Healthcare Plan, with all
powers necessary to enable it to properly carry out such responsibilities,
including the selection and compensation of the providers of administrative
services to the Healthcare Plan and the selection, monitoring, and removal of
the investment options made available to participants for the investment of
their contributions and provision of their retirement income.

176.   Emory University acts through its Board of Trustees, which is
authorized to designate a person or a committee to act on behalf of Emory
University with respect to the Retirement Plan. Similarly, Emory Healthcare
acts through its Board of Directors, and is authorized to designate a person or
committee to act on behalf of Emory Healthcare with respect to the
Healthcare Plan.

177.   Emory University, through its Board of Trustees, has created and
controls the membership of the Emory Pension Board, and also oversees

96

Emory Investment Management. The Emory Pension Board provides fiduciary oversight and administration of the Retirement and Healthcare Plans, and Emory Investment Management is responsible for the investment of Plan assets, including setting the overall investment policies for the Plans, reviewing and evaluating investment performance, and reviewing the reasonableness of the Plans' fees.

178.   Given that Emory University and Emory Healthcare have overall responsibility for the oversight of their plans, these Defendants had a fiduciary responsibility to monitor the performance of the other fiduciaries, including those individuals who were delegated fiduciary responsibility to administer and manage Plan assets.

179.   A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

180.   To the extent any of the Board of Trustees' or Emory Healthcare's Board of Directors' fiduciary responsibilities were delegated to another fiduciary, each Board's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

181.   Emory University and Emory Healthcare breached their fiduciary monitoring duties by, among other things:

    a.  failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plans suffered enormous losses as a result of their appointees' imprudent actions and omissions with respect to the Plans;

    b.   failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and investment management fees and consistently underperforming Plan investments in violation of ERISA;

    c.  failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plans' administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plans' recordkeeper and the amount of any revenue sharing payments; a process to prevent the recordkeeper from receiving revenue sharing that would increase the recordkeeper's compensation to unreasonable levels even though the services provided remained the same; and a process to periodically obtain

98

competitive bids to determine the market rate for the services provided to the Plans;

d. failing to ensure that the monitored fiduciaries considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plans' mutual fund and insurance company variable annuity options;

e. failing to ensure that the monitored fiduciaries selected, monitored, and retained investment options in compliance with the Plans' IPS; and

f. failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments, all to the detriment of Plan participants' retirement savings.

182. Had Emory University and Emory Healthcare discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plans, and the Plaintiffs and the other Class members, lost tens of millions of dollars of their retirement savings.

183.   Emory University and Emory Healthcare are personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and are subject to other equitable or remedial relief as appropriate.

## JURY TRIAL DEMANDED

184.   Pursuant to Fed.R.Civ.P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plans and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and declare that the Defendants have breached their fiduciary duties as described above;

- find and adjudge that Defendants are personally liable to make good to the Plans all losses to the Plans resulting from each breach of fiduciary duty, and to otherwise restore the Plans to the position they would have occupied but for the breaches of fiduciary duty;

- determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

- order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plans under §1109(a);

- remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- surcharge against Defendants and in favor of the Plans all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- reform the Plans to include only prudent investments;

- reform the Plans to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

- certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter, Bogard & Denton LLP as Class Counsel;

- award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- order the payment of interest to the extent it is allowed by law; and

- grant other equitable or remedial relief as the Court deems appropriate.

August 11, 2016                    Respectfully submitted,

/s/ Bradley S. Wolff
Bradley S. Wolff, GA No. 773388
SWIFT, CURRIE, MCGHEE, & HIERS, LLP
1355 Peachtree St., N.E., Ste. 300
Atlanta, GA 30309-3231
Phone: (404) 874-8800
Fax: (404) 888-6199
brad.wolff@swiftcurrie.com

Local Counsel for Plaintiffs

SCHLICHTER, BOGARD & DENTON, LLP
Jerome J. Schlichter, MO No. 32225*
Michael A. Wolff, MO No. 38207*
Troy A. Doles, MO No. 47958*
Heather Lea, MO No. 49872*
Kurt C. Struckhoff, MO No. 61873*
Ethan D. Hatch, MO No. 68126*
100 South Fourth Street, Ste. 1200
St. Louis, MO 63102
Phone: (314) 621-6115
Fax: (314) 621-5934
    * Pro Hac Vice Forthcoming

Lead Counsel for Plaintiffs

102