# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| GENEVA HENDERSON, HELEN DULOCK, RENA GUZMAN, JACQUELINE GOLDBERG, CONNIE CORPENING, JOANNE RACKSTRAW, JOANN D. WRIGHT, DEON M. MOORE, CYNTHIA T. JAMES, HUBERTA W. WALLER, JACQUELINE BLACKWELL, AND KATHRYN T. PRESLEY, individually and as representatives of a class of participants and beneficiaries on behalf of the Emory University Retirement Plan and the Emory Healthcare, Inc. Retirement Savings and Matching Plan, | Civil Action No. 1:16-cv-02920-CAP<br><br>AMENDED COMPLAINT— CLASS ACTION<br><br>JURY TRIAL DEMANDED |
| *Plaintiffs,* | |
| v. | |
| EMORY UNIVERSITY, EMORY HEALTHCARE, INC., EMORY PENSION BOARD, EMORY INVESTMENT MANAGEMENT, MARY L. CAHILL, MARY BETH ALLEN, DALLIS HOWARD-CROW, DR. DOUGLAS MORRIS, BROOKE MOORE, JAMES T. HATCHER, PETER BARNES, CAROL DILLON KISSAL, AND EDITH MURPHREE, | |
| *Defendants.* | |

## AMENDED COMPLAINT

1.     Plaintiffs Geneva Henderson, Helen Dulock, Rena Guzman, Jacqueline Goldberg, Connie Corpening, Joanne Rackstraw, Joann D. Wright, Deon M. Moore, Cynthia T. James, Huberta W. Waller, Jacqueline Blackwell, and Kathryn T. Presley, individually and as representatives of a class of participants and beneficiaries in the Emory University Retirement Plan and the Emory Healthcare, Inc. Retirement Savings and Matching Plan (the "Plans") bring this action under 29 U.S.C. §1132(a)(2) on behalf of the Plans[1] against Defendants Emory University, Emory Healthcare, Inc., Emory Pension Board, Emory Investment Management, Mary L. Cahill, Mary Beth Allen, Dallis Howard-Crow, Dr. Douglas Morris, Brooke Moore, James. T. Hatcher, Peter Barnes, Carol Dillon Kissal, and Edith Murphree for breach of fiduciary duties under ERISA.[2]

2.     "ERISA's fiduciary duties "are the highest known to the law." *Fuller v. Suntrust Banks, Inc.,* 744 F.3d 685, 695 (11th Cir. 2014); 29 U.S.C. §1104(a). In discharging those duties, ERISA fiduciaries are held to the standard of financial experts in the field of investment management. *See*

---

[1] When applicable, the Emory University Retirement Plan is referred to as the "Retirement Plan" and the Emory Healthcare, Inc. Retirement Savings and Matching Plan is referred to as the "Healthcare Plan".

[2] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.

*Katsaros v. Cody*, 744 F.2d 270, 275, 279 (2d Cir. 1984); *Liss v. Smith*, 991 F. Supp. 278, 296 (S.D.N.Y. 1998). Fiduciaries must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants," *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007)(emphasis original), and must "remove imprudent ones" within a reasonable time, *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828–29 (2015).

3.  The marketplace for retirement plan services is established and competitive. Billion-dollar-defined contribution plans, like the Plans—which are each among the largest 0.1% of defined contribution plans in the United States—have tremendous bargaining power to demand low-cost administrative and investment management services. As fiduciaries to the Plans, Defendants are obligated to limit the Plans' expenses to a reasonable amount, to ensure that *each* fund in the Plans is a prudent option for participants to invest their retirement savings and priced at a reasonable level for the size of the Plans; and to analyze the costs and benefits of alternatives for the Plans' administrative and investment structure. Defendants must make those decisions for the exclusive benefit of participants, and not for the benefit of conflicted third parties, such as the Plans' service providers.

4.  Instead of using the Plans' bargaining power to reduce expenses

3

and exercising independent judgment to determine what investments to include in the Plans, Defendants squandered that leverage by allowing the Plans' conflicted third party service providers—TIAA-CREF, Fidelity, and Vanguard—to dictate the Plans' investment lineup, to link their recordkeeping services to the placement of investment products in the Plans, and to collect unlimited asset-based compensation from their own proprietary products.[3]

5.      To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plans, bring this action on behalf of the Plans under 29 U.S.C. §1132(a)(2) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plans all losses resulting from each breach of fiduciary duty and to restore to the Plans any profits made through Defendants' use of the Plans' assets. In addition, Plaintiffs seek such other equitable or remedial relief for the Plans as the Court may deem appropriate.

---

[3] Fidelity Management Trust Company and Fidelity Investments Institutional Operations Company are referred to collectively herein as "Fidelity", Teachers Insurance and Annuity Association of America and College Retirement Equities Fund are referred to collectively as "TIAA-CREF", and Vanguard Fiduciary Trust Company and the Vanguard Group, Inc. are referred to collectively as "Vanguard".

## JURISDICTION AND VENUE

6.     **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2).

7.     **Venue.** This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the subject Plans are administered, where at least one of the alleged breaches took place, and where the Defendants reside or may be found.

8.     **Standing.** An action under §1132(a)(2) allows recovery only for a plan, and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *Id.* at 254. Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of the plan to seek relief on behalf of the plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plans suffered millions of dollars in losses caused by Defendants' fiduciary breaches and remain exposed to harm and continued future losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs. To the extent the Plaintiffs must also show an individual injury

even though §1132(a)(2) does not provide redress for individual injuries, each Plaintiff has suffered such an injury, in at least the following ways:

a.      The named Plaintiffs and all participants in the Plans suffered financial harm as a result of the imprudent or excessive fee options in the Plans because Defendants' inclusion of those options deprived participants of the opportunity to grow their retirement savings by investing in prudent options with reasonable fees, which would have been available in the Plans if Defendants had satisfied their fiduciary obligations. All participants continue to be harmed by the ongoing inclusion of these imprudent and excessive cost options and payment of excessive recordkeeping fees.

b.      The named Plaintiffs and all participants in the Plans were financially harmed by Defendants' improper bundling of some of the Plans' investment products, improperly allowing the companies who did recordkeeping for the Plans to require inclusion of their investment products in the Plans, instead of each investment option being independently selected.

c.      The named Plaintiffs' individual accounts in the Plans were further harmed by Defendants' breaches of fiduciary duties because one or more of the named Plaintiffs during the proposed class period (1)

6

invested in the CREF Stock and TIAA Real Estate accounts—which were improperly bundled with TIAA's recordkeeping services and which Defendants also failed to remove from the Plans when it was clear from abysmal past performance and their excessive fees that they were imprudent investments—at a time when those options suffered losses compared to the performance of numerous prudent alternatives in which those assets would have been invested had Defendants not breached their fiduciary duty (Plaintiffs Goldberg, Corpening, Rackstraw, and Waller), (2) invested in excessive-cost investment options, including funds that paid revenue sharing to the Plans' recordkeepers and higher-cost share classes of mutual funds in the Plans which were priced for small investors when far lower-cost but otherwise identical share classes of the same mutual funds were available for inclusion in the Plans because of the enormous size of the Plans, resulting in a loss of retirement savings (all Plaintiffs), and (3) through their investments in those mutual funds and other investments and the fees charged on their investments in those funds, paid a portion of the Plans' excessive administrative and recordkeeping fees, which would not have been incurred had Defendants discharged

their fiduciary duties to the Plans, and resulting in a loss of retirement savings (all Plaintiffs).

      d.    Specifically, during the class period: Plaintiff Henderson invested in the higher-cost share class of the TIAA-CREF Lifecycle 2010 and also invested in the TIAA Traditional, CREF Money Market, and the TIAA-CREF Life Cycle 2010; Plaintiff Corpening invested in CREF Stock, TIAA Traditional, and CREF Money Market; Plaintiff Rackstraw invested in the higher-cost share classes of the Fidelity Contrafund, Fidelity International Discovery, Fidelity Low-Priced Stock, Fidelity Spartan U.S. Bond Index, and TIAA-CREF International Equity Index and also invested in the TIAA Real Estate, TIAA Traditional, CREF Stock, CREF Money Market, TIAA-CREF International Equity Index, Fidelity Contrafund, Fidelity Freedom 2015, and Fidelity International Discovery (and many others); Plaintiff Wright invested in the higher-cost share classes of the Vanguard Growth and Income Fund and the Vanguard Total Stock Market Index Fund and also invested in the Vanguard Star Fund and Vanguard Target Retirement 2020; Plaintiff James invested in the higher-cost share classes of the Vanguard Emerging Markets Stock Index, Vanguard Growth Index, Vanguard Morgan Growth, Vanguard Total

Bond Market Index, Vanguard Total International Stock Index, Vanguard Total Stock Market Index, and Vanguard Wellington and also invested in the TIAA Traditional, CREF Growth, Vanguard Morgan Growth, Vanguard Target Retirement 2020, Vanguard Wellington, and Vanguard Windsor II (among others); Plaintiff Waller invested in the higher-cost share classes of TIAA-CREF International Equity and the TIAA-CREF International Equity Index and also invested in the TIAA Real Estate, CREF Stock, CREF Money Market, and CREF Growth (among others); Plaintiff Blackwell invested in the higher-cost share class of TIAA-CREF Lifecycle 2020; Plaintiff Presley invested in the higher-cost share class of Vanguard Total Bond Market and also invested in TIAA Traditional, Vanguard Target Retirement 2025, and Fidelity Capital and Income; Plaintiff Dulock invested in the TIAA Traditional (among others); Plaintiff Guzman invested in the TIAA Traditional; Plaintiff Goldberg invested in the TIAA Traditional and the CREF Stock; and Plaintiff Moore invested in at least one investor share class Vanguard mutual fund. Through their investments in these funds, each of the Plaintiffs paid excessive investment management fees and each was assessed a portion of the Plans' excessive administrative and recordkeeping fees. Plaintiffs would have

paid less had Defendants monitored revenue sharing, solicited competitive bids, consolidated recordkeepers, or reduced fees to reasonable levels in accordance with their fiduciary duties under ERISA.

## PARTIES

### The Emory University Retirement Plan and the Emory Healthcare, Inc. Retirement Savings and Matching Plan

9.      The Plans are defined contribution, individual account, employee pension benefit plans under 29 U.S.C. §1002(2)(A) and §1002(34).

10.     The Plans are established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1).

11.     The Plans provide for retirement income for employees of Emory University, Emory Healthcare, Inc., Emory-Children's Center, Inc. (fka Emory Children's Center, Inc.), Wesley Woods Center of Emory University, Inc., and Emory Specialty Associations, LLC, each of which have adopted the Plans with the consent of Emory University or Emory Healthcare, Inc. That retirement income depends upon contributions made on behalf of each employee by his or her employer, deferrals of employee compensation and employer matching contributions, and from the performance of investment options net of fees and expenses.

12.     As of December 31, 2014, the Retirement Plan had $2.6 billion in net assets and had 20,261 participants with account balances. As of December 31, 2014, the Healthcare Plan had $1.06 billion in net assets and had 21,536 participants with account balances. Each Plan is in the largest 0.1% of all defined contribution plans in the United States based on asset size. Plans of such great size are commonly referred to as "jumbo plans".

## Plaintiffs

13.     Geneva Henderson is a retired Environmental Services Aide at Emory University and Emory Healthcare, and resides in Atlanta, Georgia, and is a "participant" in both the Retirement Plan and Healthcare Plan under 29 U.S.C. §1002(7) and Retirement Plan §3.27 because she and her beneficiaries are eligible to receive benefits under the Plans.

14.     Helen Dulock formerly served as an Assistant Professor in the Neo-Natal Nursing Department at Emory University Nell Hodgson Woodruff School of Nursing and resides in Atlanta, Georgia, and is a participant in the Retirement Plan under 29 U.S.C. §1002(7) and Retirement Plan §3.27 because she and her beneficiaries are eligible to receive benefits under the Plan.

15.     Rena Guzman is a retired employee from the Emory Medical Care Foundation and resides in Atlanta, Georgia, and is a participant in the

Retirement Plan under 29 U.S.C. §1002(7) and Retirement Plan §3.27 because she and her beneficiaries are eligible to receive benefits under the Plan.

16.     Jacqueline Goldberg formerly served as a receptionist or customer representative at the Emory Federal Credit Union (n/k/a Emory Alliance Credit Union) and resides in Atlanta, Georgia, and is a participant in the Retirement Plan under 29 U.S.C. §1002(7) and Retirement Plan §3.27 because she and her beneficiaries are eligible to receive benefits under the Plan.

17.     Connie Corpening is a retired Lieutenant of the Emory Police Department and resides in Woodstock, Georgia, and is a participant in the Retirement Plan under 29 U.S.C. §1002(7) and Retirement Plan §3.27 because she and her beneficiaries are eligible to receive benefits under the Plan.

18.     Joanne Rackstraw is a Senior Secretary of the Emory Police Department and resides in Stonebridge, Georgia, and is a participant in the Retirement Plan under 29 U.S.C. §1002(7) and Retirement Plan §3.27 because she and her beneficiaries are eligible to receive benefits under the Plan.

19.     Joann D. Wright formerly served as an Advanced Clinician in the Cardiology Department at Emory Healthcare and resides in Decatur, Georgia, and is a participant in the Healthcare Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

20.     Deon M. Moore is a Radiology Tech in the Radiology Department at Emory Healthcare and resides in Stone Mountain, Georgia, and is a participant in the Healthcare Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are eligible to receive benefits under the Plan.

21.     Cynthia T. James is a retired Clinical Nurse at Emory Crawford Long Hospital (n/k/a Emory University Hospital Midtown) and resides in Lithonia, Georgia, and is a participant in the Healthcare Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plan.

22.     Huberta W. Waller is a retired Registered Nurse in the Cardiology Department at Emory Healthcare and resides in Stockbridge, Georgia, and is a participant in the Healthcare Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plan.

23.     Jacqueline Blackwell is an Environmental Services Aide at Emory University Hospital Midtown and resides in Stone Mountain, Georgia, and is a participant in the Healthcare Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plan.

24.     Kathryn T. Presley serves as a Medical Technologist II in the Clinical Laboratory at Emory Healthcare and resides in Cumming, Georgia, and is a participant in the Healthcare Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are eligible to receive benefits under the Plan.

## Defendants

25.     Emory University is a non-profit corporation organized under Georgia law with its principal place of business in Atlanta, Georgia. Section 12.1 of the Retirement Plan names Emory University as the fiduciary responsible for the control, management and administration of the Retirement Plan, in accordance with 29 U.S.C. §1102(a). Emory University is the Plan Administrator of the Retirement Plan under Retirement Plan §12.2 and 29 U.S.C. §1002(16)(A)(i) with exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Retirement Plan, with all powers necessary to enable it to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Retirement

Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

26.    Emory Healthcare, Inc. (hereinafter "Emory Healthcare") is a non-profit corporation organized under Georgia law with its principal place of business in Atlanta, Georgia. Upon information and belief, the Healthcare Plan names Emory Healthcare as the fiduciary responsible for the control, management and administration of the Healthcare Plan, in accordance with 29 U.S.C. §1102(a). Emory Healthcare is the Plan Administrator of the Healthcare Plan under 29 U.S.C. §1002(16)(A)(i) with exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Healthcare Plan, with all powers necessary to enable it to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Healthcare Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

27.    Emory University acts through its Board of Trustees, which is authorized to designate a person or a committee to act on behalf of Emory

University with respect to the Retirement Plan, who serve at the pleasure of the Board of Trustees. Emory University also acts through its officers.

28.     Emory Healthcare acts through its Board of Directors, which is authorized to designate a person or committee to act on behalf of Emory Healthcare with respect to the Healthcare Plan, who serve at the pleasure of the Board of Directors. Emory Healthcare also acts through its officers.

29.     The Emory University Board of Trustees has created and controls the membership of the Emory Pension Board, which provides fiduciary oversight and administration of the Plans and Emory University's other defined contribution and deferred compensation plans. The Emory Pension Board provides recommendations on Plan design and changes, reviews and approves the investment strategy and manager selection for the Plans, and monitors the performance of Plan investment options. The Finance Committee of the Board of Trustees of Emory University approves those members that serve on the Emory Pension Board after providing notice and receiving input from the Emory Healthcare Board.

30.     Upon information and belief, the Emory Pension Board has delegated development of Plan investment strategy and investment policies, as well as the appointment of Plan investment managers, to the Emory University Investment Office, aka Emory Investment Management. Emory

Investment Management supervises the management of the assets of the Plans, as well as other defined contribution, defined benefit, deferred compensation, and healthcare trust plans of Emory University and its affiliates. In addition, Emory Investment Management manages Emory University's endowment of more than $7 billion.

31.    Emory Investment Management is responsible for the investment of the assets of the Plans and Emory's other plans to the extent such investment management is not performed by external investment managers. As its investment philosophy, Emory Investment Management pursues value investments, because, as it says, "*price matters*."[4] As Emory Investment Management acknowledges, "Investments into Emory's long-term investment portfolio gain the benefit of professional investment management through a cost effective, risk controlled, and highly diversified portfolio."[5] Emory Investment Management is required to monitor the Plans' investments' compliance with portfolio management guidelines on a monthly basis.

32.    Emory Investment Management is responsible for selecting, retaining, and terminating the external investment managers and

---

[4] See Philosophy, EMORY INVESTMENT MANAGEMENT, available at http://www.investment.emory.edu/About_EIM/About_EIM_Philosophy.html (emphasis added).

[5] See http://www.investment.emory.edu/investment_management/index.html.

investment vehicles for the Plans, monitoring those investments, and implementing and ensuring compliance with the investment policies established by the Investment Committee. Emory Investment Management has responsibility for establishing internal controls, policies, and procedures to govern due diligence, execution, administration and compliance relative to the overall investment of Plan investment options and to undertake ongoing monitoring of such investments.

33.    The Emory University Board of Trustees oversees Emory Investment Management. Through its Investment Committee, the Board of Trustees sets the investment policies for the Plans and sets the overall target asset allocation for Emory's endowment fund. The Investment Committee sets the Statement of Investment Objectives, Policies, and Guidelines (also known as an investment policy statement, or IPS) for the Plans and Emory University's other plans, and is responsible for reviewing the IPS annually to assess its continued appropriateness, developing investment objectives, establishing investment performance and measurement standards and benchmarks, reviewing and evaluating investment results, and reviewing the reasonableness of Plan fees at least annually. The Investment Committee is responsible for reviewing Emory Investment Management's policies for

investment selection, ongoing due diligence of Plan investments, and approving the retention and termination of service providers to the Plan.

34.    The investment objective for the Plans is to provide participants a selection of investment vehicles that will assist participants in achieving long-term retirement goals. To accomplish that objective, investment options provided in the Plans are supposed to be diversified by asset class and investment style to provide participants a reasonable opportunity to create a diversified portfolio. The IPS requires measurement of the performance of Plan investment options against benchmarks over rolling one-, three-, and five-year periods. It also requires that passive index funds be considered for efficient markets such as large capitalization equities, where the IPS recognizes the difficulty in obtaining performance above benchmarks. The IPS also requires consideration of fees and expense ratios when selecting Plan investment options.

35.    The members of the Emory Pension Board include the following officers of Emory University or Emory Healthcare, or their affiliates: Vice President for Investments and Chief Investment Officer, Emory University; Senior Director of Human Resources, Emory Healthcare; Director, the Emory Clinic; Chief Financial Officer, the Emory Clinic; Chief Financial Officer, Emory Healthcare; representative from the Office of the General Counsel,

Emory University; Vice President for Human Resources, Emory University; and Vice President of Finance, Emory University.

36.     Upon information and belief, members of the Emory Pension Board include (or have included) the following officers of Emory University and Emory Healthcare, or other affiliates:

    a.  Vice President for Investments and Chief Investment Officer, Emory University (Chair): Mary L. Cahill

    b.  Senior Director of Human Resources, Emory Healthcare: Mary Beth Allen, and formerly Dallis Howard-Crow

    c.  Director, Emory Clinic: Dr. Douglas Morris

    d.  Chief Financial Officer, Emory Clinic: Brooke Moore

    e.  Chief Financial Officer, Emory Healthcare: James T. Hatcher

    f.  Vice President for Human Resources, Emory University: Peter Barnes

    g.  Vice President for Finance, Emory University: Carol Dillon Kissal, and formerly Edith Murphree

37.     The Investment Committee of the Board of Trustees of Emory University provides general oversight of the investments of the Plans and establishes and maintains the IPS. The Investment Committee delegates to

Emory Investment Management its responsibility for investment selection and implementation of investment policies for the Plans.

38.     Mary L. Cahill, the Vice President of Investments and Chief Investment Officer of Emory University, as previously noted, is responsible for approving investment selections for the Plans as recommended by Emory Investment Management.

39.     Emory Investment Management, the Emory Pension Board, and its individual members, including Ms. Cahill, are fiduciaries to the Plans under 29 U.S.C. §1002(21)(A) because they exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, or had discretionary authority or discretionary responsibility in the administration of the Plans, as described more fully below.

40.     Despite the apparent delegations to various departments within Emory University described above, Emory University informs participants in summary plan descriptions that it is the Plan Administrator and has exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Retirement Plan with all powers necessary to enable it to properly carry out such responsibility and exercise such authority.

41.     Similarly, Emory Healthcare informs participants in summary plan descriptions that it is the Plan Administrator and has exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Healthcare Plan with all powers necessary to enable it to properly carry out such responsibility and exercise such authority.

42.     Because all of the Emory University or Emory Healthcare entities or committee members, including the named individuals, described above have acted as alleged herein as the agents of Emory University or Emory Healthcare, all defendants are collectively referred to hereafter as Defendants.

## ERISA'S FIDUCIARY STANDARDS

43.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)     for the exclusive purpose of
>
> > (i)     providing benefits to participants and their beneficiaries; and
> > (ii)    defraying reasonable expenses of administering the plan;

[and]

(B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

44.    Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and for the *exclusive* benefit of participants in the plan, and not for the benefit of third parties including service providers to the plan such as recordkeepers and those who provide investment products. Fiduciaries must ensure that the amount of fees paid to those service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

45.    "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996); *Katsaros*, 744 F.2d at 279 (fiduciaries must use "the appropriate methods to investigate the merits" of plan investments). A defined

contribution plan fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Instead, fiduciaries must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants." *DiFelice*, 497 F.3d at 423 (emphasis original); *see also* 29 C.F.R. § 2550.404a-1; DOL Adv. Opinion 98-04A; DOL Adv. Opinion 88-16A. Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones" within a reasonable time. *Tibble*, 135 S. Ct. at 1828–29.

46.    In addition to the duties of loyalty and prudence, fiduciaries are required to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent" with ERISA. 29 U.S.C. §1104(a)(1)(D). An investment policy statement or IPS is a governing plan document within the meaning of 29 U.S.C. §1104(a)(1)(D). *See* 29 C.F.R. §2509.94-2 (1994), replaced by 29 C.F.R. §2509.08-2(2)(2008) ("Statements of investment policy issued by a named fiduciary authorized to appoint investment managers would be part of the 'documents and instruments governing the plan' within the meaning of ERISA Sec. 404(a)(1)(D)."). "Fiduciaries who are responsible for plan investments

governed by ERISA must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1042 (9th Cir. 2001). A "failure to follow written statements of investment policy constitutes a breach of fiduciary duty." *Id.* (citing *Dardaganis v. Grace Capital, Inc.*, 889 F.2d 1237, 1241–42 (2d Cir. 1989)). A violation of investment guidelines is an independent breach of fiduciary duty, regardless of whether the action was otherwise prudent. *See* 29 U.S.C. §1104(a)(1)(D).

47.     The general fiduciary duties imposed by 29 U.S.C. §1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. §1106, and are considered *per se* violations because they entail a high potential for abuse. Section 1106(a)(1) states, in pertinent part, that:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
> (A)     sale or exchange, or leasing, of any property between the plan and a party in interest;
> * * *
> (C)     furnishing of goods, services, or facilities between the plan and  party in interest;
> (D)     transfer to, or use by or for the benefit of a party in interest, of any assets of the plan…

48.     ERISA also imposes explicit co-fiduciary liabilities on plan

25

fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary

for knowingly participating in a breach by another fiduciary and knowingly

failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other
> provisions of this part, a fiduciary with respect to a plan shall be liable
> for a breach of fiduciary responsibility of another fiduciary with respect
> to the same plan in the following circumstances:
>
> > (1)   if he participates knowingly in, or knowingly
> > undertakes to conceal, an act or omission of such
> > other fiduciary, knowing such act or omission is a
> > breach; [or]
> >
> > (2)   if, by his failure to comply with section 1104(a)(1) of
> > this title in the administration of his specific
> > responsibilities which give rise to his status as a
> > fiduciary, he has enabled such other fiduciary to
> > commit a breach; or
> >
> > (3)   if he has knowledge of a breach by such other
> > fiduciary, unless he makes reasonable efforts under
> > the circumstances to remedy the breach.

49.   29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a

civil action to enforce a breaching fiduciary's liability to the plan under 29

U.S.C. §1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches
> any of the responsibilities, obligations, or duties imposed upon
> fiduciaries by this subchapter shall be personally liable to make good
> to such plan any losses to the plan resulting from each such breach,

and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## BACKGROUND FACTS

### I.    Defined contribution plans, services, and fees.

50.    When ERISA was enacted in 1974, defined benefit pension plans were America's retirement system. Such plans are now rarely available to employees in the private sector. "Defined contribution plans dominate the retirement plan scene today." *LaRue*, 552 U.S. at 255.

51.    Defined contribution plans allow employees to contribute a percentage of their pre-tax earnings to the plan, with the employer often matching those contributions up to a specified percentage. Each participant in a plan has an individual account. Participants direct the plan contributions into one or more investment options in a lineup chosen and assembled by the plan's fiduciaries. In a defined contribution plan, "participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826.

52.    The majority of fees assessed to participants in a defined

contribution plan are attributable to two general categories of services: plan administration (including recordkeeping), and investment management. These expenses "can sometimes significantly reduce the value of an account in a defined-contribution plan." *Id.*

53.     The plan's fiduciaries have control over defined contribution plan expenses. The fiduciaries are responsible for hiring administrative service providers for the plan, such as a recordkeeper, and for negotiating and approving the amount of fees paid to those administrative service providers. The fiduciaries also have exclusive control over the menu of investment options to which participants may direct the assets in their accounts. Those selections each have their own fees which are deducted from the returns that participants receive on their investments.

54.     These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of *28%* in savings at retirement. U.S. Dep't of Labor, *A Look at 401(k) Plan Fees,* at 1–2 (Aug. 2013).[6] Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control these costs and ensure that participants pay no

---

[6] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

more than a reasonable level of fees. This is particularly true for billion-dollar plans like the Plans, which have the bargaining power to obtain the highest level of service and the lowest fees. The fees available to billion-dollar retirement plans are orders of magnitude lower than the much higher retail fees available to small investors.

55.     The entities that provide services to defined contribution plans have an incentive to maximize their fees by putting their own higher-cost funds in plans and collecting the highest amount possible for recordkeeping. For each additional dollar in fees paid to a service provider, participants' retirement savings are directly reduced by the same amount, and participants lose the potential for those lost assets to grow over the remainder of their careers. Accordingly, participants' retirement security is directly affected by the diligence used by plan fiduciaries to control, negotiate, and reduce the plan's fees.

56.     Fiduciaries must be cognizant of providers' self-interest in maximizing fees, and not simply accede to the providers' preferred investment lineup—*i.e.*, proprietary funds that will generate substantial fee revenue for the provider—or agree to the provider's administrative fee quotes without negotiating or considering alternatives. In order to act in the exclusive interest of participants and not in the service providers' interest,

29

fiduciaries must negotiate as if their own money was at stake. Instead of simply accepting the investment funds or fees demanded by these conflicted providers, fiduciaries must consider whether participants would be better served by using alternative investment products or services.

## II.     Defined contribution recordkeeping.

57.     Recordkeeping is a service necessary for every defined contribution plan. The recordkeeper keeps track of the amount of each participant's investments in the various options in the plan, and typically provides each participant with a quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about the plan and to review their accounts. The recordkeeper may also provide access to investment education materials or investment advice. These services are largely commodities, and the market for recordkeeping services is highly competitive.

58.     There are numerous recordkeepers in the marketplace who are capable of providing a high level of service and who will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan. These recordkeepers will readily respond to a request for proposal and will tailor their bids based on the desired services (*e.g.*, recordkeeping, website, call center, etc.). In light of the commoditized nature of their services,

recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for jumbo plans like the Retirement Plan and the Healthcare Plan.

59.     Some recordkeepers in the market provide only recordkeeping and administrative services, while others provide both recordkeeping services and investment products. The latter group has an incentive to place their own proprietary products in the plan in order to maximize revenues from servicing the plan. As explained below, when faced with such conflicted fund recommendations, fiduciaries must independently assess whether the provider's investment product is the best choice for the plan, or whether the purpose of providing benefits to participants would be better accomplished by considering other investment managers who may offer superior funds at a better price.

### III.    Defined contribution investment options.

60.     Defined contribution fiduciaries have exclusive control over the particular investment options available in a plan. Plan participants direct and allocate the assets in their accounts to one or more of these options, and the investment returns on which are credited to participants' accounts.

61.     Each investment option is typically a pooled investment product,

such as a mutual fund, and invests in a diversified portfolio of securities in a broad asset class such as fixed income, bonds, or equities. Fixed income funds may include conservative principal protection options, such as stable value funds, or other diversified portfolios of government or corporate debt securities. Equity funds invest in diversified portfolios of stocks of large, mid-size, or small domestic or international companies in a particular style such as growth or value (or a blend of the two). Balanced funds invest in a mix of stocks and bonds in varying percentages.

62.     Investment options can be passively or actively managed. In a passively managed or "index" fund, the investment manager attempts to match the performance of a given benchmark index by holding a representative sample of securities in that index, such as the S&P 500. In an actively managed fund, the investment manager uses her judgment in buying and selling individual securities (*e.g.*, stocks, bonds, etc.) in an attempt to generate investment returns that surpass a benchmark index, net of fees. Because no stock selection or research is necessary for the manager to track the index and trading is limited, passively managed investments charge significantly lower fees than actively managed funds.

63.     Mutual fund fees are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the mutual fund

deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points (bps).[7] The fees deducted from a mutual fund's assets reduce the value of the shares owned by fund investors.

64.     Many mutual funds offer their investors different share classes. Retail share classes are marketed to individuals with small amounts to invest. Institutional share classes are offered to investors with large amounts to invest, such as large retirement plans. The different share classes of a given mutual fund have the identical manager, are managed identically, and invest in the same portfolio of securities. The only difference is that the retail shares charge significantly higher fees, resulting in retail class investors receiving lower returns. The share classes are otherwise identical in all respects.

65.     Some mutual funds engage in a practice known as "revenue sharing." In a revenue-sharing arrangement, a mutual fund pays a portion of its expense ratio to the entity providing administrative and recordkeeping services to a plan. The difference in fees between a mutual fund's retail and institutional share classes is often attributable to revenue sharing. To illustrate, a fund's retail share class may have an expense ratio of 100 bps, including 25 bps of revenue sharing, while the institutional share class

---

[7] One basis point is equal to 1/100th of one percent (or 0.01%).

charges 75 bps, with no or lesser revenue sharing. The presence of revenue sharing thus provides an incentive for administrative service providers to recommend that the fiduciary select higher cost funds, including in-house funds of the administrative service provider that pay the provider revenue sharing. "[V]ery little about the mutual fund industry," including revenue sharing practices, "can plausibly be described as transparent[.]" *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 907 (7th Cir. 2013).

66.    The importance of fees cannot be overstated. Indeed, "the duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule" under the common law of trusts, which informs ERISA's fiduciary duties. Restatement (Third) of Trusts ch. 17, intro. note (2007); *see Tibble*, 135 S. Ct. at 1828 (citing Restatement (Third) of Trusts § 90 in finding a continuing duty to monitor under ERISA). As the Restatement explains, "cost-conscious management is fundamental to prudence in the investment function." Restatement (Third) of Trusts § 90 cmt. b. While a fiduciary may consider higher-cost, actively-managed mutual funds as an alternative to index funds, "active management strategies involve investigation expenses and other transaction costs . . . that must be considered, realistically, in relation to the likelihood of increased return from such strategies." Restatement (Third) of Trusts ch. 17, intro. note; *id*. § 90 cmt. h(2).

67.    Academic and financial industry literature demonstrates that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2008); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010)(summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed mutual funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

68.    In light of this effect of fees on expected returns, fiduciaries must carefully consider whether the added cost of actively-managed funds is realistically justified by an expectation of higher returns. Restatement (Third) of Trusts ch. 17, intro. note; *id*. § 90 cmt. h(2). A prudent investor will not select higher-cost actively managed funds without analyzing whether a particular investment manager is likely to beat the overwhelming odds

against outperforming its benchmark index over time, net of the fund's

higher investment expenses.

## IV. Revenue sharing: a practice that can lead to excessive fees if not properly monitored and capped.

69.     There are two primary methods for defined contribution plans to

pay for recordkeeping and administrative services: "direct" payments from

plan assets, and "indirect" revenue sharing payments from plan investments

such as mutual funds. Plans may use one method or the other exclusively, or

may use a combination of both direct and indirect payments.

70.     In a typical direct payment arrangement, the fiduciary contracts

with the recordkeeper to obtain administrative services in exchange for a flat

annual fee based on the number of participants for which the recordkeeper

will be providing services, for example $30 per participant. Jumbo defined

contribution plans possess tremendous economies of scale for purposes of

recordkeeping and administrative fees. A plan with 20,000 participants can

obtain a much lower fee on a per-participant basis than a plan with 2,000

participants.

71.     A recordkeeper's cost for providing services depends on the

number of participants in the plan, not the amount of assets in the plan or in

an individual account. The cost of recordkeeping a $75,000 account balance is

the same as a $7,500 account. Accordingly, a flat price based on the number of participants in the plan ensures that the amount of compensation is tied to the actual services provided and does not grow based on matters that have nothing to do with the services provided, such as an increase in plan assets due to market growth or greater plan contributions by the employee.

72.     As an example, a fiduciary of a 20,000 participant, $2 billion plan may issue a request for proposal to several recordkeepers and request that the respondents provide pricing based on a flat rate for a 20,000 participant plan. If the winning recordkeeper offers to provide the specified services at a flat rate of $30 per participant per year, the fiduciary would then contract with the recordkeeper for the plan to pay a $600,000 direct annual fee (20,000 participants at $30/participant). If the plan's assets increase to $3 billion during the course of the contract but the participant level stays constant, the recordkeeper's compensation does not change, because the services provided have not changed.

73.     Such a flat per-participant agreement does not necessarily mean, however, that every participant in the plan must pay the same $30 fee from his or her account. The fiduciary could reasonably determine that it is equitable to charge each participant the same $30 (for example, through a quarterly charge of $7.50 to each account in the plan). Alternatively, the

fiduciary could conclude that assessing the same fee to all investors would discourage participants with relatively small accounts from participating in the plan, and that, once the aggregate flat fee for the plan has been determined, a proportional asset-based charge would be best. In that case, the flat per-participant rate of $30 per participant multiplied by the number of participants would simply be converted to an asset-based charge, such that every participant pays the same percentage of his or her account balance. For the $2 billion plan in this example, each participant would pay a direct administrative fee of 0.03% of her account balance annually for recordkeeping ($600,000/$2,000,000,000 = 0.0003). If plan assets increase thereafter, the percentage would be adjusted downward so that the *plan* is still paying the same $600,000 price that was negotiated at the plan level for services to be provided to the plan.

74.    Defendants use a different method of paying for recordkeeping for the Plans, through "indirect" revenue sharing payments from the plan's mutual funds. Revenue sharing, while not a *per se* violation of ERISA, can lead to excessive fees if not properly monitored and capped.

75.    In a revenue sharing arrangement, the mutual fund pays the plan's recordkeeper putatively for providing recordkeeping and administrative services for the fund. However, because revenue sharing

payments are asset based, the fees can grow to unreasonable levels if plan assets grow while the number of participants, and thus the services provided, has not increased at a similar rate. The opposite is generally not true. If plan assets decline, participants will not receive a sustained benefit of paying lower fees, because the recordkeeper will demand that the plan make up the shortfall through additional direct payments.

76.     If a fiduciary decides to use revenue sharing to pay for recordkeeping, it is required that the fiduciary (1) determine and monitor the amount of the revenue sharing and any other sources of compensation that the provider has received, (2) compare that amount to the price that would be available on a flat per-participant basis, and (3) control the amount of fees paid through recordkeeping by obtaining rebates of any revenue sharing amounts that exceed the reasonable level of fees.

77.     As to the second critical element—determining the price that would be available on a flat per-participant basis—making that assessment for a jumbo plan requires soliciting bids from competing providers. In billion-dollar plans with over 10,000 participants, such as the Emory Plans, benchmarking based on fee surveys alone is inadequate. Recordkeeping fees for jumbo plans have also declined significantly in recent years due to increased technological efficiency, competition, and increased attention to

fees by sponsors of other plans such that fees that may have been reasonable at one time may have become excessive based on current market conditions. Accordingly, the only way to determine the true market price at a given time is to obtain competitive bids. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011)(a 401(k) excessive fee case which denied summary judgment based in part on the opinion of an independent consultant that "'without an actual fee quote comparison'—*i.e.,* a bid from another service provider—[consultant] 'could not comment on the competitiveness of [recordkeeper's] fee amount for the services provided.'"). Industry experts recognize that this principle applies fully in a university 403(b) context, just as in the 401(k) context. Compared to benchmarking, "the RFP is a far better way to negotiate fee and service improvements for higher education organizations." Fiduciary Plan Governance, LLC, *Buying Power for Higher Education Institutions: When you Have It and When You Don't – Part 2.*[8] Indeed, "[c]onducting periodic due diligence RFPs is a critical part of fulfilling the fiduciary duty." Western PA Healthcare News, *403(b) Retirement Plans:*

---

[8] Available at http://www.fiduciaryplangovernance.com/blog/buying-power-for-higher-education-institutions-when-you-have-it-and-when-you-dont-part-2.

*Why a Due Diligence Request for Proposal.*[9] Engaging in in this RFP process "allows plan sponsors . . .to meet their fiduciary obligations, provides leverage to renegotiate services and fees; enhances service and investment opportunities and improves overall plan operation." *Id.* Prudent fiduciaries of defined contribution plans—including 403(b) plans—thus obtain competitive bids for recordkeeping at regular intervals of approximately three years.

## V. Bundled services and open architecture.

78.     As the prevalence and asset size of defined contribution plans grew, in the shift away from traditional defined benefit pension plans, numerous financial services companies entered this burgeoning retirement plan market. These providers often marketed "bundled" plans, offering to assist in setting up a plan and providing a package of the provider's proprietary investment funds as well as administrative and recordkeeping services. The plans were often marketed as "free" plans, meaning there were supposedly no additional fees beyond the revenues the provider received from having their investment funds in the plan. These purportedly free plans had a significant caveat—in order to obtain the free pricing, the fiduciary had to agree to put the provider's preferred investment lineup in the plan, *i.e.,* a

---

9 Available at http://www.wphealthcarenews.com/403b-retirement-plans-why-a-due-diligence-request-for-proposal/.

group of hand-picked funds that would guarantee the provider would receive its desired fee revenue on an ongoing basis. Any deviations from that lineup or removal of funds after the plan was established would require the provider's approval or result in the plan being assessed additional direct fees. Thus, under these closed arrangements, funds were included in some defined contribution plans not based on an independent analysis of their merits or what was in the best interests of participants, but because of the benefits they provided to the plan's service providers.

79.    In an open architecture model, a plan is not limited to the recordkeeper's own proprietary investment products, which the provider has an interest in including in the plan because the funds provide it with revenue sharing and investment fees. Instead, the fiduciary is free to reject the recordkeeper's conflicted fund recommendations, can independently assess whether another investment manager offers a superior product at a more attractive price, and can include such funds in the plan's investment lineup. Open architecture also facilitates negotiation of reasonable recordkeeping fees, since the price of the recordkeeping service is more transparent and not obscured by opaque revenue sharing arrangements—through which the investment product provider does not publicize the amount of revenue sharing it kicks back to itself in its separate role as a recordkeeper—and can

be negotiated separately without investment revenue skewing the recordkeeping price. There are recordkeepers in the market that exclusively operate on an open architecture basis in that they do recordkeeping only and do not sell investment products. These providers can offer pricing on a pure per-participant basis, without any revenue sharing component taken from funds in the plan. In light of these benefits, prudent fiduciaries of large defined contribution plans have largely rejected bundling and embraced open architecture platforms.

80. Open, transparent architecture allows for greater control over revenue sharing arrangements if they are used at all, and indeed, allows a fiduciary to eliminate revenue sharing altogether. If revenue sharing payments are used, they can effectively be "kickbacks" to induce recordkeepers to advocate for a fund to be included in the plan's investment lineup or even attempt to dictate its inclusion. An independent assessment of each fund is thus essential and required by ERISA to determine whether the fund should be included in the plan based strictly on its merits as an investment, regardless of whether it provides revenue sharing.

## VI.   403(b) plans share common fiduciary duties with 401(k) plans.

81. Defined contribution plans can qualify for favored tax treatment under different sections of the Internal Revenue Code. Plans offered by

corporate employers typically qualify under 26 U.S.C. §401(k), and are commonly referred to as 401(k) plans. Tax-exempt organizations, public schools (including state colleges and universities), and churches are eligible to offer plans qualified under §403(b), commonly known as 403(b) plans. 26 U.S.C. §403(b)(1)(A).

82.  Plans sponsored by tax-exempt organizations such as private universities, unlike churches and public schools, are subject to Title I of ERISA and its fiduciary requirements, unless the plan satisfies a 1979 "safe-harbor" regulation based on the employer having limited involvement in operating the plan. 29 C.F.R. §2510.3-2(f). To the best of Plaintiffs' knowledge, the Plans have never qualified for the safe harbor, and thus have long been subject to ERISA's fiduciary requirements. In the Plans' annual reports (Forms 5500) filed with the Department of Labor, Defendants have acknowledged the Plans are subject to ERISA.

83.  Moreover, Defendants have disclosed that the Emory University Retirement Plan has been subject to ERISA since at least May 31, 1991. According to the May 31, 1991 summary plan description for the Retirement Plan, Emory affirmatively admitted that "*ERISA imposes duties upon the people who are responsible for the operation of the Plan*. The people who operate your Plan ('fiduciaries') have a duty to do so prudently and in the

44

interest of you and other Plan participants and beneficiaries." (emphasis added).

84.    Although 401(k) plans and 403(b) plans have different historical origins, legislative and regulatory developments over a number of decades largely eroded those differences, as reflected in final 403(b) regulations published by the IRS on July 26, 2007. Sponsors of 403(b) plans were given almost one-and-a-half years to prepare for the effective date of the regulations, January 1, 2009. The regulations required certain employers to become more involved with administering their plans than they had previously, potentially disqualifying those plans from satisfying the ERISA safe harbor and subjecting the plans to ERISA fiduciary requirements for the first time. However, for retirement plans like the Plans that were *already* subject to ERISA's fiduciary requirements because they were never safe-harbor plans, the IRS regulations had no effect on the Plans' status for ERISA fiduciary purposes; ERISA already required Defendants to be actively involved in exercising care, prudence, skill, and diligence in administering the Plans for the exclusive benefit of participants.

85.    When §403(b) was first enacted in 1958, plan assets could only be invested in insurance company annuity contracts. 26 U.S.C. §403(b)(1). In 1974, §403(b) was amended to allow 403(b) plans to invest in custodial

accounts holding mutual fund shares. 26 U.S.C. §403(b)(7).

86.    Regardless of any differences between 401(k) and 403(b) plans, both types of plans have the same fundamental purpose: allowing employees to save for a secure retirement. The duties of fiduciaries in both are the same: to operate as a financial expert familiar with investment practices, to operate the plan for the exclusive benefit of employees and retirees, and to make sure that fees are reasonable and investments are prudent. Participants in both types of plans depend on their plan fiduciaries to ensure that those savings are not depleted by excessive fees or imprudent investments. Accordingly, the historical differences and investment limitations of 403(b) plans do not allow 403(b) fiduciaries to exercise a lesser degree of care or attention to fees and investments than their 401(k) counterparts.

**VII.   Historical practice of multiple recordkeepers and placement of many investment options in 403(b) plans, which some fiduciaries failed to evaluate as required.**

87.    As the Department of Labor has recognized, historically, many 403(b) sponsors had treated their plans as a collection of individual contracts under which employees could take various actions without the consent or involvement of the employer or plan administrator, instead of fiduciaries evaluating investment options placed in the plan. Field Assistance Bulletin 2009-02.

88.    Some 403(b) plans historically before 2009 included multiple bundled service providers, with each performing the recordkeeping function for its own investment products in the plan, unlike 401(k) plans which had a single recordkeeper. In fact, "403(b) plan investment options were often 'sold' by record keepers and their representatives rather than offered by plan sponsors as evaluated investments." Fiduciary Plan Governance, LLC, *Legacy Investments in Higher Education: What is a Plan Sponsor's Responsibility to Participants*?[10] Indeed, sponsors of these plans often took a "'hands off' approach to plan oversight." *Id*. This practice resulted in plans having excessive recordkeeping costs and structures involving multiple recordkeepers with each recordkeeper having its own investment options in the plan. This left participants with the task of navigating a haphazard collection of duplicative and overlapping investment options from the various recordkeepers, and ultimately led to them paying excessive and unnecessary fees, both for recordkeeping and for investment products in the plans. *Id*. In some cases the recordkeeper insisted on its own funds being included in the plan without any resistance or analysis of those funds by the fiduciaries.

---

[10] Available at http://www.fiduciaryplangovernance.com/blog/legacy-investments-in-higher-education-what-is-a-plan-sponsors-responsibility-to-participants.

## VIII. TIAA-CREF's bundled 403(b) plan services.

89.    TIAA-CREF is an insurance company financial services provider that historically has dominated the market for services to educational institution 403(b) plans, and has heavily marketed to them. TIAA-CREF consists of two companion organizations: Teachers Insurance and Annuity Association of America ("TIAA"), and College Retirement Equities Fund ("CREF"). The services that TIAA-CREF provides to 403(b) plans include annuities, mutual funds, insurance coverage, trust services, and administrative services.

90.    Although TIAA-CREF's marketing materials suggest that it is a "nonprofit" organization, that is misleading. In 1998, Congress revoked both TIAA's and CREF's statuses as tax-deductible 501(c)(3) charitable organizations because TIAA-CREF "competed directly with for-profit insurance companies and mutual fund groups." Reed Abelson, *Budget Deal to Cost T.I.A.A.-C.R.E.F. Its Tax Exemption*, N.Y. Times (July 30, 2007).[11] As a result, they are subject to federal income taxation and are not 501(c)(3) charitable organizations.

91.    While CREF is organized as a New York not-for-profit

---

[11] Available at http://www.nytimes.com/1997/07/30/business/budget-deal-to-cost-tiaa-cref-its-tax-exemption.html.

corporation, TIAA is organized as a *for-profit* stock life insurance company.

TIAA's "operating surplus" is spent, loaned, and otherwise distributed to

some of its subsidiaries as well. An example is Nuveen Investments, a for-

profit investment manager, which TIAA acquired in April 2014 for an

enterprise value of $6.25 billion. TIAA receives dividends from these for-

profit subsidiaries.[12]

92.     TIAA owns and controls numerous for-profit subsidiaries, which

send dividends to TIAA, including the following subsidiaries for which TIAA

files consolidated federal income tax returns:

| TIAA Subsidiary | Not-For-Profit Entity | For-Profit Entity |
|---|---|---|
| 730 Texas Forests Holdings, Inc. | | X |
| Covariance Capital Management, Inc. | | X |
| GreenWood Resources, Inc. | | X |
| JWL Properties, Inc. | | X |
| ND Properties, Inc. | | X |
| Nuveen Asia Investments, Inc. | | X |
| Nuveen Holdings, Inc. | | X |
| Nuveen Investments, Inc. | | X |
| Nuveen Investments Advisers, Inc. | | X |
| Nuveen Investments Holdings, Inc. | | X |

[12] Available at https://www.tiaa.org/public/pdf/C16623_where-tiaa-profits-go.pdf.

| TIAA Subsidiary | Not-For-Profit Entity | For-Profit Entity |
|---|---|---|
| Nuveen Investments Institutional Services Group, LLC | | X |
| Nuveen Investment Solutions, Inc. | | X |
| Nuveen Securities, LLC | | X |
| Oleum Holding Company, Inc. | | X |
| Rittenhouse Asset Management, Inc. | | X |
| T-C Europe Holdings, Inc. | | X |
| T-C SP, Inc. | | X |
| T-C Sports Co., Inc. | | X |
| T-Investment Properties Corp. | | X |
| TCT Holdings, Inc. | | X |
| Teachers Advisors, Inc. | | X |
| Teachers Personal Investors Service, Inc. | | X |
| Terra Land Company | | X |
| TIAA Asset Management Finance Company, LLC | | X |
| TIAA-CREF Life Insurance Company. | | X |
| TIAA-CREF Tuition Financing, Inc. | | X |
| TIAA-CREF Trust Company, FSB | | X |
| Westchester Group Asset Management, Inc. | | X |
| Westchester Group Farm Management, Inc. | | X |
| Westchester Group Investment | | X |

| TIAA Subsidiary | Not-For-Profit Entity | For-Profit Entity |
|---|---|---|
| Management Holding, Inc. | | |
| Westchester Group Investment Management, Inc. | | X |
| Westchester Group Real Estate, Inc. | | X |

*See* 2015 Annual Statement of the Teachers Insurance and Annuity Association of America, at 39, 112–19 (Jan. 26, 2016).[13]

93.     Also, consistent with its conduct as a profit-seeking enterprise, the compensation of TIAA's CEO and other executives is greater than or close to the very highest paid executives of some of Wall Street's largest for-profit investment managers and insurance companies, such as J.P. Morgan Chase, Prudential, Deutsche Bank, and Metlife. In 2015, TIAA's CEO received $18 million in compensation,[14] more than the CEOs of Metlife ($14 million) and Deutsche Bank ($5.2 million), and just below the CEOs of J.P. Morgan Chase ($18.2 million) and Prudential ($19.9 million). When expressed as a

---

[13] Available at https://www.tiaa.org/public/pdf/tiaa_annual_statement_2015.pdf. This list does not include the hundreds of TIAA's for-profit, joint venture subsidiaries, all of which are controlled by TIAA. *See id*. at 112–19; *see also* https://www.sec.gov/Archives/edgar/data/1429401/000119312510093446/dex21.htm.

[14] TIAA Compensation Disclosures, Executive Compensation Discussion and Analysis, at 20 (May 2016), available at https://www.tiaa.org/public/pdf/about/governance/exec_comp_policy.pdf.

percentage of assets under management, TIAA's CEO had the very highest

compensation rate among reporting investment companies. In fact, TIAA's

five highest-ranking "named executive officers" earned a combined total of

well over $40 million in compensation in 2015. *Id.*



94.    Adding to this, and undercutting any claim that it operates as a

non-profit, TIAA's compensation disclosures further state that its employees'

compensation and benefits programs are linked to "*profitability.*" TIAA

Compensation Disclosures, *Executive Compensation Discussion and Analysis*

3 (May 2016)(emphasis added).[15]

95.    Responding to criticism that TIAA-CREF's CEO and other executives "garnered salaries and bonuses significantly greater than similar pension fund operations," TIAA-CREF responded that such extremely high pay was justified because "the company had to compete for top-level employees with major financial services corporations." Funding Universe, *Teachers Insurance and Annuities Association – College Retirement Equities Fund History* [16] Critics found this justification dubious because the "flagship CREF Stock Account, an equity portfolio of $59 billion, was primarily indexed to the Russell 3000," meaning that "CREF automatically invested nearly two of every three dollars in companies held by the benchmark fund," leaving "little for the highly paid officers to manage." *Id.*

96.    In benchmarking (and justifying) its executives' compensation packages, TIAA disclosed the following sixteen *for-profit* financial services and insurance companies as the peer group it used for competitive analysis:

---

[15] Available at
https://www.tiaa.org/public/pdf/about/governance/exec_comp_policy.pdf.
[16] Available at http://www.fundinguniverse.com/company-histories/teachers-insurance-and-annuity-association-college-retirement-equities-fund-history/.

The comparator group used in the market competitive analysis consists of the following sixteen companies (the "Peer Group"), which were selected based on being of similar size and complexity in the asset management and insurance industries:

| Affiliated Managers Group | Invesco | Principal Financial |
|---|---|---|
| Ameriprise Financial | Legg Mason | Prudential Financial |
| Bank of NY Mellon | Lincoln National | T. Rowe Price |
| Charles Schwab | MassMutual Financial | Voya Financial |
| Franklin Resources | MetLife | |
| The Hartford Financial | Northern Trust | |

97.    TIAA-CREF provided its 403(b) plan services exclusively on a bundled basis. If a plan wished to offer the TIAA Traditional Annuity, a fixed annuity product, TIAA-CREF required that the CREF Stock Account and Money Market Account also be put in the plan, and required the plan to use TIAA as recordkeeper for its proprietary products. Thus, by using TIAA-CREF, the Emory fiduciaries locked the Plans into an arrangement in advance in which certain investments could not be removed from the plan—*even if the funds were not prudent investments or would become imprudent in the future*. By accepting this arrangement, Defendants failed to implement an open architecture platform and use another recordkeeper who could provide the same administrative services at lower cost. Compounding this bundling requirement by TIAA, Defendants used multiple recordkeepers, each with their own investment products, resulting in an inefficient and excessively expensive plan structure, as described in more detail below.

98.    There is no shortage of high-quality, low-cost alternatives to

TIAA-CREF's products in the defined contribution plan market. For example, many 403(b) plan fiduciaries have recognized that stable value funds are prudent alternatives to TIAA's Traditional Annuity as a conservative principal preservation option, providing superior returns to a money market fund, and can be recordkept by virtually any defined contribution recordkeeper. Other insurance companies, besides TIAA, also offer fixed annuity products. And there are myriad large cap blend mutual fund investments in the market that provide far superior returns to the CREF Stock Account at much lower cost. Fiduciaries of 403(b) defined contribution plans must engage in a cost-benefit analysis to evaluate each investment option and determine whether it is prudent and in the exclusive best interest of participants, in light of TIAA-CREF's restrictions and superior market alternatives in the market, to lock their plans into an arrangement that precludes the removal of imprudent plan investments and results in excessive plan fees. Defendants failed to perform such an evaluation of the funds and services TIAA-CREF required. Defendants also failed to evaluate whether participants would be better served by using superior low-cost alternatives to TIAA-CREF's products when they could have saved millions of dollars in administrative and investment management costs by hiring a different recordkeeper. As explained below, prudent 403(b) fiduciaries have

engaged in this analysis and overhauled their plans for the benefit of participants.

## IX.   Move to consolidation and open architecture in 403(b) plans.

99.   Under the 2007 final regulations that became effective January 1, 2009,[17] certain employers with 403(b) plans were compelled to exercise greater control over their 403(b) plans than they had previously. Among other things, the final regulations required 403(b) plans to be maintained under a "written defined contribution plan" containing all the material terms and conditions for benefits under the plan. DOL separately published revised Form 5500 annual reporting rules effective January 1, 2009, that required large ERISA-covered 403(b) plans to file audited financial statements providing detailed information about the assets in the plan. The regulations are expressly intended to make 403(b) plans more like 401(k) plans.

100.   Once the final regulations were published, many 403(b) plan fiduciaries recognized that fulfilling their fiduciary obligations required them to engage, if they had not already been doing so, in a comprehensive review of their plans' fees, investment options and structure, and service provider arrangements, to determine whether changes had to be made for the benefit

---

[17] The regulations gave 403(b) plans almost a year and a half to make changes necessary to comply before the regulation became effective January 1, 2009.

of participants. While the Plans have long been subject to ERISA because their employer match was sufficient for the Plans to be "established or maintained" as ERISA plans under 29 U.S.C. §1002(2)(A)—and, indeed Defendants have informed the Department of Labor in the Plans' Forms 5500 that the Plans are subject to ERISA—even if they had not previously been subject to ERISA's requirements, there can be no doubt that 403(b) plan fiduciaries could not just accept investment options provided by the same providers who did recordkeeping for the plan in order to comply with ERISA's requirements that all fees be reasonable and investments be prudent.

101.   Once these regulations were published, some non-profit plan sponsors whose 403(b) programs previously qualified for the safe-harbor determined they would have to comply with ERISA's fiduciary requirements by the regulations' effective date of January 1, 2009. As a result, the fiduciaries of many 403(b) plans implemented dramatic overhauls to their plans and acknowledged that these changes were necessary to comply with the IRS regulations and to satisfy their fiduciary obligations under ERISA.

102.   For example, the fiduciaries of the Loyola Marymount University (LMU) Defined Contribution Plan, a 403(b) plan, recognized that under the new regulations, "Recordkeeping must be consolidated and/or managed by a

single party." *See* LMU 403(b) Retirement Plan Project Overview, at 1.[18]
Beginning in 2008, to assist LMU in assessing the plan's investment options
and recordkeeping services, LMU hired an independent third party
consultant, Hewitt Associates (n/k/a AonHewitt), to issue a request for
proposal to seven different 403(b) recordkeeping providers, including AIG
Retirement, Diversified Investment Advisors, Fidelity, ING, Lincoln
Financial Group, Principal Financial Group, and TAA-CREF.[19] LMU
consolidated from two recordkeepers to one effective on the date the final
regulation became effective, January 1, 2009. Loyola Marymount's fiduciaries
recognized that a dual recordkeeper structure would require its employees to
pay higher fees for overlapping services, and because consultants, legal
counsel, and all of the recordkeeping firms interviewed recommended that
LMU use only one record keeper, starting in January 2009. *See* LMU 403(b)
Retirement Plan Project Overview, at 2. Moreover, LMU selected Diversified
as the new recordkeeper because Diversified "is not an investment manager
and therefore, does not require that certain investment options be offered by
LMU." *Id*. LMU was therefore able to offer "best in class" funds in each fund
category. *Id.* at 6.

---

[18] Available at http://www.lmu.edu/AssetFactory.aspx?vid=33038
[19] *See* http://www.lmu.edu/AssetFactory.aspx?vid=32045.

103.   Similarly, following the new IRS 403(b) regulations, the

fiduciaries of the Pepperdine University Retirement Plan recognized the

implications of maintaining four different recordkeepers. In order to comply

with the regulations and its fiduciary responsibilities, Pepperdine determined

that it must make certain changes to the plan, including "Consolidating

recordkeeping (by having one fund provider manage administration for

multiple providers or by moving to a sole administrator scenario)." *See*

Pepperdine University Participant Q & A. [20] Pepperdine retained an

independent third party consultant to assist the fiduciaries in issuing a

request for proposal to different 403(b) recordkeeping providers. Following

the competitive bidding process, effective February 1, 2009, Pepperdine

selected Diversified, a recordkeeper which does not offer proprietary

investments, as the "sole administrator" and consolidated from four

recordkeepers (Fidelity, TIAA-CREF, Vanguard and Prudential) to a single

recordkeeper. Pepperdine found that the benefits of consolidation included

lower costs and more robust services, as well as a streamlined compliance

process and simplified data coordination. *Id.* Pepperdine acknowledged that

maintaining a multiple-vendor platform was not a "cost-effective, viable

---

[20] Available at

http://community.pepperdine.edu/hr/content/benefits/fulltime/faq.pdf.

option." Paul B. Lasiter, *Single Provider, Multiple Choices*, NACUBO .[21]

Recognizing the inefficiencies and overlapping work in a multiple

recordkeeper arrangement, Pepperdine determined that costs were "higher in

a multivendor arrangement, because each vendor receives only a portion of

the ongoing total plan contributions," while a single provider allowed to

"realize true economies of scale." *Id.*

    104.   Pepperdine also recognized that the bundled model demanded by

certain providers was not in participants' interest. Using those providers

"meant being obligated to offer some or all of that provider's proprietary

funds on the plan's investment menu—*whether or not those investments*

*offered participants the best range of choice, value, and relative performance*."

*Id.* (emphasis added). Acting in participants' interest required that the

fiduciaries instead have the ability to select those "funds that the

university—working with an independent financial adviser—could identify as

being the 'best options in their respective asset classes.'" *Id.*  After weighing

and analyzing a variety of factors, Pepperdine determined that "consolidating

with a single vendor has been the straightforward solution to achieving" the

objective of acting "for the exclusive benefit of plan participants." The

---

[21] Available at
http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_Provider_Multiple_Choices.html.

benefits of consolidation included "[a] better fiduciary process with ongoing evaluation" of plan investments, "[e]conomies of scale," and "[g]reater transparency of fees and lowered costs for plan participants." *Id.*

105.   In the fall of 2008, in response to the new, not yet effective regulations and required changes within the defined contribution industry, Purdue University began a comprehensive review of its defined contribution retirement program. Purdue recognized that "*[t]he primary intent of the regulations was to reduce the difference between Section 403(b) plans, Section 401(k) plans* and Section 457(b) plans; to enhance 403(b) plan compliance; and to establish a more structured retirement program for employees in the non-profit sector." James S. Almond, *403(b) Plan Redesign–Making a Good Retirement Plan Better*, Purdue University (emphasis added).[22] Purdue hired an independent third party consultant, EnnisKnupp & Associates (n/k/a AonHewitt), to assist the fiduciaries in evaluating the investment options, participants' fees, and recordkeeping services, which included developing and issuing an RFP to recordkeepers. The "benefits" of Purdue's program enhancements included the transition from five providers (TIAA-CREF,

---

[22] Available at http://www.cacubo.org/wp-content/uploads/2016/02/10_403b_Plan_Redesign_Making_a_Good_Retirement_Plan_Better.docx.

Fidelity, American Century, Lincoln, and VALIC) to a single administrative service provider (Fidelity) with a corresponding significant reduction in recordkeeping expenses. The reformed plan "[p]rovided a transparent investment and administrative fee structure" and "[l]everaged plan assets to lower administrative and investment fees, including access to institutional share class funds and a flat administrative fee, instead of administrative fees as a percentage of retirement savings." Purdue reduced the number of investment options from 381 to 19, "eliminating redundant investment options with varying levels of expenses" and replacing the menu of duplicative investment options with "a limited menu of pre-screened, broadly diversified investment options." *Id.* Purdue's analysis showed that "reducing administrative and investment plan fees under the new structure for a plan of Purdue's size, would increase participant balances by an estimated *$3–4 million per year* which is then compounded over time." *Id.* (emphasis added).

106. Likewise, California Institute of Technology (CalTech) TIAA-CREF DC Retirement Plan consolidated from multiple recordkeepers (TIAA-CREF and Fidelity) to a single recordkeeper (TIAA-CREF) effective January 1, 2010, with the assistance of an independent third party consultant, Mercer Investment Consulting. *See Caltech Names TIAA-CREF Recordkeeper,*

Institutional Investor (Dec. 10, 2009).[23] In selecting a core set of investment options for the plan, CalTech eliminated over 100 Fidelity mutual fund options. Based on disclosures in the plan's Forms 5500 filed with the Department of Labor, between 2013 and 2015, CalTech negotiated over *$15 million* in revenue sharing rebates from TIAA-CREF, which was returned to the plan to benefit participants.

107.  Extensive industry literature shows that these sponsors are not outliers, and that similarly situated fiduciaries who have also comprehensively reviewed their plans have been able to reduce recordkeeping and investment management fees, consolidate recordkeepers and investment options, leading to enhanced outcomes and retirement security for their plans' participants.

108.  In connection with a plan redesign project at the University of Notre Dame, independent investment consultant Hewitt EnnisKnupp (n/k/a AonHewitt) issued a "403(b) Plan Redesign Working Paper" which set forth 403(b) fiduciary best practices taken in response to the IRS 403(b) regulations. Hewitt EnnisKnupp, *403(b) Plan Redesign Working Paper:*

---

[23] Available at http://www.institutionalinvestor.com/Article/2355324/Search/Caltech-Names-TIAA-CREF-Record-Keeper.html#/.WBn8Oy0rKpp.

*University of Notre Dame* (Feb. 2014).[24] Hewitt noted that "[w]ith the issuance of new Internal Revenue Service regulations in 2008, there has been an accelerated evolution of the 403(b) marketplace into something that more closely resembles the private sector 401(k) market." *Id.* at 3.

109.   Hewitt noted several areas of plan improvements. *First*, recordkeeper consolidation provided "many benefits to participants," including cost savings.  Although the multiple-recordkeeper model had been common in the higher-education marketplace, "[e]xperience and research suggests that this type of administrative structure can be costly and confusing to faculty and staff." *Id.* at 4. "The multiple-recordkeeper model tends to divide participant assets into individual accounts held at separate recordkeepers resulting in costs that are meaningfully higher than under a single recordkeeper model." *Id.* at 5. Such "[e]xcess fees and misallocated costs are a potential threat to the financial security of many defined contribution plan participants." *Id.*

110.   *Second*, Hewitt recommended that plans "unbundl[e]" investment management and administrative services, and to replace revenue sharing arrangements with "explicit, hard dollar administrative fee[s]." Hewitt's

---

[24] Available at https://workplacecontent.fidelity.com/bin-public/070_NB_PreLogin_Pages/documents/ND_403(b)%20Plan%20Redesign%20White%20Paper.pdf.

"experience and research suggests that the transparency gained through an 'unbundled' administrative fee solution with little or no revenue sharing typically results in meaningful fee savings for participants." *Id.* at 6. An unbundled arrangement allows plan fiduciaries "to determine whether or not the internal administrative fee allocations used by the existing bundled recordkeepers is a true representation of the costs of these services." *Id.* An unbundled arrangement also provided opportunities to incorporate "'institutional' share classes of funds" into the investment lineup.

111.   Further, according to a 2013 survey of 403(b) plans, more than 90% of plans use a single recordkeeper to provide administrative and recordkeeping services to participants. *See* LIMRA Retirement Research, *403(b) Plan Sponsor Research* (2013).[25]

112.   Annual surveys by Plan Sponsor Council of America found that in each year from 2010 through 2014, unlike the Emory Plans, the overwhelming majority of 403(b) plans—over 80%—have only a single recordkeeper, and provide an average of 28 investment fund options.[26] An

---

[25] Available at http://www.limra.com/uploadedFiles/limracom/LIMRA_Root/Secure_Retirement_Institute/News_Center/Reports/130329-01exec.pdf.

[26] Each PSCA survey covers the year prior to the year indicated in the title. PSCA's 2015 Benchmarking Survey of 403(b) Plans, at 32, 65; PSCA's 2014 Benchmarking Survey of 403(b) Plans, at 32, 61; PSCA's 2013 Benchmarking

earlier PSCA survey of 403(b) plans found that as of 2009, 57% of 403(b) plan

fiduciaries had made changes to their plans as a result of the new 403(b)

regulations that became effective January 1, 2009.[27]

113.   The majority of plans use a single recordkeeper because a "**multi-recordkeeper platform is inefficient**" and squanders the ability to

leverage a plan's bargaining power. The Standard Retirement Services, Inc.,

*Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 (Nov.

2009)(emphasis in original).[28] "By selecting a single recordkeeper, plan

sponsors can enhance their purchasing power and negotiate lower,

transparent investment fees for participants," while allowing participants to

"benefit from a more manageable number of institutional-quality investment

options to choose from." *Id.* Additional benefits of a single recordkeeper

platform include simplifying personnel and payroll data feeds, reducing

electronic fund transfers, and avoiding duplication of services when more

than one recordkeeper is used.

114.   AonHewitt, an independent investment consultant, similarly

---

Survey of 403(b) Plans, at 32, 61, 64; PSCA's 2013 Benchmarking Survey of
403(b) Plans, at 32, 61, 64; PSCA's 2012 Benchmarking Survey of 403(b)
Plans, at 30, 61, 64; PSCA's 2012 Benchmarking Survey of 403(b) Plans, at
30, 61, 64; PSCA's 2011 Benchmarking Survey of 403(b) Plans, at 28, 55, 59.
[27] PSCA's 2010 Benchmarking Survey of 403(b) Plans, at 45.
[28] Available at
https://www.standard.com/pensions/publications/14883_1109.pdf.

recognized that "403(b) plan sponsors can dramatically reduce participant-borne costs while improving employees' retirement readiness by" "[c]onsolidating recordkeepers," "[l]everaging aggregate plan size and scale to negotiate competitive pricing, and reducing the number of investment options and "utilizing an 'open architecture' investment menu[.]" AonHewitt, *How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It* (Jan. 2016).[29]

115.   Another independent investment consultant, Towers Watson, also recognized that using multiple recordkeepers makes it "difficult for employers to monitor available choices and provide ongoing oversight" while harming participants through "high investment and administrative costs" and a lack of guidance needed to achieve retirement readiness. Peter Grant and Gary Kilpatrick, *Higher Education's Response to a New Defined Contribution Environment*, Towers Watson Viewpoints, at 2 (2012).[30]

116.   The recommendations of these independent, widely used

---

[29] Available at https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-4bc0-aac1-1685d2a64078/How_403(b)_Plans_are_Wasting_Nearly_$10_Billion_Annually_Whitepaper_FINAL.pdf.aspx.

[30] Available at https://www.towerswatson.com/DownloadMedia.aspx?media=%7B08A2F366-14E3-4C52-BB78-8930F598FD26%7D.

investment consultants are buttressed by other industry literature supporting the fact that the use of a single recordkeeper provides reasonable fees. *See, e.g.*, Kristen Heinzinger, *Paring Down Providers: A 403(b) Sponsor's Experience,* PLANSPONSOR (Dec. 6, 2012)("One advantage of consolidating to a single provider was an overall drop in administrative fees and expenses. Recordkeeping basis points returned to the plan sponsors rather than to the vendor. All plan money aggregated into a single platform, and participants were able to save on fee structure. This also eliminated the complications and confusion of having three different recordkeepers.");[31] Paul B. Lasiter, *Single Provider, Multiple Choices*, BUSINESS OFFICER (Mar. 2010)(identifying, among other things, the key disadvantages of maintaining a multi-provider platform including the fact that it is "cumbersome and costly to continue overseeing multiple vendors.").[32]

117.   Use of a single recordkeeper is also less confusing to participants and eliminates excessive, overlapping recordkeeping fees. *Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29, 2010)(recognizing the following benefits, among others: "The plan

---

[31] Available at http://www.plansponsor.com/paring-down-providers-a-403b-sponsors-experience/?fullstory=true.

[32] Available at http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_Provider_Multiple_Choices.html.

participant experience is better" because "employees are benefiting from less confusion as a result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because "[w]ith a reduced number of vendors in the equation, plan sponsors are better able to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per-participant ratio").[33]

## DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES AND COMMITTED PROHIBITED TRANSACTIONS

118.   The use by Defendants of multiple recordkeepers and proprietary funds required by the recordkeepers to be included in the Plans demonstrates that, in contrast with the comprehensive plan reviews conducted by the 403(b) plan fiduciaries described above, Defendants failed to adequately engage in a similar analysis. Had Defendants conducted such a review of the Plans, Defendants would not have allowed the Plans to continue to pay excessive administrative fees; would not have maintained an inefficient multi-recordkeeper structure; would not have continued to include over 100 investment options in the Plans, including duplicative funds in numerous investment styles and higher-cost retail share classes for which identical lower-cost versions of the same funds were available; and would not have

---

[33] Available at http://www.plansponsor.com/vendor-consolidation-in-higher-education/?fullstory=true.

retained investment options in the Plans despite a sustained track record of underperformance. This follows because a prudent process would have produced a different outcome.

## I.    The Plans' investments.

119.   In the Plans, Emory University or Emory Healthcare makes a non-elective contribution to individual participant accounts and provides eligible employees a cash or deferred arrangement in which employees can elect to have their employer contribute a portion of their compensation to their individual accounts in the Plans and the employer will provide a matching contribution.

120.   All contributions to individual participant accounts are held in group custodial accounts that are selected and maintained by Emory University or Emory Healthcare. The Plans allow participants to designate investment options into which their individual accounts are invested. Emory University has and exercises exclusive and discretionary authority and control over the investment options that are included in the Retirement Plan, and Emory Healthcare has and exercises exclusive and discretionary authority and control over the investment options that are included in the Healthcare Plan.

121.   Defendants have included as Plan investment options over 100 different mutual funds or insurance company variable annuity products from TIAA-CREF, Vanguard, and Fidelity.

122.   The Plans' investment options were and are offered by three separate recordkeepers who provide custodial and recordkeeping services to the Plans. As previously noted, these recordkeepers are Fidelity, TIAA-CREF, and Vanguard.

123.   Defendants select investment options into which participants' investments are directed, including those investment options that have been removed from the Plans.

124.   The Retirement Plan and the Healthcare Plan offer the virtually the same investment options to participants based on Defendants' centralized management of Plan assets. As of December 31, 2014, Defendants included *111* investment options in the Plans, including 43 Fidelity options, 23 TIAA-CREF options, and 44 Vanguard options. These investments included mutual funds, an insurance separate account, variable annuity options, and a fixed annuity option. Despite the jumbo size of the Plans, the mutual fund options included *retail* share class mutual funds designed for small individual investors which are identical in every respect to institutional share classes of the same funds, except for much higher fees.

71

125.   All investment options provided to the Plans' participants are designated by Emory University or Emory Healthcare as available investment alternatives offered under the Plans.

126.   Many of the Plans' mutual funds offer multiple share classes. The share classes are identical in nearly all respects. They invest in the same portfolio of securities and provide identical investment management; the only difference between the share classes is cost. "Retail" shares are designed for small individual investors and charge much higher fees, resulting in lower net investment returns. "Institutional" shares are designed for investors with a large amount of assets to invest, such as billion dollar retirement plans. As explained more fully below, Defendants selected dozens of mutual funds in higher cost share classes for the Plans even though identical lower-cost versions of the same funds were available.

127.   The TIAA Traditional Annuity offered in the Plans is a guaranteed fixed annuity contract that guarantees principal and a contractually specified minimum interest rate. Assets invested in the TIAA Traditional Annuity are held in the general account of TIAA and are backed by the claims-paying ability of TIAA.

128.   The TIAA Traditional Annuity has severe restrictions and penalties for withdrawal if participants wish to change their investments in

the Plan. For example, some participants who invest in the TIAA Traditional Annuity may withdraw or change their investment in a single lump sum within 120 days of termination of employment, but, to do so, such participants must pay a 2.5% surrender charge. Rather than participants being able to withdraw or change their TIAA Traditional Annuity investments earlier, the only way participants can withdraw or change their investment is to spread withdrawal over a *ten-year period,* unless a substantial penalty is paid. Thus, participants who wish to withdraw their investment without penalty can only do so over ten years.

129.   The Plans also include the CREF Stock Account, CREF Global Equities Account, CREF Equity Index Account, CREF Growth Account, CREF Social Choice Account, CREF Money Market Account, and CREF Bond Market Account, which are variable annuities that invest in underlying securities for a given mandate. The value of each participant's investment in the variable annuity will change over time based on the investment experience and expenses of the account.

130.   The TIAA Real Estate Account is an insurance separate account maintained by TIAA. An insurance separate account is an investment vehicle that aggregates assets from more than one retirement plan for a given

investment strategy, but those assets are segregated from the insurance company's general account assets.

131.   The remaining TIAA-CREF funds are registered investment companies under the Investment Company Act of 1940, known as mutual funds. The TIAA-CREF mutual funds charge varying amounts for investment management, distribution, marketing and other expenses, depending on the investment at issue and share class.

132.   The Fidelity and Vanguard investment options offered to Plan participants are exclusively mutual funds that charge varying amounts for investment management and other expenses, depending on the investment at issue and share class.

133.   Mutual funds have shareholders who are not participants in the Plans, or any retirement plan, and who purchase shares as a result of marketing the fund. However, all shareholders in mutual funds, including participants in the Plans, pay all the mutual fund expenses set forth in herein.

134.   As of December 31, 2014, of the Retirement Plan's $2.6 billion in net assets, TIAA-CREF investments accounted for approximately $1.4 billion, Vanguard $687 million, and Fidelity $549 million. As of the same date, of the Healthcare Plan's $1.06 billion in net assets, TIAA-CREF investments

accounted for approximately $470 million, Vanguard $296 million, and Fidelity $284 million.

## II. Defendants improperly allowed TIAA-CREF to require inclusion of its investment products in the Plans and TIAA-CREF to require it to provide recordkeeping services for its proprietary options.

135.  ERISA requires fiduciaries to independently evaluate the prudence of each investment option offered in a defined contribution plan, *DiFelice*, 497 F.3d at 423, and to remove imprudent investments, *Tibble*, 135 S. Ct. at 1828–29.

136.  As noted, TIAA-CREF offered its products and services strictly on a bundled basis. If a plan offers the TIAA Traditional Annuity, TIAA-CREF required that the plan also offer its flagship CREF Stock Account and Money Market Account, and to also use TIAA as recordkeeper for its proprietary products. By linking use of TIAA as a recordkeeper to including these funds in the Plans, TIAA drove uncapped revenue to its recordkeeping arm.

137.  By allowing the Plans to enter such a bundled arrangement with TIAA-CREF, Defendants agreed to lock its employees into funds which Defendants did not analyze. It can never be prudent to lock in a fund in a plan for the future no matter what its expenses or its performance. To do so creates a structure which at the outset, and on an ongoing basis, violates the

ERISA's requirement that fiduciaries must independently monitor investment options on an ongoing basis and remove those that are imprudent. *Tibble*, 135 S. Ct. at 1828–29. Defendants thus failed to discharge their duty to independently evaluate whether each investment option was prudent for the Plans, and whether the use of TIAA as a plan recordkeeper was prudent, reasonably priced, and in the exclusive interest of participants, and whether it was prudent to include and retain the CREF Stock and Money Market accounts and the TIAA Traditional Annuity in the Plans. Instead of acting solely in the interest of participants, Defendants allowed TIAA's financial interest to dictate the Plans' investment selections and recordkeeping arrangement. Because Defendants allowed CREF Stock Account to be locked into the Plans, Defendants could not satisfy their duty to evaluate for inclusion and retention in the Plans, whether it was prudent at the time of inclusion and whether it should be removed if imprudent. As a result of Defendants' breach in allowing CREF Stock Account to be retained in the Plans because TIAA-CREF demanded it and not based on an independent and ongoing assessment of the merits of the option, the Plans suffered massive losses compared to prudent alternatives, as discussed in more detail below.

138.   As noted above, both Plans offer the TIAA Traditional Annuity.

This option is a fixed annuity contract that returns a contractually specified minimum interest rate. This Annuity has severe restrictions and penalties for withdrawal if participants wish to change their investments in the Plans. For example, some participants who invest in the TIAA Traditional Annuity must pay a 2.5% surrender charge if they withdraw their investment in a single lump sum within 120 days of termination of employment.

139.   Both Plans include TIAA-CREF's proprietary funds, including the CREF Stock Account, CREF Global Equities Account, CREF Equity Index Account, CREF Growth Account, CREF Social Choice Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, and CREF Bond Market Account, which are variable annuities with four layers of expenses that invest in underlying securities for a given investment style. The value of the Plans' investment in these variable annuities changes over time based on investment performance and the expenses of the accounts.

140.   The expense ratio of the CREF variable annuity accounts is made up of multiple layers of expense charges consisting of the following:

     a.  "administrative expense" charge (24 bps);[34]

     b.   "distribution expense" charge (9.5 bps);

     c.  "mortality and expense risk" charge (0.5 bps); and

---

[34] Expenses are stated as of May 1, 2014.

d. "investment advisory expense" charge (ranging from 4 to 12.5 bps).

141. Two of these four layers of fees charged on the CREF variable annuity accounts, including the CREF Stock Account, are unreasonable for the actual services provided by TIAA-CREF to the Plans' participants, and the other two provide no benefit to the Plans' participants.

a. **Administrative expenses (or recordkeeping fees):** The administrative fee assessed on each variable annuity option is charged as a percentage of assets, rather than a flat fee per participant. As described above, recordkeeping costs depend on the number of participant accounts that the recordkeeper will service in the plan rather than the size of assets because a higher account balance costs no more to track than a lower account balance. As a result, as the growth in the Plans' assets outpaced the growth in participants, the fees paid to TIAA-CREF likewise increased even though the services provided did not increase at the same rate, resulting in further unreasonable compensation.

b. **Distribution expenses (or 12b-1 fees):** Distribution expenses are charged for services performed for marketing and advertising of the fund to potential investors. However, in a retirement

plan, the funds are selected by the sponsor. Thus, marketing and distribution services provide no benefit to plan participants and are wholly unnecessary. Being charged for such wholly useless expenses causes a loss of retirement assets to participants with no benefit.

     **c.**     **Mortality and expense risk charges:** Some annuity or insurance providers charge mortality and expense risk charges to compensate the insurance company for the risk it assumes when providing periodic income or payments to the investor over her lifetime, which will vary depending on the value of the underlying investments. However, in the CREF variable annuities in the Emory Plans, the participant does not make the choice of whether to take the account's value in a lump sum or an annuity until retirement. Thus, this charge only benefits a participant if she elects at the time of retirement to annuitize her holdings in the account to provide for periodic income. Prior to annuitizing her account, the participant derives no benefit for paying such a charge, year after year, and TIAA-CREF provides no actual services or incurs any risk to justify the fee until a decision is made at retirement to convert the value of the lump sum to an annuity. Moreover, most participants in retirement plans recordkept by TIAA-CREF do not elect to annuitize their holdings in their variable annuity

accounts upon retirement. Yet, *all* participants pay these fees for many years regardless of whether they annuitize their variable annuity account.

**d.     Investment advisory expense charge (or investment management fees):** It is a fundamentally established principle of investment management that larger asset size enables the asset holder to obtain lower investment management fees as a percentage of assets. Fund managers institute breakpoints, whereby the investment management fee is reduced, as asset size goes up, at pre-specified asset thresholds to pass along economies of scale to the investor. For example, if $5 million is a breakpoint, one fee, based on a percentage of assets, will be charged on the first $5 million, and a lesser percentage will be charged on the next portion of the assets, or on all assets. A large investor will therefore be charged a lower fee, on a percentage of assets, than a smaller investor to recognize the economies of scale generated from the higher asset levels. Jumbo plans, such as Emory's, can command extremely low fees. Despite this recognized principle, TIAA-CREF has not instituted *any* breakpoints whatsoever on its investment management fees to pass along economies of scale experienced by jumbo plan investors. The Plans' fiduciaries did not

obtain the lower investment management fees that come with the
Plans' enormous asset size. As a result, the Plans, with billions of
dollars invested in CREF variable annuities, pay the same asset-based
fee as the smallest clients with a tiny fraction of their total assets,
resulting in a windfall to TIAA-CREF and excessive fees paid by
Emory's employees and retirees.

142.   The excessiveness of this investment management fee is even
more egregious because of the way critics have documented CREF "manages"
the CREF Stock Account by investing nearly two out of every three dollars in
companies held by its benchmark index, the Russell 3000 Index. *See supra*
¶95.

143.   The TIAA Real Estate Account is an insurance separate account
maintained by TIAA. Similar to the CREF variable annuity accounts, the
expense ratio of the TIAA Real Estate Account is made up of the same four
layers of excessive expenses detailed above, and even adds a fifth layer for a
so-called "liquidity guarantee." As of May 1, 2013, these charges consisted of
the following:

    a.   "administrative expense" charge (26.5 bps);

    b.   "distribution expense" charge (8 bps);

    c.   "mortality and expense risk" charge (0.5 bps);

    d.  "liquidity guarantee" (18 bps); and

    e.  "investment management expense" charge (36.5 bps).

144.   The 18 bps "liquidity guarantee" expense of the TIAA Real Estate Account is yet another excessive fee that is not charged by better performing and lower cost mutual funds such as the Vanguard REIT Index (Inst) which has a *total* expense ratio of 8 bps. *See infra* ¶¶237–239.

145.   The remaining TIAA-CREF funds are mutual funds. The TIAA-CREF mutual funds charge varying amounts for investment management, but also charge distribution, marketing, and other expenses, depending on the type of investment and share class.

146.   Thus, the Emory Plans' participants are paying for marketing costs of funds which their employer has placed in their retirement plan when such marketing costs provide no benefit to them. Other mutual funds that were available to the Plans do not include such marketing costs.

## III.   Defendants caused the Plans to pay excessive administrative and recordkeeping fees.

147.   As set forth above, recordkeeping is a service necessary for every defined contribution plan. The market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to large defined

contribution plans like the Plans. These recordkeepers primarily differentiate themselves based on price and vigorously compete for business by offering the best price and will readily respond to a request for proposal.

148.    Because market rates for recordkeeping services have declined in recent years and because the only way to reliably determine the true market rate for a complex jumbo plan is to obtain an actual fee quote comparison, prudent fiduciaries of jumbo defined contribution plans put the plan's recordkeeping and administrative services out for competitive bidding at regular intervals of approximately three years.

149.    Prudent fiduciaries of similarly sized defined contribution plans use a single recordkeeper rather than hiring multiple recordkeepers and custodians or trustees. This leverages plan assets to provide economies of scale and ensures that plan participants pay only reasonable recordkeeping fees, while also simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when more than one recordkeeper is used.

150.    Despite the long-recognized benefits of a single recordkeeper for a defined contribution plan, Defendants have continued to contract with *three* separate recordkeepers for the Plans: TIAA-CREF, Fidelity, and Vanguard. This inefficient and costly structure has caused Plan participants to pay

excessive and unreasonable fees for Plan recordkeeping and administrative services.

151.   Mary L. Cahill, Emory's Vice President of Investments and Chief Investment Officer, who is responsible for approving Plan investment selections, has personal knowledge of retirement plan services provided to multi-billion dollar retirement plans. Before joining Emory, Ms. Cahill was Deputy Chief Investment Officer at Xerox Corporation where she was responsible for developing, recommending and implementing investment alternatives for Xerox's $12 billion in defined benefit and defined contribution plan assets. While she was responsible for investment management of the Xerox defined contribution plan, named the Xerox Corporation Savings Plan, Xerox only used a single recordkeeper to provide recordkeeping and administrative services to the plan.

152.   Moreover, the Emory Clinic, Inc. Retirement Savings Plan is a 403(b) plan with $310.4 million in assets and 2,231 participants with an account balance as of December 31, 2014. In contrast to the administration of the Plans, the Emory Clinic's 403(b) plan has a *single* recordkeeper (Fidelity), even though both Vanguard and Fidelity mutual fund options are included in that plan. Notably, no TIAA-CREF investments are offered. Despite the Emory Clinic's 403(b) plan having significantly less assets than the Plans,

*that plan invested in lower-cost share classes than the Plans* for many of the same mutual fund options offered to participants. *See infra* ¶176.

153.   The Plans' recordkeepers receive compensation for providing recordkeeping services through per-participant fees and/or revenue sharing payments from the Plans' investments.

154.   Under the recordkeeping services agreement between TIAA-CREF and Emory University dated April 1, 2008, TIAA-CREF is compensated based on revenue sharing payments from mutual funds or annuity contracts. The agreement does not specify the negotiated fee between Emory University and TIAA-CREF for administrative services. Administrative fees and revenue sharing payments are also not listed on the agreement's Schedule B, despite the requirement in the agreement that such information be provided. Upon information and belief, TIAA-CREF is compensated based on the same or substantially similar terms under the recordkeeping services agreement between TIAA-CREF and Emory Healthcare.

155.   Upon information and belief and industry experts, the amount of revenue sharing kicked back to the TIAA-CREF recordkeeping entity for the Plans' TIAA-CREF investments from the expense ratio paid by participants is set forth below.

| TIAA-CREF Investment | Revenue Share |
|---|---|
| CREF variable annuity contracts | 24 bps |
| Premier share class of TIAA-CREF mutual funds | 15 bps |
| Retirement share class of TIAA-CREF mutual funds | 25 bps |
| TIAA Real Estate Account | 24–26.5 bps |
| TIAA Traditional Annuity | 15 bps |

156. Under the recordkeeping services agreement between Vanguard and Emory University dated January 1, 2010, Vanguard charges a per-participant fee deducted from participant accounts for recordkeeping and administrative services. However, Vanguard receives much more by receiving asset-based compensation through internal revenue sharing from the Vanguard Investor share mutual funds, a higher priced share class than institutional rates readily available to the Plans. Upon information and belief, Vanguard is compensated based on the same or substantially similar terms under the recordkeeping services agreement between Vanguard and Emory Healthcare.

157. Upon information and belief, prior to 2013, Fidelity assessed a per-participant fee deducted from participant accounts for recordkeeping and administrative services for the Retirement Plan. During 2013, Fidelity eliminated this per-participant fee. Upon information and belief, Fidelity is

86

compensated based on the same or substantially similar terms under the recordkeeping services agreement between Fidelity and Emory Healthcare.

158.   Apart from the per-participant fee, Fidelity is compensated through internal revenue sharing payments from the Fidelity mutual fund options. Upon information and belief and industry experts, the amount of revenue sharing kicked back to Fidelity's recordkeeping arm from the expense ratio paid by participants is set forth below.

| Fidelity Mutual Fund | Revenue Share |
|---|---|
| Actively managed equity mutual funds | 35 bps |
| Fidelity Freedom Funds | 35 bps |
| Actively managed K share equity mutual funds | 20 bps |
| Fidelity Freedom K share funds | 20 bps |
| Actively managed fixed income and money market mutual funds | 20 bps |

159.   In addition, the Plans' recordkeepers receive additional indirect compensation, including float, revenue derived from securities lending, distribution fees, mortality and expense charges, surrender charges, spread, and redemption fees.

160.   Experts in the recordkeeping industry with vast experience in requests for proposals and information for similar plans have determined the market rate that the Plan likely would have been able to obtain had the

fiduciaries put the Plan's recordkeeping services out for competitive bidding. Based on the Plans' features, the nature of the administrative services provided by the Plans' recordkeepers, the Plans' combined participant level (roughly 40,000), and the recordkeeping market, the outside limit of a reasonable recordkeeping fee for the Plans would have approximated a fixed $1.25 million in the aggregate for both Plans combined (or $30 per participant with an account balance). Even if Defendants had negotiated a reasonable recordkeeping fee for the Retirement Plan and Healthcare Plan separately, the Plans would have paid dramatically less for recordkeeping services.

161.   The Retirement Plan's Form 5500 filed with the Department of Labor reported that TIAA-CREF *alone*—as one of three recordkeepers— received $5.69 million in recordkeeping compensation for 2011, which equals $372 per participant with an account balance. In 2012, TIAA-CREF received $6.16 million, or $583 per participant. In 2011 and 2012 alone, the Plan's fiduciaries caused the Retirement Plan to pay well over 1140% and 1843% more than what was a reasonable fee for recordkeeping services. These reported expenses are understatements of the Retirement Plan's total recordkeeping fees because they do not take into account the compensation received by Vanguard and Fidelity for similar services. Therefore, the total

88

per-participant fee is substantially higher when these additional sources of recordkeeping expenses from Vanguard and Fidelity are included.

162.   Overall, based on the direct and indirect compensation levels shown on the Plans' Forms 5500 filed with the Department of Labor, and on the internal revenue share allocated to Vanguard, TIAA-CREF, and Fidelity for recordkeeping services, the Retirement Plan paid between $2 million and $6.6 million (up to approximately $594 per participant) per year from 2010 to 2014. The Healthcare Plan paid between $1.1 and $1.5 million (up to approximately $119 per participant) per year from 2010 to 2014. The Plans therefore paid millions of dollars in excessive recordkeeping fees.[35] The Plans' recently released 2015 Forms 5500 show that the Plans' recordkeeping fees continue to be excessive.

163.   The impact of excessive fees on employees' and retirees' retirement assets is dramatic, as the U.S. Department of Labor has found.  . U.S. Dep't of Labor, *A Look at 401(k) Plan Fees,* at 1–2 (Aug. 2013) (finding

---

[35] The recordkeeping fees paid by the Plans are based on information presently known to Plaintiffs and reported by Emory University and Emory Healthcare. However, Emory University has failed to maintain sufficient account records. For instance, Emory University reported in the Retirement Plan's Form 5500 for 2010 that "*the Plan has not maintained sufficient accounting records and supporting documents relating to the Plan's beginning balance at January 1, 2009 which in turn affects the Plan's beginning balance at January 1, 2010.*" 2010 Emory University Retirement Plan Form 5500, Notes to Fin. Stmts, at 1 (emphasis added).

that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career).[36]

164.   Defendants failed to prudently monitor and control the compensation paid for recordkeeping and administrative services, particularly the asset-based revenue sharing received by TIAA-CREF, Fidelity, and Vanguard and therefore caused the Plans to pay unreasonable recordkeeping fees. Defendants allowed participants to be charged asset-based fees for recordkeeping, instead of flat per-participant rates. Because revenue sharing payments are asset-based, the already excessive compensation paid to the Plans' recordkeepers became even more excessive as the Plans' assets grew, even though the administrative services provided to the Plans remained the same. Defendants could have capped the amount of revenue sharing to ensure that any excessive amounts were returned to the Plans, but failed to do so.

165.   Further, Defendants have failed to put the Plans' recordkeeping services out for competitive bidding. A competitive bidding process for the Plans' recordkeeping services would have determined a reasonable recordkeeping fee for the Plans. As the fiduciaries to the Plans, Defendants have a duty to determine the market rate for Plan recordkeeping services and

---

[36] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

the amount of excess compensation paid to the recordkeepers. Without a competitive bidding process, Defendants would not obtain a market rate bid for recordkeeping and administrative services. This competitive bidding process would have thus enabled Defendants to obtain a reasonable fee for recordkeeping services.

166.    To discharge their fiduciary duties, Defendants were required to obtain sufficient information to determine all sources of compensation received by the Plans' recordkeepers, including the amount of any revenue sharing payments, and to make an informed assessment as to whether the amount of compensation was no more than reasonable for the services provided. *George*, 641 F.3d at 798–99. Defendants failed to do so, causing the Plans' participants to lose millions of dollars in retirement savings as a result.

167.    Aside from the failures to monitor the amount of revenue sharing payments and to solicit competitive bids, Defendants also failed to negotiate sufficient rebates of excessive fee payments to TIAA-CREF, Fidelity, and Vanguard for years. As a specific example, because the billion-dollar plans paid the same percentage of asset-based fees as much smaller plans that used TIAA-CREF's products and services, Defendants could have demanded "plan pricing" rebates from TIAA-CREF based on the Plans' economies of scale.

Just as with investment management fees, the Plans' size would have enabled Defendants to command a much lower fee. Defendants could have also demanded similar rebates of all excessive fee payments from Vanguard. Had Defendants adequately negotiated for these rebates, the Plans' recordkeeping fees would have been reduced, avoiding additional losses of retirement savings.

168.   Had Defendants monitored the compensation paid to the Plans' recordkeepers—TIAA-CREF, Vanguard and Fidelity—and ensured that participants were only charged reasonable fees for administrative and recordkeeping services, Plan participants would not have lost in excess of $30 million of their retirement savings through unreasonable recordkeeping fees.[37]

## IV.  Defendants caused the Plans to pay wholly unnecessary and excessive fees by using higher-cost share classes of mutual funds instead of identical versions of the same funds in lower-cost share classes.

169.   Jumbo retirement plans have massive bargaining power to negotiate low fees for investment management services. If a plan invests in

---

[37] Plan losses have been brought forward to the present value using the investment returns of the S&P 500 index to compensate participants who have not been reimbursed for their losses. This is because the excessive fees participants paid would have remained in Plan investments growing with the market.

mutual funds, fiduciaries must review and consider the available share

classes. Because the only difference between the various share classes is fees,

selecting a higher-cost share class results in the plan paying wholly

unnecessary fees. Accordingly, absent some compelling reason to opt for the

higher-cost version, prudent fiduciaries will select the lowest-cost share class

available to the plan. As a prominent legal counsel to defined contribution

fiduciaries explained:

> The fiduciaries also must consider the size and purchasing power
> of their plan and select the share classes (or alternative
> investments) that a fiduciary who is knowledgeable about such
> matters would select under the circumstances. In other words,
> the "prevailing circumstances"—such as the size of the plan—are
> a part of a prudent decisionmaking process. The failure to
> understand the concepts and to know about the alternatives
> could be a costly fiduciary breach.

Fred Reish, *Class–ifying Mutual Funds*, PLANSPONSOR (Jan. 2011).[38]

170.   Given that defined contribution plan fiduciaries are held to the

standard of a knowledgeable financial expert, a fiduciary should know the

basic principle that asset size matters, and must review a fund's prospectus

to determine if a lower-cost chare class of the same fund is available, to avoid

saddling the plan with unnecessary fees.

171.   Jumbo investors like the Plans can obtain share classes with far

---

[38] Available at
http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

lower costs than retail mutual fund shares. In addition, insurance company pooled separate accounts are available that can significantly reduce investment fees charged on mutual fund investments in defined contribution plans.

172.   Moreover, lower-cost share classes of mutual fund investment options were readily available to the Plans. Minimum investment thresholds for institutional share classes are routinely waived by the investment provider if not reached by a single fund based on the retirement plan's total investment in the provider's platform.

> For large 401(k) plans with over a billion dollars in total assets…mutual funds will often waive an investment minimum for institutional share classes. It is also common for investment advisors representing large 401(k) plans to call mutual funds and request waivers of the investment minimums so as to secure the institutional shares.

*Tibble v. Edison Int'l*, No. 07-5359, 2010 U.S. Dist. LEXIS 69119, at *27–28 (C.D. Cal. July 8, 2010), *aff'd* 729 F.3d 1110 (9th Cir. 2013).

173.   In fact, Vanguard expressly "reserves the right to establish higher or lower minimum amounts for certain investors", including when the "plan sponsor's aggregate assets within the Vanguard Funds will likely

generate substantial economies in the servicing of their accounts."[39]

174.   For Vanguard and TIAA-CREF mutual fund options, as further support of the routine waiver of investment minimums for large institutional investors, fiduciaries of other defined contribution plans have successfully negotiated on behalf of their plan less expensive institutional share classes for a particular mutual fund option despite that fund not meeting the minimum investment threshold.

175.   Therefore, Defendants knew or should have known that investment providers would have allowed the Plans to provide lower-cost share classes to participants if Defendants had asked.

176.   Despite these far lower-cost options that were available, Defendants selected and continue to retain Plan investment options with far higher costs than were and are available for the Plans based on their size, such as separate accounts and collective trusts. Moreover, Defendants saddled the Plans with unnecessary fees by using much higher-cost share classes, when a lower-cost share class of the *exact same mutual fund option* was available that was identical in every way except that it charged lower fees. The following table sets forth each higher-cost Fidelity, TIAA-CREF,

---

[39] *See* Vanguard Funds Multiple Class Plan, available at https://www.sec.gov/Archives/edgar/data/1409957/000093247113007109/multipleclassplanvanguardfun.pdf.

and Vanguard mutual fund share class that was included in the Plans during the proposed class period for which a significantly lower-cost, but otherwise identical, share class of the same mutual fund was available. The expense ratio identified for the Plans' investment option and the lower-cost share class alternative are based on the earliest date during the proposed class period that the higher-cost fund was included in the Plans:

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Fidelity Balanced (FBALX) | 61 bps | Fidelity Balanced K (FBAKX) | 47 bps | 29.79% |
| Fidelity Blue Chip Growth (FBGRX) | 93 bps | Fidelity Blue Chip Growth K (FBGKX) | 74 bps | 25.68% |
| Fidelity Capital Appreciation (FDCAX) | 86 bps | Fidelity Capital Appreciation K (FCAKX) | 68 bps | 26.47% |
| Fidelity Contrafund (FCNTX) | 91 bps | Fidelity Contrafund K (FCNKX) | 78 bps | 16.67% |
| Fidelity Disciplined Equity (FDEQX) | 68 bps | Fidelity Disciplined Equity K (FDEKX) | 51 bps | 33.33% |
| Fidelity Equity Income II (FEQTX) | 69 bps | Fidelity Equity Income II K (FETKX) | 54 bps | 27.78% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Fidelity Equity-Income (FEQIX) | 74 bps | Fidelity Equity-Income K (FEIKX) | 54 bps | 37.04% |
| Fidelity Freedom 2000 (FFFBX) | 51 bps | Fidelity Freedom 2000 K (FFKBX) | 43 bps | 18.60% |
| Fidelity Freedom 2005 (FFFVX) | 64 bps | Fidelity Freedom 2005 K (FFKVX) | 52 bps | 23.08% |
| Fidelity Freedom 2010 (FFFCX) | 67 bps | Fidelity Freedom 2010 K (FFKCX) | 53 bps | 26.42% |
| Fidelity Freedom 2015 (FFVFX) | 68 bps | Fidelity Freedom 2015 K (FKVFX) | 54 bps | 25.93% |
| Fidelity Freedom 2020 (FFFDX) | 74 bps | Fidelity Freedom 2020 K (FFKDX) | 57 bps | 29.82% |
| Fidelity Freedom 2025 (FFTWX) | 76 bps | Fidelity Freedom 2025 K (FKTWX) | 59 bps | 28.81% |
| Fidelity Freedom 2030 (FFFEX) | 79 bps | Fidelity Freedom 2030 K (FFKEX) | 61 bps | 29.51% |
| Fidelity Freedom 2035 (FFTHX) | 81 bps | Fidelity Freedom 2035 K (FKTHX) | 61 bps | 32.79% |
| Fidelity Freedom 2040 (FFFFX) | 81 bps | Fidelity Freedom 2040 K (FFKFX) | 62 bps | 30.65% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Fidelity Freedom 2045 (FFFGX) | 82 bps | Fidelity Freedom 2045 K (FFKGX) | 62 bps | 32.26% |
| Fidelity Freedom 2050  (FFFHX) | 84 bps | Fidelity Freedom 2050 K (FFKHX) | 63 bps | 33.33% |
| Fidelity Freedom Income  (FFFAX) | 50 bps | Fidelity Freedom Income K (FFKAX) | 42 bps | 19.05% |
| Fidelity Fund (FFIDX) | 60 bps | Fidelity Fund K (FFDKX) | 43 bps | 39.53% |
| Fidelity Growth Company (FDGRX) | 89 bps | Fidelity Growth Company K (FGCKX) | 72 bps | 23.61% |
| Fidelity International Discovery (FIGRX) | 100 bps | Fidelity International Discovery K (FIDKX) | 79 bps | 26.58% |
| Fidelity Large Cap Growth (FSLGX) | 86 bps | Fidelity Large Cap Growth (Instl) (FLNOX) | 74 bps | 16.22% |
| Fidelity Low-Priced Stock (FLPSX) | 99 bps | Fidelity Low-Priced Stock K (FLPKX) | 85 bps | 16.47% |
| Fidelity Magellan (FMAGX) | 74 bps | Fidelity Magellan K (FMGKX) | 58 bps | 27.59% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Fidelity Mid-Cap Stock (FMCSX) | 64 bps | Fidelity Mid-Cap Stock K (FKMCX) | 41 bps | 56.10% |
| Fidelity Overseas (FOSFX) | 85 bps | Fidelity Overseas K (FOSKX) | 66 bps | 28.79% |
| Fidelity Puritan (FPURX) | 61 bps | Fidelity Puritan K (FPUKX) | 47 bps | 29.79% |
| Fidelity Spartan 500 Index (Adv) (FUSVX) | 7 bps | Fidelity Spartan 500 Index (Adv Instl) (FXAIX) | 3 bps | 133.33% |
| Fidelity Spartan 500 Index (Inv) (FUSEX) | 10 bps | Fidelity Spartan 500 Index (Adv) (FUSVX) | 7 bps | 43% |
| Fidelity Spartan 500 Index (Inv) (FUSEX) | 10 bps | Fidelity Spartan 500 Index (Adv Instl) (FXAIX) | 3 bps | 233% |
| Fidelity Spartan Extended Market Index (Adv) (FSEVX) | 7 bps | Fidelity Spartan Extended Market Index (Adv Instl) (FSMAX) | 6 bps | 16.67% |
| Fidelity Spartan Extended Market Index (Inv) (FSEMX) | 10 bps | Fidelity Spartan Extended Market Index (Adv) (FSEVX) | 6 bps | 66.67% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Fidelity Spartan International Index  (Adv) (FSIVX) | 7 bps | Fidelity Spartan International Index  (Adv Instl) (FSPSX) | 6 bps | 16.67% |
| Fidelity Spartan International Index (inv) (FSIIX) | 10 bps | Fidelity Spartan International Index  (Adv) (FSIVX) | 7 bps | 42.86% |
| Fidelity Spartan Total Market Index (Instl) (FSKTX) | 6 bps | Fidelity Spartan Total Market Index (Adv Instl) (FSKAX) | 5 bps | 20.00% |
| Fidelity Spartan U.S. Bond Index (Adv) (FSITX) | 12 bps | Fidelity Spartan U.S. Bond Index (Adv Instl) (FXNAX) | 5 bps | 140.00% |
| Fidelity Spartan U.S. Bond Index (Inv) (FBIDX ) | 27 bps | Fidelity Spartan U.S. Bond Index (F) (FUBFX ) | 12 bps | 125.00% |
| Fidelity Stock Selector (FDSSX) | 86 bps | Fidelity Stock Selector K (FSSKX) | 66 bps | 30.30% |
| Fidelity Value (FDVLX) | 63 bps | Fidelity Value K (FVLKX) | 46 bps | 36.96% |
| Fidelity Value Discovery (FVDFX) | 95 bps | Fidelity Value Discovery K (FVDKX) | 74 bps | 28.38% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| TIAA-CREF International Equity Index (Prem) (TRIPX) | 24 bps | TIAA-CREF International Equity Index (Instl) (TCIEX) | 9 bps | 166.67% |
| TIAA-CREF International Equity Index (Retire) (TRIEX) | 35 bps | TIAA-CREF International Equity Index (Instl) (TCIEX) | 10 bps | 250.00% |
| TIAA-CREF International Equity (Prem) (TREPX) | 68 bps | TIAA-CREF International Equity (Instl) (TIIEX) | 53 bps | 28.30% |
| TIAA-CREF International Equity (Retire) (TRERX) | 78 bps | TIAA-CREF International Equity (Instl) (TIIEX) | 57 bps | 36.84% |
| TIAA-CREF Lifecycle 2010 (Prem) (TCTPX) | 55 bps | TIAA-CREF Lifecycle 2010 (Instl) (TCTIX) | 40 bps | 37.50% |
| TIAA-CREF Lifecycle 2010 (Retire) (TCLEX) | 65 bps | TIAA-CREF Lifecycle 2010 (Instl) (TCTIX) | 40 bps | 62.50% |
| TIAA-CREF Lifecycle 2015 (Prem) (TCFPX) | 56 bps | TIAA-CREF Lifecycle 2015 (Instl) (TCNIX) | 41 bps | 36.59% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| TIAA-CREF Lifecycle 2015 (Retire) (TCLIX) | 67 bps | TIAA-CREF Lifecycle 2015 (Instl) (TCNIX) | 42 bps | 59.52% |
| TIAA-CREF Lifecycle 2020 (Prem) (TCWPX) | 57 bps | TIAA-CREF Lifecycle 2020 (Instl) (TCWIX) | 42 bps | 35.71% |
| TIAA-CREF Lifecycle 2020 (Retire) (TCLTX) | 67 bps | TIAA-CREF Lifecycle 2020 (Instl) (TCWIX) | 42 bps | 59.52% |
| TIAA-CREF Lifecycle 2025 (Prem) (TCQPX) | 58 bps | TIAA-CREF Lifecycle 2025 (Instl) (TCYIX) | 43 bps | 34.88% |
| TIAA-CREF Lifecycle 2025 (Retire) (TCLFX) | 69 bps | TIAA-CREF Lifecycle 2025 (Instl) (TCYIX) | 44 bps | 56.82% |
| TIAA-CREF Lifecycle 2030 (Prem) (TCHPX) | 59 bps | TIAA-CREF Lifecycle 2030 (Instl) (TCRIX) | 44 bps | 34.09% |
| TIAA-CREF Lifecycle 2030 (Retire) (TCLNX) | 71 bps | TIAA-CREF Lifecycle 2030 (Instl) (TCRIX) | 46 bps | 54.35% |
| TIAA-CREF Lifecycle 2035 (Prem) (TCYPX) | 60 bps | TIAA-CREF Lifecycle 2035 (Instl) (TCIIX) | 45 bps | 33.33% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| TIAA-CREF Lifecycle 2035 (Retire) (TCLRX) | 72 bps | TIAA-CREF Lifecycle 2035 (Instl) (TCIIX) | 47 bps | 53.19% |
| TIAA-CREF Lifecycle 2040 (Prem) (TCZPX) | 60 bps | TIAA-CREF Lifecycle 2040 (Instl) (TCOIX) | 45 bps | 33.33% |
| TIAA-CREF Lifecycle 2040 (Retire) (TCLOX) | 72 bps | TIAA-CREF Lifecycle 2040 (Instl) (TCOIX) | 47 bps | 53.19% |
| TIAA-CREF Lifecycle 2045 (Prem) (TTFPX) | 60 bps | TIAA-CREF Lifecycle 2045 (Instl) (TTFIX) | 45 bps | 33.33% |
| TIAA-CREF Lifecycle 2045 (Retire) (TTFRX) | 72 bps | TIAA-CREF Lifecycle 2045 (Instl) (TTFIX) | 47 bps | 53.19% |
| TIAA-CREF Lifecycle 2050 (Prem) (TCLPX) | 60 bps | TIAA-CREF Lifecycle 2050 (Instl) (TFTIX) | 45 bps | 33.33% |
| TIAA-CREF Lifecycle 2050 (Retire) (TLFRX) | 71 bps | TIAA-CREF Lifecycle 2050 (Instl) (TFTIX) | 46 bps | 54.35% |
| TIAA-CREF Lifecycle 2055 (Prem) (TTRPX) | 62 bps | TIAA-CREF Lifecycle 2055 (Instl) (TTRIX) | 49 bps | 30.61% |
| TIAA-CREF Lifecycle Retirement Income (Prem) (TPILX) | 55 bps | TIAA-CREF Lifecycle Retirement Income (Instl) (TLRIX) | 38 bps | 39.47% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| TIAA-CREF Lifecycle Retirement Income (Retire) (TLIRX) | 65 bps | TIAA-CREF Lifecycle Retirement Income (Instl) (TLRIX) | 40 bps | 62.50% |
| Vanguard 500 Index (Inv) (VFINX) | 17 bps | Vanguard 500 Index (Instl Plus) (VIIIX) | 2 bps | 750.00% |
| Vanguard Capital Opportunity (Inv) (VHCOX) | 48 bps | Vanguard Capital Opportunity (Adm) (VHCAX) | 41 bps | 17.07% |
| Vanguard Developed Markets Index (Inv) (VDMIX) | 20 bps | Vanguard Developed Markets Index (Instl Plus) (VDMPX) | 6 bps | 233.33% |
| Vanguard Emerging Markets Stock Index (Inv) (VEIEX) | 35 bps | Vanguard Emerging Markets Stock Index (Instl) (VEMIX) | 15 bps | 133.33% |
| Vanguard Emerging Markets Stock Index (Inv) (VEIEX) | 33 bps | Vanguard Emerging Markets Stock Index (Instl Plus) (VEMRX) | 10 bps | 230.00% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Vanguard Equity-Income (Inv) (VEIPX) | 31 bps | Vanguard Equity-Income (Adm) (VEIRX) | 22 bps | 40.91% |
| Vanguard Explorer (Inv) (VEXPX) | 49 bps | Vanguard Explorer (Adm) (VEXRX) | 32 bps | 53.13% |
| Vanguard Extended Market Index (Inv) (VEXMX) | 26 bps | Vanguard Extended Market Index (Instl Plus) (VIEIX) | 8 bps | 225.00% |
| Vanguard Extended Market Index (Inv) (VEXMX) | 24 bps | Vanguard Extended Market Index (Instl Plus) (VEMPX) | 6 bps | 300.00% |
| Vanguard Growth & Income (Inv) (VQNPX) | 32 bps | Vanguard Growth & Income (Adm) (VGIAX) | 21 bps | 52.38% |
| Vanguard Growth Index (Inv) (VIGRX) | 26 bps | Vanguard Growth Index (Instl) (VIGIX) | 8 bps | 225.00% |
| Vanguard International Growth (Inv) (VWIGX) | 49 bps | Vanguard International Growth (Adm) (VWILX) | 33 bps | 48.48% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Vanguard Mid Cap Index (Inv) (VIMSX) | 26 bps | Vanguard Mid Cap Index (Instl) (VMCIX) | 8 bps | 225.00% |
| Vanguard Mid Cap Index (Inv) (VIMSX) | 24 bps | Vanguard Mid Cap Index (Instl Plus) (VMCPX) | 6 bps | 300.00% |
| Vanguard Morgan Growth (Inv) (VMRGX) | 43 bps | Vanguard Morgan Growth (Adm) (VMRAX) | 29 bps | 48.28% |
| Vanguard Prime Money Market (Inv) (VMMXX) | 23 bps | Vanguard Prime Money Market (Adm) (VMRXX) | 9 bps | 155.56% |
| Vanguard PRIMECAP (Inv) (VPMCX) | 45 bps | Vanguard PRIMECAP (Adm) (VPMAX) | 36 bps | 25.00% |
| Vanguard Small Cap Growth Index (Inv) (VISGX) | 26 bps | Vanguard Small Cap Growth Index (Instl) (VSGIX) | 8 bps | 225.00% |
| Vanguard Small Cap Index (Inv) (NAESX) | 26 bps | Vanguard Small Cap Index (Instl) (VSCIX) | 8 bps | 225.00% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Vanguard Small Cap Index (Inv) (NAESX) | 24 bps | Vanguard Small Cap Index (Instl Plus) (VSCPX) | 6 bps | 300.00% |
| Vanguard Small Cap Value Index (Inv) (VISVX) | 26 bps | Vanguard Small Cap Value Index (Instl) (VSIIX) | 8 bps | 225.00% |
| Vanguard Tax-Managed International (Inv) (VDVIX) | 20 bps | Vanguard Tax-Managed International (Instl) (VTMNX) | 7 bps | 185.71% |
| Vanguard Total Bond Market Index (Inv) (VBMFX) | 22 bps | Vanguard Total Bond Market Index (Instl) (VBTIX) | 7 bps | 214.29% |
| Vanguard Total Bond Market Index (Inv) (VBMFX) | 22 bps | Vanguard Total Bond Market Index (Instl Plus) (VBMPX) | 5 bps | 340.00% |
| Vanguard Total International Stock Index (Inv) (VGTSX) | 22 bps | Vanguard Total International Stock Index (Instl Plus) (VTPSX) | 10 bps | 120.00% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plans' Excess Cost |
|---|---|---|---|---|
| Vanguard Total Stock Market Index (Inv) (VTSMX) | 17 bps | Vanguard Total Stock Market Index (Instl Plus) (VITPX) | 2 bps | 750.00% |
| Vanguard U.S. Growth (Inv) (VWUSX) | 44 bps | Vanguard U.S. Growth (Adm) (VWUAX) | 30 bps | 46.67% |
| Vanguard Value Index (Inv) (VIVAX) | 26 bps | Vanguard Value Index (Instl) (VIVIX) | 8 bps | 225.00% |
| Vanguard Wellington (Inv) (VWELX) | 30 bps | Vanguard Wellington (Adm) (VWENX) | 22 bps | 36.36% |
| Vanguard Windsor II (Inv) (VWNFX) | 35 bps | Vanguard Windsor II (Adm) (VWNAX) | 27 bps | 29.63% |

177.   These lower-cost share classes have been available to the Plans for years, some dating back to the early 2000s or before.

178.   The failure to select lower-cost share classes for the Plans' mutual fund options *identical in all respects* (portfolio manager, underlying investments, and asset allocation) *except for cost* demonstrates that Emory failed to consider the size and purchasing power of their plans when selecting

share classes and engaged in no prudent process in the selection, monitoring, and retention of those mutual funds.

179.   Had the amounts invested in the higher-cost share class mutual fund options instead been invested in the readily available lower-cost share class mutual fund options, the Plans' participants would not have lost millions of dollars of their retirement savings.

## V.   Defendants selected and retained a large number of duplicative investment options, diluting the Plans' ability to pay lower fees and confusing participants.

180.   Defendants provided a multitude of duplicative funds in the same investment style thereby depriving the Plans of their bargaining power associated with offering a single option in each investment style, which significantly reduces investment fees, and leading to "decision paralysis" for participants. *See, e.g.,* Michael Liersch, *Choice in Retirement Plans: How Participant Behavior Differs in Plans Offering Advice, Managed Accounts, and Target-Date Investments,* T. ROWE PRICE RETIREMENT RESEARCH, at 2 (Apr. 2009)("Offering too many choices to consumers can lead to decision paralysis, preventing consumers from making decisions."). Over 100 investment options were included and continue to be included in the Plans in every major asset class. The number of options provided in each of these asset classes included: target date funds (3 fund families), asset allocation

funds (6 options), large cap domestic equities (24 to 31 options), mid cap domestic equities (9 to 10 options), small cap domestic equities (7 options), international equities (12 to 13 options), fixed income (9 options), money market (6 options), real estate (2 options), and fixed guaranteed annuity (1 option).

181.   Such an overwhelming number of investment options places an unreasonable burden on the Plans' participants in selecting options in which to invest. A fund's objectives or goals, investment strategies, principal risks, historical performance, fees and expenses, and fund managers and advisers, among other information are set forth in a prospectus. Prospectuses are designed to educate a potential investor and provide material information to enable her to make an informed, prudent investment decision. For the Fidelity Freedom Funds alone, the prospectus and supporting materials filed with the Securities and Exchange Commission span almost *800* printed pages.[40] If an Emory Plan participant were to review the prospectuses of all 111 investment options in the Plans, this would require reading many thousands of pages of materials. This is a virtually impossible burden. Even

---

[40] *See* Fidelity Freedom Funds Prospectus, Form N-1A (May 28, 2016), available at https://www.sec.gov/Archives/edgar/data/880195/000137949116004218/filing717.htm.

for the Plans' fiduciaries, it is inconceivable that they have read the prospectuses and supporting materials of the 111 funds they have selected.

182.   In contrast to the 111 options in the Emory Plans, defined contribution plans in 2014 had an average of 15 investment options, excluding target date funds. Callan Investments Institute, *2015 Defined Contribution Trends,* at 28 (2015).[41] This number of options provides participants with a choice of investment styles while maintaining a larger pool of assets in each investment style, which benefits participants by avoiding participant confusion and obtaining lower fees. It also is the output of an evaluation and selection by prudent fiduciaries of the "best in class" investment choice in a particular investment style. Indeed, since it is the fiduciaries in a plan who ERISA holds to a standard of a prudent financial expert, it is important for fiduciaries to perform that selection role for the exclusive benefit of participants who are not financial experts.

183.   A larger pool of assets in each investment style also significantly reduces fees paid by participants. By consolidating duplicative investments of the same investment style into a single investment option, the Plans would then have the ability to command lower-cost investments, such as a low-cost institutional share class of the selected mutual fund option.

---

[41] Available at https://www.callan.com/research/files/990.pdf.

184.   Fund selections must be the result of a detailed due diligence process that considers factors such as risk, investment return, and expenses of available investment alternatives, and the fiduciary must give "appropriate consideration" to "the role the investment or investment course of action plays . . . in the plan's investment portfolio," 29 C.F.R. §§2550.404a-1(b)(i)-(ii). Fiduciaries cannot discharge their duties "by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker*, 569 F.3d at 711. Including a large number of options removes the benefit of pooling assets consistent with the size of the Plans. Assembling a haphazard lineup of over 100 duplicative options, proprietary to the Plans' recordkeepers—and shifting to participants the burden to screen those options—does not reflect a prudent investment selection process.

185.   Within each asset class and investment style deemed appropriate for a participant-directed retirement plan, prudent fiduciaries must make a reasoned determination and select a prudent investment option. In contrast to the investment lineup assembled by Defendants, prudent fiduciaries do not select and retain numerous duplicative investment options for a single asset class and investment style. When many investment options in a single

investment style are included in a plan, fiduciaries lose the bargaining power to obtain lower investment management expenses for that style.

186.   Moreover, if a participant puts her assets in each of the funds within a given investment style, as commentators have said they are likely to do,[42] when many actively managed funds are included within the same investment style, this  results in those participants effectively having an index return. This is because the investments are spread so broadly over that investment style. Yet the participants will be paying much higher fees for active management than the fees of a passive index fund.

187.   In addition, providing multiple options in a single investment style adds unnecessary complexity to the investment lineup and leads to participant confusion. *See* The Standard, *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 ("Numerous studies have demonstrated that when people are given too many choices of anything, they lose confidence or make no decision."); Michael Liersch, *Choice in Retirement Plans: How Participant Behavior Differs in Plans Offering Advice, Managed Accounts, and Target-Date Investments,* T. ROWE PRICE RETIREMENT RESEARCH, at 2

---

[42] Ian Ayres & Quinn Curtiss, *Beyond Diversification: The Pervasive Problem of Excessive Fees and Dominated Funds in 401(k) Plans*, 124 YALE L.J. 1476, 1481 (2015)("It is well established that some investors naively diversify by spreading their plan investments across all fund offerings.").

(Apr. 2009)("Offering too many choices to consumers can lead to decision paralysis, preventing consumers from making decisions.").[43]

188.   Moreover, having many actively managed funds in the Plans within the same investment style results in the Plans effectively having an index fund return even though the plan is paying fees for active management that are much higher than the fees of a passive index fund.

189.   Since 2010, the Plans have included duplicative investments in every major asset class and investment style, including balanced/asset allocation (13 options), fixed income and high yield bond (22 options), international (12 options), large cap domestic equities (22 options), mid cap domestic equities (7 options), small cap domestic equities (5 options), real estate (2 options), money market (4 options), and target date investments (2 fund families). Such a dizzying array of duplicative funds in a single investment style violates the well-recognized industry principle that too many choices harm participants and can lead to no decision or spreading investments across each fund in a given investment style.

190.   For example, in the large cap blend investment style for the Retirement Plan, Defendants offered *nine* actively managed or passively

---

[43] Available at
http://www.behavioralresearch.com/Publications/Choice_in_Retirement_Plans_April_2009.pdf.

managed investment options for a combined asset amount of $602 million. If those investments were consolidated into a single investment for the large cap domestic blend asset category, the Plans would have saved millions of dollars in investment management expenses.

191. For illustration purposes, the Plans' large cap domestic blend investments are summarized below and compared to a lower-cost alternative, the Vanguard Institutional Index Fund-Instl Plus (VIIIX) with an expense ratio of 2 bps. The expenses and assets of the Retirement Plan are noted in this example as of December 31, 2013.

| Investment | Assets | Plan Fee | Lower-Cost Fund Fee | Plan's Excess |
|---|---|---|---|---|
| CREF Stock Account | $422,863,993 | 49 bps | 2 bps | 2350% |
| CREF Equity Index | $50,553,487 | 43 bps | 2 bps | 2050% |
| Vanguard 500 Index Fund-Inv. (VFINX) | $55,676,352 | 17 bps | 2 bps | 750% |
| Vanguard Growth and Income Fund-Inv. (VQNPX) | $838,525 | 34 bps | 2 bps | 1600% |
| Vanguard Total Stock Market Index Fund-Inv. (VTSMX) | $41,466,550 | 18 bps | 2 bps | 89% |
| Spartan 500 Index-Adv. (FUSVX) | $8,089,166 | 7 bps | 2 bps | 250% |
| Spartan Total Market Index-Instl (FSKTX) | $13,351,098 | 7 bps | 2 bps | 250% |

| Investment | Assets | Plan Fee | Lower-Cost Fund Fee | Plan's Excess |
|---|---|---|---|---|
| Fidelity Disciplined Equity-K (FDEKX) | $3,388,342 | 39 bps | 2 bps | 1850% |
| **Total** | **$596,227,514** | | | |

192.   With over *$500 million* held in the CREF Stock Account and the CREF Equity Index Account as of December 31, 2014, these large cap blend options were *23 and 18 times* more expensive than the far lower-cost Vanguard index option with an expense ratio of 2 bps. Moreover, the CREF Stock Account has also been recommended for removal from defined contribution plans by an independent consultant. *See infra* ¶228.



193.   Many other large cap index funds are also available at far lower costs than the Plans' large cap funds. Had the amounts invested in the Plans' large cap blend options been consolidated into the Vanguard Institutional Index Fund-Instl Plus, Plan participants would have saved in excess of $2 million in fees for 2014 alone, and many more millions since 2010 to the present and continuing into the future.

194.   In addition, Defendants even selected and continue to retain multiple passively managed index options in the same investment style. In contrast to an actively-managed fund, in which the investment manager selects stocks or bonds in an attempt to generate investment returns in excess of the fund's benchmark, passively managed index funds simply attempt to replicate a market index, such as the S&P 500, by holding a representative sample of securities in the index. Because no stock selection or research is needed, index funds fees are much lower than the fees of actively-managed funds in the same investment style, as set forth in ¶¶66–68.

195.   For example, in the large cap blend investment style, Defendants provided five index funds that have similar investment strategies designed to generate investment results that correspond to the return of the U.S. equity market. For fixed income or the intermediate-term bond investment style, as another example, Defendants have retained two separate index funds.

196.   Since index funds merely hold the same securities in the same proportions as the index,[44] having multiple index funds of the same investment style in the Plans provides no benefit to participants. *Cf.* Lewis Braham, *Morningstar Announces Free Use of Its Indexes*, Barron's (Nov. 5, 2016) (quoting Morningstar CEO, Joe Mansueto, for the principle that "[b]asic market indexes are virtually interchangeable").[45] Instead, it hurts participants by diluting the Plans' ability to obtain lower rates for a single index fund of that style because the amount of assets in any one such fund is smaller than the aggregate would be in that investment style. Moreover, multiple managers holding stocks which mimic the S&P 500 or a similar index would pick the same stocks in the same proportions as the index.

197.   Thus, there is no value in offering separate index funds in the same investment style. Had Defendants combined hundreds of millions of dollars in Plan assets from duplicative index funds into a single index fund, the Plans would have generated higher investment returns, net of fees, and participants would not have lost significant retirement assets.

198.   Had Defendants combined hundreds of millions of dollars in Plan assets from duplicative index funds into a single index fund, the Plans would

---

[44] Another example of an index is the Dow Jones Industrial Average.

[45] Available at http://www.barrons.com/articles/morningstar-announces-free-use-of-its-indexes-1478322642.

have obtained lower fees and generated higher returns, net of fees, and participants would not have millions of dollars of retirement assets.

## VII. Defendants disloyally and imprudently retained historically underperforming Plan investments.

199.   The overlap in investment options in asset classes and investment styles based on Defendants' failure to conduct appropriate due diligence in selecting and monitoring the Plans' investments resulted in options being retained in the Plans despite years of historical underperformance compared to superior lower-cost alternatives, causing massive losses to the Plans compared to what those assets would have earned if invested in prudent alternatives.

200.   The excessive fees in the Plans' investments were not justified by superior investment returns. As of December 31, 2015, *three-fifths or sixty percent of the Plans' investment options*—65 of the 108 investment options in the Plans—underperformed their respective benchmarks over the previous 5-year period.[46] These underperforming funds include the following:

---

[46] These results are based on the performance and benchmark for each fund as shown in the Retirement Plan Participant Disclosure Notice, available at http://www.hr.emory.edu/eu/docs/disclosure.pdf.

| Fund Name | Ticker |
|---|---|
| CREF Bond Market R3 | QCBMIX |
| CREF Equity Index R3 | QCEQIX |
| CREF Inflation-Linked Bond R3 | QCILIX |
| CREF Money Market R3 | QCMMIX |
| CREF Social Choice R3 | QCSCIX |
| CREF Stock R3 | QCSTIX |
| Fidelity Balanced K | FBAKX |
| Fidelity Disciplined Equity K | FDEKX |
| Fidelity Equity-Income K | FEIKX |
| Fidelity Freedom K 2015 | FKVFX |
| Fidelity Freedom K 2020 | FFKDX |
| Fidelity Freedom K 2025 | FKTWX |
| Fidelity Freedom K 2030 | FFKEX |
| Fidelity Freedom K 2035 | FKTHX |
| Fidelity Freedom K 2040 | FFKFX |
| Fidelity Freedom K 2045 | FFKGX |
| Fidelity Freedom K 2050 | FFKHX |
| Fidelity Mid-Cap Stock K | FKMCX |

| Fund Name | Ticker |
|---|---|
| Fidelity Money Market Trust Retirement Government Money Market Portfolio | FGMXX |
| Fidelity Puritan K | FPUKX |
| Fidelity Money Market Trust Retirement Government Money Market Portfolio II | FRTXX |
| Fidelity Small Cap Stock | FSLCX |
| Fidelity Spartan 500 Index ADV | FUSVX |
| Fidelity Spartan International Index  ADV | FSIVX |
| Fidelity Spartan Total Market Index INS | FSKTX |
| Fidelity Trend | FTRNX |
| Fidelity US Bond Index | FBIDX |
| TIAA Real Estate (100881) | QREARX |
| TIAA Real Estate (100880) | QREARX |
| TIAA-CREF International Equity Index Premier (100880) | TRIPX |
| TIAA-CREF International Equity Premier (100881) | TREPX |
| TIAA-CREF Lifecycle 2015 Premier (100881) | TCFPX |
| TIAA-CREF Lifecycle 2020 Premier (100881) | TCWPX |
| TIAA-CREF Lifecycle 2025 Premier (100881) | TCQPX |
| TIAA-CREF Lifecycle 2030 Premier (100881) | TCHPX |

| Fund Name | Ticker |
|---|---|
| TIAA-CREF Lifecycle 2035 Premier (100881) | TCYPX |
| TIAA-CREF Lifecycle 2040 Premier (100881) | TCZPX |
| TIAA-CREF Lifecycle 2045 Premier (100881) | TTFPX |
| TIAA-CREF Lifecycle 2050 Premier (100881) | TCLPX |
| Vanguard 500 Index Inv | VFINX |
| Vanguard Admiral Treasury Money Market Inv | VUSXX |
| Vanguard Emerging Markets Stock Index Inv | VEIEX |
| Vanguard Extended Market Index Inv | VEXMX |
| Vanguard Mid Cap Index Inv | VIMSX |
| Vanguard Morgan Growth Inv | VMRGX |
| Vanguard Prime Money Market Inv | VMMXX |
| Vanguard Selected Value Inv | VASVX |
| Vanguard Small Cap Index Inv | NAESX |
| Vanguard Small Cap Value Index Inv | VISVX |
| Vanguard STAR Inv | VGSTX |
| Vanguard Target Retirement 2010 Inv | VTENX |
| Vanguard Target Retirement 2015 Inv | VTXVX |
| Vanguard Target Retirement 2020 Inv | VTWNX |

| Fund Name | Ticker |
|---|---|
| Vanguard Target Retirement 2025 Inv | VTTVX |
| Vanguard Target Retirement 2030 Inv | VTHRX |
| Vanguard Target Retirement 2035 Inv | VTTHX |
| Vanguard Target Retirement 2040 Inv | VFORX |
| Vanguard Target Retirement 2045 Inv | VTIVX |
| Vanguard Target Retirement 2050 Inv | VFIFX |
| Vanguard Target Retirement 2055 Inv | VFFVX |
| Vanguard Total Bond Market Index Inv | VBMFX |
| Vanguard Total Stock Market Index Inv | VTSMX |
| Vanguard Value Index Inv | VIVAX |
| Vanguard Wellington Inv | VWELX |
| Vanguard Windsor  II Inv | VWNFX |

201.   Had Defendants conducted a prudent investment review process, many of these options that consistently failed to meet performance objectives would have been eliminated from the Plans or replaced. Defendants' failure to do so caused the Plans substantial losses compared to prudent alternative investments that were available to the Plans. The severe harm to the Plans resulting from Defendants' breaches of fiduciary duties is shown by the Plans'

actively managed large cap domestic equity investments (including the CREF

Stock Account), and the TIAA Real Estate Account.

## A.       Large cap domestic equity investments

### 1.       *Actively managed investments offered in an efficient large capitalization market*

202.   According to the Plans' IPS, and as is generally understood in the

investment community, passively managed investment options should be

used in efficient markets such as large capitalization U.S. stocks, because it

is difficult and extremely unlikely to find actively managed mutual funds

that outperform a passive index, net of fees, particularly on a persistent

basis. This unlikelihood is even greater in the large cap market because such

companies are the subject of many analysts' coverage, unlike smaller stocks

which are not covered by many analysts leading to potential inefficiencies in

pricing.

203.   The efficiencies of the large cap market hinder an active

manager's ability to achieve excess returns for investors.

> In conclusion, this study of mutual funds does not provide any
> reason to abandon a belief that securities markets are
> remarkably efficient. Most investors would be considerably better
> off by purchasing a low expense index fund, than by trying to
> select an active fund manager who appears to possess a "hot
> hand." Since active management generally fails to provide excess
> returns and tends to generate greater tax burdens for investors,
> the advantage of passive management holds, a fortiori.

Burton G. Malkiel, *Returns from Investing in Equity Mutual Funds 1971 to 1991*, 50 J. FIN. 549, 571 (1995).[47]

204.   Academic literature overwhelmingly concludes that active managers consistently underperform the S&P 500 index.

> Active managers themselves provide perhaps the most persuasive case for passive investing. Dozens of studies have examined the performance of mutual funds and other professional-managed assets, and virtually all of them have concluded that, on average, active managers underperform passive benchmarks…The median active fund underperformed the passive index in 12 out of 18 years [for the large-cap fund universe]…The bottom line is that, over most periods, the majority of mutual fund investors would have been better off investing in an S&P 500 Index fund.
>
> ***
>
> Most of the dismal comparisons for active managers are for large-cap domestic managers versus the S&P 500 Index.

Robert C. Jones, *The Active Versus Passive Debate: Perspectives of an Active Quant*, ACTIVE EQUITY PORTFOLIO MANAGEMENT, at 37, 40, 53 (Frank J. Fabozzi ed., 1998).

205.   Prudent fiduciaries of large defined contribution plans conduct an analysis to determine whether actively managed funds, particularly large cap, will outperform their benchmark net of fees. Prudent fiduciaries then make a reasoned decision as to whether it would be in the participants' best

---

[47] Available at http://indeksirahastot.fi/resource/malkiel.pdf.

interest to offer an actively managed large cap option, with its much higher fees, for that particular investment style and asset class.

206. Defendants failed to undertake such analysis when they selected and retained actively managed large cap investments in the Plans. Defendants also provided these actively managed investments despite the IPS's requirement and the acceptance within the investment industry that the large cap domestic equity market is the most efficient market and that active managers do not outperform passive managers net of fees in this investment style. Had such an analysis been conducted by Defendants, they would have determined that the actively-managed large cap blend investments would not be expected to outperform passively managed large cap blend funds. That is in fact what occurred.

207. With the exception of the Vanguard Growth and Income Fund, all of the Plans' other actively managed large cap blend investments (CREF Stock Account, Fidelity Disciplined Equity Fund-K, and Vanguard Dividend Growth Fund) underperformed passively managed index funds over one- and five-year periods ending December 31, 2014. These index funds include the Vanguard Total Stock Market Index Fund-Instl Plus (VITPX) and the Vanguard Institutional Index-Instl Plus (VIIIX). The CREF Stock Account, the Vanguard Growth and Income Fund, and the Fidelity Disciplined Equity

Fund-K also underperformed passively managed index funds over the ten-year period ending December 31, 2014.[48]

208.   Had Defendants removed the large cap domestic equity blend funds and the amounts been invested in a lower-cost passively managed index fund, such as the Vanguard Total Stock Market Index Fund-Instl Plus, Plan participants would not have lost in excess of $117 million from these funds being retained in the Plans.[49]

### 2.   *CREF Stock Account*

209.   TIAA-CREF imposed restrictive provisions on the specific annuities that *must* be provided in the Plans. In its fund fact sheets and participant disclosures to the Plans' participants, TIAA-CREF classifies the CREF Stock Account as a domestic equity investment in the large cap blend Morningstar category. For its benefit, TIAA-CREF required that the CREF Stock Account be offered to Plan participants, in addition to the TIAA Traditional Annuity and the CREF Money Market Account. Instead of

---

[48] The passively managed index funds used for comparison purposes are the Vanguard Total Stock Market Index Fund-Instl Plus (VITPX) and the Vanguard Institutional Index-Instl Plus (VIIIX). Like the Plans' actively managed large cap blend options listed in ¶207, these options are large cap blend investments.

[49] Plan losses have been brought forward to the present value using the investment returns of the lower-cost alternatives to compensate participants who have not been reimbursed for their losses.

controlling each plan option allowed in the Plans, and acting for the sole benefit of the Plans' participants, as ERISA requires, Defendants allowed TIAA-CREF to dictate that the CREF Stock Account would be placed and retained in the Plans. Defendants did so without a prudent process to determine whether there were other prudent alternatives in the exclusive best interest of Plan participants and beneficiaries. TIAA-CREF required the CREF Stock Account to be included in the Plans to drive very substantial amounts of revenue sharing payments to TIAA-CREF for recordkeeping services. The CREF Stock Account paid 24 bps for revenue sharing, which exceeded other TIAA-CREF investments by over 50% (15 bps).

210.   The CREF Stock Account has excessive and unnecessary fees, has consistently underperformed for years, and continues to underperform its benchmark TIAA-CREF and Defendants told participants was the proper one, and underperformed lower-cost actively and passively managed investments that were available to the Plans, yet has not been removed from the Plans nor frozen to new investments. The CREF Stock Account is one of the largest, by asset size, investment options in the Plans with *over $500 million* in combined assets, and has been included in the Plans from 2010 to date. In its fund fact sheets and participant disclosures, TIAA-CREF classifies the CREF Stock Account as a domestic equity investment in the

large cap blend Morningstar category. This option has consistently underperformed over years and continues to underperform its benchmark and lower-cost actively and passively managed investments that were available to the Plans.

211.   As understood in the investment community, passively managed investment options should either be used or, at a minimum, thoroughly analyzed and considered in efficient markets such as large capitalization U.S. stocks. This is because it is difficult and either unheard of, or extremely unlikely, to find actively managed mutual funds that outperform a passive index, net of fees, particularly on a persistent basis. This extreme unlikelihood is even greater in the large cap market because such companies are the subject of many analysts' coverage, while smaller stocks are not as widely covered by analysts and thus are subject to potential inefficiencies in pricing.

212.   Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 FIN. ANALYSTS

J. 7, 8 (Jan./Feb. 1991);[50] Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1915 (2010)("After costs . . . in terms of net returns to investors, active investment must be a negative sum game.").

213.   To the extent fund managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Fama & French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, at 1931–34; *see also* Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. FIN. 1655, 1690 (2000) ("on a net-return level, the funds underperform broad market indexes by one percent per year").

214.   If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. FIN. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. FIN. 57, 57, 59 (1997)(measuring thirty-one

---

[50] Available at http://www.cfapubs.org/doi/pdf/10.2469/faj.v47.n1.7.

years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). However, the *worst-performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

215.   Accordingly, investment costs are of paramount importance to prudent investment selection, and a prudent investor will not select higher-cost actively managed funds unless there has been a documented process leading to the realistic conclusion that the fund is likely to be that extremely rare exception, if one even exists, that will outperform its benchmark over time, net of investment expenses.

216.   Prudent fiduciaries of large defined contribution plans must conduct an analysis to determine whether actively managed funds, particularly large cap, will outperform their benchmark net of fees. Prudent fiduciaries then make a reasoned decision as to whether it is in participants' best interest to offer an actively managed large cap option for the particular investment style and asset class, in light of the higher costs of active management. *See supra* ¶¶203–204.

217.   Defendants failed to undertake such an analysis, or any analysis, when it allowed the actively managed CREF Stock Account to be included

and retained in the Plans. This is particularly true given TIAA-CREF's requirement that the CREF Stock Account be provided in the Plans in order to drive revenue to TIAA-CREF. By allowing the Plans to be bound by this requirement, Defendants failed to conduct an independent evaluation of the prudence of this option, which contradicts every principle of prudent investing because an investment that was no longer prudent could not be removed from the Plans.

218.   Additionally, as detailed above, the 46 bps that the CREF Stock Account charged was comprised of four layers of fees that were each unreasonable compared to the actual services provided by TIAA-CREF to the Plans' participants. Defendants failed to analyze whether these fees were appropriate and reasonable in light of the services provided and given that the Plans collectively invested over *$500 million* in the CREF Stock Account.

219.   Had Defendants engaged in a prudent investment review and monitoring process, it would have determined that the CREF Stock Account would not be expected to outperform the large cap index after fees. That is in fact what occurred.

220.   The CREF Stock Account did not merely experience poor performance in a single year or two, but rather its historical performance has been persistently poor for many years compared to both available lower-cost

index funds and the Russell 3000 Index benchmark, provided to the Plans'
participants as the appropriate benchmark in participant communications.

221. Defendants and TIAA-CREF identified the Russell 3000 Index as
the appropriate benchmark to evaluate the fund's investment results, as
shown in the excerpt below that was provided to the Plans' participants.

| Investment Name / Benchmark | Morningstar Category | Ticker Symbol | Inception Date |
| --- | --- | --- | --- |
| CREF Stock Account | Large Blend | CSTK# | 07/31/1952 |
| *Russell 3000 Index* | | | |

222. The CREF Stock Account did not merely underperform in a single
year or two. Historical performance of the CREF Stock Account has been
persistently poor for many years compared to this identified benchmark index
(Russell 3000 Index), and also as compared to available low-cost index funds.
The following chart compares the investment returns of the CREF Stock
Account to its benchmark and two other passively managed index funds in
the same investment style and its benchmark for the one-, five-, and ten-year

periods ending December 31, 2014.[51] For each comparison, the CREF Stock Account dramatically underperformed the benchmark and index alternatives. The passively managed index funds used for comparison purposes are the Vanguard Total Stock Market Index Fund (Instl Plus) (VITPX) and the Vanguard Institutional Index (Instl Plus) (VIIIX). Like the CREF Stock Account, these options are large cap blend investments.

223.   Rather than poor performance in a single year or two, historical performance of the CREF Stock Account has been persistently poor for many years compared to both available lower-cost index funds and the index benchmark. In participant communications, Defendants and TIAA-CREF identified the Russell 3000 index as the appropriate benchmark to evaluate the fund's investment results. The following performance chart compares the investment returns of the CREF Stock Account to its benchmark and two other passively managed index funds  for the one-, five-, and ten-year periods ending December 31, 2014.[52] For each comparison, the CREF Stock Account dramatically underperformed the benchmark and index alternatives. The passively managed index funds used for comparison purposes are the

---

[51] Performance data provided as of December 31, 2014 to correspond to the Plans' most recent Form 5500 filed with the Department of Labor as of the original complaint in this action.

[52] Performance data provided as of December 31, 2014 to correspond to the most recent filing of the Plans' Form 5500s with the Department of Labor.

Vanguard Total Stock Market Index Fund-Instl Plus (VITPX) and the

Vanguard Institutional Index-Instl Plus (VIIIX). Like the CREF Stock

Account, these options are large cap blend investments.



224.  The CREF Stock Account, with an expense ratio of 46 bps as of

December 31, 2014, was and is dramatically more expensive than far better

performing index alternatives: the Vanguard Total Stock Market Index Fund-

Instl Plus (2 bps) and the Vanguard Institutional Index-Instl Plus (2 bps).

225.   Apart from underperforming passively managed index funds, the fund also significantly underperformed comparable actively managed funds over the one-, five- and ten-year periods ending December 31, 2014. These large cap alternatives with similar underlying asset allocations to the CREF Stock Account include the Vanguard Diversified Equity-Inv (VDEQX), the Vanguard PRIMECAP-Adm (VPMAX), and the Vanguard Capital Opp.-Adm (VHCAX).



226.   The CREF Stock Account also had a long history of substantial underperformance compared to these actively managed alternatives over the one-, five-, and ten-year periods ending December 31, 2009.[53]



---

[53] For the Vanguard PRIMECAP-Adm and Vanguard Capital Opportunity Fund-Adm, the investment returns of the investor share class for ten-year performance were used because the admiral share class for each of these funds was not offered until November 12, 2001. The return since inception for the Vanguard PRIMECAP-Adm was 3.23%, and for the Vanguard Capital Opportunity Fund-Adm, 5.89%.





227.   Despite the consistent underperformance, the CREF Stock Account, with an expense ratio of 46 bps as of December 31, 2014, was more expensive than better performing alternatives: the Vanguard Diversified Equity-Inv (40 bps), the Vanguard PRIMECAP-Adm (35 bps), and the Vanguard Capital Opp.-Adm (40 bps).

228.   In addition to the excessive cost and consistent underperformance compared to both passively and actively managed funds, the continued retention of the CREF Stock Account is contrary to the terms of the Plans' IPS. As noted above, the IPS requires that passively managed investments be considered for efficient markets, such as large capitalization U.S. stocks. Despite the acceptance in the investment industry that the large cap domestic equity market is the most efficient market, Defendants continue to retain this actively managed fund in the Plans.

229.   The IPS further requires that Defendants evaluate the performance and risk of each Plan investment option.

> Performance of designated investment vehicles will be measured versus the appropriate asset class benchmark on rolling one, three, and five year periods. Risk undertaken by the manager of the designated investment vehicle to meet the performance objectives will be measured along with return to evaluate performance.

230.   In addition to underperforming its disclosed benchmark (Russell 3000) over one-, five-, and ten-year periods as of December 31, 2014, *see supra* ¶223, the CREF Stock Account has continued to underperform its benchmark in subsequent periods. In accordance with the IPS, the following charts compare the investment returns of the CREF Stock Account to its benchmark for the one-, three-, and five-year periods as of December 31, 2015.[54]



---

[54] For illustrative purposes, the R1 share class was used because the R3 share class did exist until April 24, 2015.



231.   The CREF Stock Account has also incurred significantly more risk relative to its peers. Developed by Nobel Laureate William Sharpe, the Sharpe ratio is a risk-adjusted return measure that is "designed to measure the expected return per unit of risk[.]"  The higher the fund's Sharpe ratio, the better its returns have been relative to the risk it has assumed. Between March 31, 2012 and December 31, 2015, for example, the CREF Stock Account had a Sharpe ratio below (lower) than the median of its peer group for 15 out of 16 quarters, including *12* consecutive quarters. Therefore, the fund has experienced consistently lower risk-adjusted performance compared to its peer group.

232.   Apart from the abysmal long-term underperformance of the CREF Stock Account compared to both index funds and actively managed funds, the fund was recognized as imprudent in the industry. In March 2012, an independent investment consultant, AonHewitt, recognized the imprudence of the CREF Stock Account and recommended to its clients they remove this fund from their retirement plan. AonHewitt, *TIAA-CREF Asset Management*, InBrief, at 3 (July 2012).[55] This recommendation was made due to numerous factors, including the historical underperformance, high turnover of asset management executives and portfolio managers, and the fact that the fund had over 60 separate underlying investment strategies, greatly reducing the fund's ability to generate excess returns over any substantial length of time. *Id.* at 4–5.

233.   The Supreme Court has recently and unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1829. In contrast to the conduct of prudent fiduciaries, Defendants failed to conduct a prudent process to monitor the CREF Stock Account and continue to retain the fund despite its continuing to underperform lower-cost investment alternatives

---

[55] Available at http://system.nevada.edu/Nshe/?LinkServID=82B25D1E-9128-6E45-1094320FC2037740.

that were readily available to the Plans, particularly due to TIAA-CREF's requirement that the CREF Stock Account be provided in the Plans in order to drive revenue to TIAA-CREF.

234.   Prudent fiduciaries of defined contribution plans continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better performing and reasonably priced options. Under the standards used by prudent independent fiduciaries, the CREF Stock Account would have been removed from the Plans.

235.   Had Defendants removed the CREF Stock Account and the amounts been invested in a lower-cost prudent alternative, as set forth  in ¶¶223, 225, Plan participants would not have lost in excess of $136 million of their retirement savings from the fund being retained in the Plans.[56]

## B.        TIAA Real Estate Account

236.   Defendants selected and retained the TIAA Real Estate Account as a real estate investment option in the Plans. The fund has far greater fees than are reasonable, has historically underperformed, and continues to

---

[56] Plan losses have been brought forward to the present value using the investment returns of the lower-cost alternatives to compensate participants who have not been reimbursed for their losses.

143

consistently underperform comparable real estate investment alternatives, including the Vanguard REIT Index I (VGSNX).

237.  With an expense ratio of 87 bps as of December 31, 2014, the TIAA Real Estate Account is over *10 times more expensive* than the Vanguard REIT Index I with an expense ratio of 8 bps.



238.  The TIAA Real Estate Account had a long history of substantial underperformance relative to the Vanguard REIT Index over the one-, five-,

and ten-year periods ending December 31, 2009.[57] Despite this, Defendants

selected and retained it in the Plans.



---

[57] The return of the investor share class was used for ten-year performance because the institutional share class was not offered until December 2, 2003. The return since inception for the Vanguard REIT Index-I was 5.49%.





239.   This underperformance occurred for years and has continued after 2009. The TIAA Real Estate Account significantly underperformed the Vanguard REIT Index I over the one-, five-, and ten-year periods ending December 31, 2014.[58]



[58] Performance data provided as of December 31, 2014 to correspond to the most recent filing of the Plans' Form 5500s with the Department of Labor.

147

240.   As the Supreme Court unanimously ruled in *Tibble,* prudent fiduciaries of defined contribution plans continuously monitor plan investment options and replace imprudent investment options. *Tibble*, 135 S. Ct. at 1829.  In contrast, Defendants failed to conduct such a process and continue to retain the TIAA Real Estate Account as a Plan investment option despite its continued underperformance and higher cost compared to available investment alternatives.

241.   Had Defendants removed the TIAA Real Estate Account and the amounts been invested in the lower-cost and better-performing Vanguard REIT Index I, Plan participants would not have lost in excess of $11 million of their retirement savings from the fund being retained in the Plans.[59]

## CLASS ACTION ALLEGATIONS

242.   29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plans to bring an action individually on behalf of the Plans to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109(a).

243.   In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plans, as an alternative to direct individual actions on behalf of the Plans under 29

---

[59] Plan losses have been brought forward to the present value using the investment returns of the Vanguard REIT Index I to compensate participants who have not been reimbursed for their losses.

U.S.C. §1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plans. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of the Emory University Retirement Plan and the Emory Healthcare, Inc. Retirement Savings and Matching Plan from August 11, 2010 through the date of judgment, excluding the Defendants.

244.   This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.   The Class includes over 40,000 members and is so large that joinder of all its members is impracticable.

b.   There are questions of law and fact common to this Class because the Defendants owed fiduciary duties to the Plans and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plans and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plans breached their fiduciary duties to the Plans; what are the losses to the Plans resulting from each breach of fiduciary duty; and what Plan-wide equitable and

other relief the court should impose in light of Defendants' breach of duty.

      c.    Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plans were harmed by Defendants' misconduct.

      d.    Plaintiffs are adequate representatives of the Class because they were participants in the Plans during the Class period, have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

      e.    Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plans and personal liability to the Plans under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plans would, as a practical matter, be dispositive of the interests of the participants and

beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

245.   A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

246.   Plaintiffs' counsel, Schlichter, Bogard & Denton LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

a.      Schlichter, Bogard & Denton has been appointed as class counsel in 17 other ERISA class actions regarding excessive fees in

large defined contribution plans. As Chief Judge Michael J. Reagan of the Southern District of Illinois recognized in approving a settlement which was reached on the eve of trial after eight years of litigation, resulting in a $62 million monetary recovery and very substantial affirmative relief to benefit the Plans, the firm had shown "exceptional commitment and perseverance in representing employees and retirees seeking to improve their retirement plans," and "demonstrated its well-earned reputation as a pioneer and the leader in the field" of 401(k) plan excessive fee litigation. *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S.Dist.LEXIS 93206, at *4–5 (S.D.Ill. July 17, 2015).  In that same case, Judge Reagan recognized that the law firm of "Schlichter, Bogard & Denton has had a humungous impact over the entire 401(k) industry, which has benefited employees and retirees throughout the entire country by bringing sweeping changes to fiduciary practices." *Abbott*, 2015 U.S. Dist. LEXIS 93206, at *9 (internal quotations omitted).

      b.    Other courts have made similar findings: "It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive

resources in this area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 U.S.Dist.LEXIS 166816 at 8 (N.D. Ill. June 26, 2012).

     c.    "As the preeminent firm in 401(k) fee litigation, Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 U.S.Dist.LEXIS 184622 at 8 (C.D. Ill. Oct. 15, 2013).

     d.    "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 U.S.Dist.LEXIS 12037 at *8 (S.D. Ill. Jan. 31, 2014). The court also emphasized that "the law firm of Schlichter, Bogard & Denton is the leader in 401(k) fee litigation." *Id.* at *8 (internal quotations omitted).

     e.    U.S. District Court Judge Baker acknowledged the significant impact of the firm's work by stating that as of 2013 the nationwide "fee reduction attributed to Schlichter, Bogard & Denton's fee litigation and the Department of Labor's fee disclosure regulations approach *$2.8 billion in annual savings* for American workers and retirees." *Nolte*, 2013 U.S. Dist. LEXIS 184622, at *6 (emphasis added).

f.      U.S. District Judge Herndon of the Southern District of

Illinois, recognized the firm's extraordinary contributions to the

retirement industry: "Schlichter, Bogard & Denton and lead attorney

Jerome Schlichter's diligence and perseverance, while risking vast

amounts of time and money, reflect the finest attributes of a private

attorney general..." *Beesley*, 2014 U.S. Dist. LEXIS 12037, at *8.

g.      The U.S. District Court Judge G. Patrick Murphy recognized the

work of Schlichter, Bogard & Denton as exceptional:

> "Schlichter, Bogard & Denton's work throughout this
> litigation illustrates an exceptional example of a
> private attorney general risking large sums of money
> and investing many thousands of hours for the
> benefit of employees and retirees. No case had
> previously been brought by either the Department of
> Labor or private attorneys against large employers
> for excessive fees in a 401(k) plan. Class Counsel
> performed substantial work … investigating the
> facts, examining documents, and consulting and
> paying experts to determine whether it was viable.
> This case has been pending since September 11,
> 2006. Litigating the case required Class Counsel to
> be of the highest caliber and committed to the
> interests of the participants and beneficiaries of the
> General Dynamics 401(k) Plans."

*Will v. General Dynamics Corp.*, No. 06-698, 2010 U.S.Dist.LEXIS

123349 at 8–9 (S.D.Ill. Nov. 22, 2010).

h.      Schlichter, Bogard & Denton handled the only full trial of

154

an ERISA excessive fee case, resulting in a $36.9 million judgment for the plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees after trial, the district court concluded that "Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S.Dist.LEXIS 157428 at 10 (W.D. Mo. Nov. 2, 2012). Following remand, the district court again awarded Plaintiffs' attorney's fees, emphasizing the significant contribution Plaintiffs' attorneys have made to ERISA litigation, including educating the Department of Labor and federal courts about the importance of monitoring fees in retirement plans:

> "Of special importance is the significant, national contribution made by the Plaintiffs whose litigation clarified ERISA standards in the context of investment fees. The litigation educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees and separating a fiduciary's corporate interest from its fiduciary obligations."

*Tussey v. ABB, Inc.,* No. 06-4305, 2015 U.S.Dist.LEXIS 164818 at 7–8 (W.D. Mo. Dec. 9, 2015).

    i.    In *Spano v. Boeing Co.*, in approving a settlement reached after nine years of litigation which included $57 million in monetary

relief and substantial affirmative relief to benefit participants, the court found that "[t]he law firm Schlichter, Bogard & Denton has significantly improved 401(k) plans across the country by bringing cases such as this one, which have educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees." No. 06-cv-743, Doc. 587, at 5–6 (S.D.Ill. Mar. 31, 2016) (Rosenstengel, J.) (internal quotations omitted).

j.    Recently, in approving a settlement including $32 million plus significant affirmative relief, Chief Judge William Osteen in *Kruger v. Novant Health, Inc.*, No. 14-208, Doc. 61, at 7–8 (M.D.N.C. Sept. 29, 2016) found that "Class Counsel's efforts have not only resulted in a significant monetary award to the class but have also brought improvement to the manner in which the Plans are operated and managed which will result in participants and retirees receiving significant savings[.]"

k.    On November 3, 2016, Judge Michael Ponsor of the United States District Court for the District of Massachusetts found that by securing a $30.9 million settlement, Schlichter, Bogard & Denton had achieved an "outstanding result for the class," and "demonstrated

extraordinary resourcefulness, skill, efficiency and determination."
*Gordan v. Mass Mutual Life Ins., Co.*, No. 14-30184, Doc. 144 at 5 (D.
Mass. November 3, 2016).

l.      Schlichter, Bogard & Denton is also class counsel in and
handled *Tibble v. Edison International*—the first and only Supreme
Court case to address the issue of excessive fees in a defined
contribution plan—in which the Court held in a unanimous 9–0
decision that ERISA fiduciaries have "a continuing duty to monitor
investments and remove imprudent ones[.]" 135 S. Ct. at 1829.
Schlichter, Bogard & Denton successfully petitioned for a writ of
certiorari, and obtained amicus support from the United States
Solicitor General and AARP, among others. Given the Court's broad
recognition of an ongoing fiduciary duty, the *Tibble* decision will affect
all ERISA defined contribution plans.

m.      The firm's work in ERISA excessive fee class actions has
been featured in the New York Times, Wall Street Journal, NPR,
Reuters, and Bloomberg, among other media outlets. See, e.g., Anne
Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL ST. J.

(May 15, 2016);[60] Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014);[61] Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015);[62] Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. TIMES (Oct. 16, 2014);[63] Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, WALL ST. J. (Aug. 25, 2015);[64] Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015); [65] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014);[66] Mark Miller*, Are 401(k) Fees Too High? The High-Court May Have an Opinion*, REUTERS (May 1, 2014);[67] Greg Stohr,

---

[60] Available at http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601.

[61] Available at http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[62] Available at http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

[63] Available at http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

[64] Available at http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/.

[65] Available at http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

[66] Available at http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

[67] Available at http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501.

*401(k) Fees at Issue as Court Takes Edison Worker Appeal*, BLOOMBERG
(Oct. 2, 2014).[68]

## COUNT I

## Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)
## Locking Plans into CREF Stock Account and TIAA Recordkeeping

247.   Plaintiffs restate and incorporate the allegations in the preceding
paragraphs ¶¶9–168, 199–235.

248.   Defendants were required to discharge their duties with respect
to the Plans solely in the interest of, and for the exclusive purpose of
providing benefits to, Plan participants and beneficiaries, defraying
reasonable expenses of administering the Plans, and acting with the care,
skill, prudence, and diligence required by ERISA.

249.   Defendants were required to independently assess "the prudence
of *each* investment option" for the Plans on an ongoing basis, *DiFelice*, 497
F.3d at 423, and to act prudently and solely in the interest of the Plans'
participants in deciding whether to maintain a recordkeeping arrangement,
DOL Adv. Op. 97-16A. Defendants were also required to remove investments
that were no longer prudent for the Plans, as the Supreme Court recently

---

[68] Available at http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal.

confirmed. *Tibble*, 135 S. Ct. at 1828–29.

250.   By allowing TIAA-CREF to mandate the inclusion of the CREF Stock Account and Money Market Account in the Plans, as well as the TIAA Traditional Annuity,  and to require that it provide recordkeeping for its proprietary options, Defendants committed the Plans to an imprudent arrangement in which certain investments had to be included and could not be removed from the plan *even if they were no longer prudent investments*, and prevented the Plans from using alternative recordkeepers who could provide superior services at a lower cost. In so doing, Defendants abdicated their duty to independently assess the prudence of each option in the Plans on an ongoing basis, and to act prudently and solely in the interest of participants in selecting the Plans' recordkeeper. By allowing TIAA-CREF to dictate these terms, Defendants favored the financial interests of TIAA-CREF in receiving a steady stream of revenues from TIAA-CREF's proprietary funds over the interest of participants.

251.   Because Defendants shackled the Plans with the CREF Stock Account and TIAA recordkeeping services without engaging in a reasoned decision-making process as to the prudence of those options, Defendants are liable to make good to the Plans all losses resulting from its breach. 29 U.S.C. §1109(a). As described in detail above, the Plans suffered massive losses from

the inclusion of the CREF Stock Account in the Plans compared to what those assets would have earned if invested in prudent alternative investments that were available to the Plans, and also suffered losses from paying TIAA recordkeeping fees that far exceeded market rates.

252.   Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT II

### Prohibited transactions—29 U.S.C. §1106(a)(1)

### Locking Plans into CREF Stock Account and TIAA Recordkeeping

253.   Plaintiffs restate and incorporate herein the allegations of the preceding paragraphs ¶¶9–168, 199–235.

254.   Section 1106(a)(1) prohibits transactions between a plan and a "party in interest," and provides as follows:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –

161

(A)     sale or exchange, or leasing, of any property between the plan and a party in interest;
* * *
(C)     furnishing of goods, services, or facilities between the plan and  party in interest;
(D)     transfer to, or use by or for the benefit of a party in interest, of any assets of the plan …

29 U.S.C. §1106(a)(1).

255.   Congress defined "party in interest" to encompass "those entities that a fiduciary might be inclined to favor at the expense of the plan beneficiaries," such as employers, other fiduciaries, and service providers. *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.,* 530 U.S. 238, 242 (2000); 29 U.S.C. §1002(14)(A)–(C). As a service provider to the Plans, TIAA-CREF is a party in interest. 29 U.S.C. §1002(14)(B).

256.   By allowing the Plans to be locked into an unreasonable arrangement that required the Plans to include the CREF Stock Account and to use TIAA as the recordkeeper for its proprietary products even though the fund was no longer a prudent option for the Plans due to its excessive fees and poor performance, and even though TIAA's recordkeeping fees were unreasonable for the services provided, Defendants caused the Plans to engage in transactions that it knew or should have known constituted an exchange of property between the Plans and TIAA-CREF prohibited by 29

U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plans and TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(C), and a transfer of Plan assets to TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plans paid fees to TIAA-CREF in connection with the Plans' investments in the CREF Stock Account and other proprietary options that paid revenue sharing to TIAA.

257.   Under 29 U.S.C. §1109(a), Defendants are liable to restore all losses to the Plans resulting from these prohibited transactions, and to provide restitution of all proceeds of these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

258.   Each Defendant knowingly participated in these transactions, enabled the other Defendants to cause the Plans to engage in these transactions, and knew of these transactions and failed to make any reasonable effort under the circumstances to remedy or discontinue the transactions. Thus, under 29 U.S.C. §1105(a), each Defendant is liable for restoring all the proceeds and losses attributable to these transactions.

## COUNT III

## Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)

### Unreasonable Administrative Fees

259.   Plaintiffs restate and incorporate the allegations in the preceding

paragraphs ¶¶9–168.

260.   Defendants were required to discharge their duties with respect to the Plans solely in the interest of, and for the exclusive purpose of providing benefits to Plan participants and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with the care, skill, prudence, and diligence required by ERISA.

261.   If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. *See Georg*, 641 F.3d at 798–99. Similarly, failing to "monitor and control recordkeeping fees" and "paying excessive revenue sharing" as a result of failures to "calculate the amount the Plan was paying … through revenue sharing," to "determine whether [the recordkeeper's] pricing was competitive," and to "leverage the Plan's size to reduce fees," while allowing the "revenue sharing to benefit" a third-party recordkeeper "at the Plan's expense," is a breach of fiduciary duties. *Tussey*, 746 F.3d at 336.

262.   Defendants' process for monitoring and controlling the Plans' recordkeeping fees was a fiduciary breach in that Defendants failed to: monitor the amount of the revenue sharing received by the Plans' recordkeepers, determine if those amounts were competitive or reasonable for

the services provided to the Plans, or use the Plans' size to reduce fees or obtain sufficient rebates to the Plans for the excessive fees paid by participants. Moreover, Defendants failed to solicit bids from competing providers on a flat per-participant fee basis. As the Plans' assets grew, the asset-based revenue sharing payments to the Plans' recordkeepers grew, even though the services provided by the recordkeepers remained the same. This caused the recordkeeping compensation paid to the recordkeepers to exceed a reasonable fee for the services provided. This conduct was a breach of fiduciary duties.

263.   By allowing TIAA-CREF, Fidelity, and Vanguard to put their proprietary investments in the Plans without scrutinizing those providers' financial interest in using funds that provided them a steady stream of revenue sharing payments, Defendants failed to act in the exclusive interest of participants.

264.   In contrast to the comprehensive plan reviews conducted by similarly situated 403(b) plan fiduciaries which resulted in consolidation to a single recordkeeper and significant fee reductions, Defendants failed to engage in a timely and reasoned decisionmaking process to determine whether the Plans would similarly benefit from consolidating the Plans' administrative and recordkeeping services under a single provider. Instead,

Defendants continue to contract with *three* separate recordkeepers. This failure to consolidate the recordkeeping services eliminated the Plans' ability to obtain the same services at a lower cost with a single recordkeeper. Defendants' failure to "balance the relevant factors and make a reasoned decision as to the preferred course of action—under circumstances in which a prudent fiduciary would have done so"—and, indeed, *did* so—was a breach of fiduciary duty. *George*, 641 F.3d at 788.

265.   Total losses to the Plans will be determined after complete discovery in this case and are continuing.

266.   Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

267.   Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT IV

## Prohibited transactions—29 U.S.C. §1106(a)(1)

## Administrative Services and Fees

268.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs ¶¶9–168.

269.   As service providers to the Plans, TIAA-CREF, Fidelity, and Vanguard are parties in interest. 29 U.S.C. §1002(14)(B).

270.   By causing the Plans to use TIAA-CREF, Fidelity, and Vanguard as the Plans' recordkeepers from year to year, Defendants caused the Plans to engage in transactions that Defendants knew or should have known constituted an exchange of property between the Plans and TIAA-CREF, Fidelity, and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plans and TIAA-CREF, Fidelity, and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(C), and a transfer of Plans' assets to, or use by or for the benefit of TIAA-CREF, Fidelity, and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plans paid fees to TIAA-CREF, Fidelity, and Vanguard directly and in connection with the Plans' investments in funds that paid revenue sharing to TIAA, Fidelity, or Vanguard.

271.   Under 29 U.S.C. §1109(a), Defendants are liable to restore all

losses to the Plans resulting from these prohibited transactions, and to provide restitution of all proceeds from these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

272.   Each Defendant knowingly participated in these transactions, enabled the other Defendants to cause the Plans to engage in these transactions, and knew of these transactions and failed to make any reasonable effort under the circumstances to remedy or discontinue the transaction. Thus, under 29 U.S.C. §1105(a), each Defendant is liable for restoring all proceeds and losses attributable to these transactions.

### COUNT V

### Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)

### Unreasonable Investment Management Fees, Unnecessary Marketing and Distribution (12b-1) Fees and Mortality and Expense Risk Fees, and Performance Losses

273.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs ¶¶9–146, 169–241.

274.   Defendants are responsible for selecting prudent investment options, ensuring that those options charge only reasonable fees, and taking any other necessary steps to ensure that the Plans' assets are invested prudently. Defendants had a continuing duty to evaluate and monitor the Plans' investments on an ongoing basis and to "remove imprudent ones"

within a reasonable time. *Tibble,* 135 S. Ct. at 1829.

275.   These duties required Defendants to independently assess whether each option was a prudent choice for the Plans, and not simply to follow the recordkeepers' fund choices or to allow the recordkeepers to put their entire investment lineups in the Plans' menus. *DiFelice,* 497 F.3d at 423; *see Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 590, 595–96 (8th Cir. 2009).

276.   In making investment decisions, Defendants were required to consider all relevant factors under the circumstances, including without limitation alternative investments that were available to the Plans, the recordkeepers' financial interest in having their proprietary investment products included in the Plans, and whether the higher cost of actively managed funds was justified by a realistic expectation of higher returns. *Braden*, 588 F.3d at 595–96; *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 360 (4th Cir. 2014); 29 C.F.R. § 2550.404a-1(b); Restatement (Third) of Trusts ch. 17, intro. note; *id.* § 90 cmt. h(2).

277.   Defendants selected and retained for years as Plan investment options mutual funds and insurance company variable annuities with high expenses and poor performance relative to other investment options that were readily available to the Plans at all relevant times.

278.   Many of these options included unnecessary layers of fees that provided no benefit to participants but significant benefits to TIAA-CREF, including marketing and distribution (12b-1) fees and "mortality and expense risk" fees.

279.   Rather than consolidating the Plans' 111 investment options into a core lineup in which prudent investments were selected for a given asset class and investment style, as is the case with most defined contribution plans, Defendants retained multiple investment options in each asset class and investment style, thereby depriving the Plans of their ability to qualify for lower cost share classes of certain investments, while violating the well-known principle for fiduciaries that such a high number of investment options causes participant confusion and inaction. In addition, as a fiduciary required to operate as a prudent financial expert, *Katsaros*, 744 F.2d at 279, Defendants knew or should have known that providing numerous actively managed duplicative funds in the same investment style would produce a "shadow index" return before accounting for much higher fees than index fund fees, thereby resulting in significant underperformance. The Plans' investment offerings included the use of mutual funds and variable annuities with retail expense ratios far in excess of other lower-cost options available to the Plans. These lower-cost options included lower-cost share class mutual

funds with the identical investment manager and investments, lower-cost insurance company variable annuities and insurance company pooled separate accounts. All of the Plans' options were the recordkeepers' own proprietary investments. Thus, the use of these funds was tainted by the recordkeepers' financial interest in including these funds in the Plans, which Defendants failed to consider. In so doing, Defendants failed to make investment decisions based solely on the merits of the investment funds and what was in the interest of participants. Defendants therefore failed to discharge their duties with respect to the Plans solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plans. This was a breach of fiduciary duties.

280.   Defendants failed to engage in a prudent process for monitoring the Plans' investments and removing imprudent ones within a reasonable period. This resulted in the Plans continuing to offer excessively expensive funds with inferior historical performance compared to superior low-cost alternatives that were available to the Plans. As of December 31, 2015, *three-fifths or sixty percent of the Plans' investment options*—65 of the 108 investment options in the Plans—underperformed their respective benchmarks over the previous 5-year period.

281.   Large cap domestic equity investment options: The Plans' IPS as well as prudent investment management principles require Defendants to consider passively managed investments for large cap blend domestic equities. Despite the IPS's requirement and these principles, Defendants failed to analyze whether such investments would be likely to outperform the market after fees. Defendants have selected and continue to include actively managed investments for this asset class and investment style in the Plans, and failed to consider passive investments in place of these investment options. These Plan investments have underperformed and continue to underperform lower-cost passively managed index funds.

282.   CREF Stock Account: Defendants included and retained the CREF Stock Account despite its excessive cost and historical underperformance compared to both passively managed investments and actively managed investments of the benchmark, the Russell 3000 Index, which Defendants and TIAA told participants was the appropriate benchmark.

283.   TIAA Real Estate Account: Defendants included and retained the TIAA Real Estate Account despite its excessive fees and historical underperformance compared to lower-cost real estate investments.

284.   Had Defendants engaged in a prudent investment review process,

172

it would have concluded that these options were causing the Plans to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plans, and thus should be removed from the Plans or, at a minimum, frozen to new investments.

285.   Total losses to the Plans will be determined after complete discovery in this case and are continuing.

286.   Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

287.   Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

# COUNT VI

## Prohibited transactions—29 U.S.C. §1106(a)(1)

## Investment Services and Fees

288.   Plaintiffs restate and incorporate herein the allegations of the preceding paragraphs ¶¶9–146, 169–241.

289.   As the plan's providers of investment services, TIAA-CREF, Fidelity, and Vanguard are parties in interest. 29 U.S.C. §1002(14)(B).

290.   By placing investment options in the Plans in investment options managed by TIAA-CREF, Fidelity, and Vanguard in which the entirety of the Plans' approximately $3.7 billion in combined assets were invested, Defendants caused the Plans to engage in transactions that Defendants knew or should have known constituted an exchange of property between the Plans and TIAA-CREF, Fidelity, and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(A); a direct or indirect furnishing of services between the Plans and TIAA-CREF, Fidelity, and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(C); and transfers of the Plans' assets to, or use by or for the benefit of TIAA-CREF, Fidelity, and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plans paid fees to TIAA-CREF, Fidelity, and Vanguard in connection with the Plans' investments in TIAA-CREF, Fidelity, and Vanguard investment options.

291.   Under 29 U.S.C. §1109(a), Defendants are liable to restore all losses to the Plans resulting from these prohibited transactions, and to provide restitution of all proceeds of these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

292.   Each Defendant knowingly participated in these transactions, enabled the other Defendants to cause the Plans to engage in these transactions, and knew of these transactions and failed to make any reasonable effort under the circumstances to remedy or discontinue the transaction. Thus, under 29 U.S.C. §1105(a), each Defendant is liable for restoring all proceeds and losses attributable to these transactions.

## COUNT VII

## Failure to Monitor Fiduciaries

293.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs ¶¶9–241.

294.   This Count alleges breach of fiduciary duties against Emory University and Emory Healthcare.

295.   Emory University is the named fiduciary under Retirement Plan §12.1 with the overall responsibility for the control, management and administration of the Plan, in accordance with 29 U.S.C. §1102(a). Emory University is the Plan Administrator of the Retirement Plan under Plan

§12.2 and 29 U.S.C. §1002(16)(A)(i) with exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Retirement Plan, with all powers necessary to enable it to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Retirement Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

296.   Upon information and belief, Emory Healthcare is the named fiduciary under the Healthcare Plan with the overall responsibility for the control, management and administration of the Healthcare Plan, in accordance with 29 U.S.C. §1102(a). Emory Healthcare is the Plan Administrator of the Healthcare Plan under 29 U.S.C. §1002(16)(A)(i) with exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Healthcare Plan, with all powers necessary to enable it to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Healthcare Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

176

297.   Emory University acts through its Board of Trustees, which is authorized to designate a person or a committee to act on behalf of Emory University with respect to the Retirement Plan. Similarly, Emory Healthcare acts through its Board of Directors, and is authorized to designate a person or committee to act on behalf of Emory Healthcare with respect to the Healthcare Plan.

298.   Emory University, through its Board of Trustees, has created and controls the membership of the Emory Pension Board, and also oversees Emory Investment Management. The Emory Pension Board provides fiduciary oversight and administration of the Retirement and Healthcare Plans, and Emory Investment Management is responsible for the investment of Plan assets, including setting the overall investment policies for the Plans, reviewing and evaluating investment performance, and reviewing the reasonableness of the Plans' fees.

299.   Given that Emory University and Emory Healthcare have overall responsibility for the oversight of their plans, these Defendants had a fiduciary responsibility to monitor the performance of the other fiduciaries, including those individuals who were delegated fiduciary responsibility to administer and manage Plan assets.

300.   A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

301.   To the extent any of the Board of Trustees' or Emory Healthcare's Board of Directors' fiduciary responsibilities were delegated to another fiduciary, each Board's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

302.   Emory University and Emory Healthcare breached their fiduciary monitoring duties by, among other things:

a.   failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plans suffered enormous losses as a result of their appointees' imprudent actions and omissions with respect to the Plans;

b.   failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and investment management fees and consistently underperforming Plan investments in violation of ERISA;

c.     failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plans' administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plans' recordkeeper and the amount of any revenue sharing payments; a process to prevent the recordkeeper from receiving revenue sharing that would increase the recordkeeper's compensation to unreasonable levels even though the services provided remained the same; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plans;

d.     failing to ensure that the monitored fiduciaries considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plans' mutual fund and insurance company variable annuity options;

e.     failing to ensure that the monitored fiduciaries selected, monitored, and retained investment options in compliance with the Plans' IPS; and

f.     failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessively

179

costly, and poorly performing investments, all to the detriment of Plan participants' retirement savings.

303.   Had Emory University and Emory Healthcare discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plans, and the Plaintiffs and the other Class members, lost tens of millions of dollars of their retirement savings.

304.   Emory University and Emory Healthcare are personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and are subject to other equitable or remedial relief as appropriate.

## JURY TRIAL DEMANDED

305.   Under Fed.R.Civ.P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plans and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and declare that the Defendants have breached their fiduciary duties as described above;

- find and adjudge that Defendants are personally liable to make good to the Plans all losses to the Plans resulting from each breach of fiduciary duty, and to otherwise restore the Plans to the position they would have occupied but for the breaches of fiduciary duty;

- determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

- order the Defendants to pay the amount equaling all sums received by the conflicted recordkeepers as a result of recordkeeping and investment management fees;

- order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plans under §1109(a);

- remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- surcharge against Defendants and in favor of the Plans all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- reform the Plans to include only prudent investments;

- reform the Plans to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

- certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter, Bogard & Denton LLP as Class Counsel;

- award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- order the payment of interest to the extent it is allowed by law; and

- grant other equitable or remedial relief as the Court deems appropriate.

November 21, 2016                Respectfully submitted,

/s/ Jerome J. Schlichter
SCHLICHTER, BOGARD & DENTON, LLP
Jerome J. Schlichter, MO No. 32225*
Michael A. Wolff, MO No. 38207*
Troy A. Doles, MO No. 47958*
Kurt C. Struckhoff, MO No. 61873*
Heather Lea, MO No. 49872*
100 South Fourth Street, Ste. 1200
St. Louis, MO 63102
Phone: (314) 621-6115
Fax: (314) 621-5934
    * admitted *Pro Hac Vice*

*Lead Counsel for Plaintiffs*

/s/ Bradley S. Wolff
Bradley S. Wolff, GA No. 773388
SWIFT, CURRIE, MCGHEE, & HIERS, LLP
1355 Peachtree St., N.E., Ste. 300
Atlanta, GA 30309-3231
Phone: (404) 874-8800
Fax: (404) 888-6199
brad.wolff@swiftcurrie.com

*Local Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to the Civil Local Rules of Practice for the United States District Court for the Northern District of Georgia, this is to certify that the foregoing document complies with the font and point selections approved by the Court in Local Rule 5.1C. The foregoing was prepared on computer using Century Schoolbook font (13 point).

/s/ Jerome J. Schlichter
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2016, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send e- notification of such filing to the attorneys of record.

/s/ Jerome J. Schlichter
Attorney for Plaintiffs